Received and E-Filed for Record
4/1/2019 3:25 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Terrell Mizell

*EXHIBIT 1*

Cause No. _19-04-04618_

| | | |
|---|---|---|
| MARION FAWN CREIGHTON | § | IN THE DISTRICT COURT |
| Individually and Derivatively on behalf of | § | |
| (1) VIP MED SURG VENTURES, LLC, | § | OF MONGOMERY COUNTY, TEXAS |
| (2) VIP SURG ASC, LLC, and | § | |
| (3) 3083 IMAGING,LLC | § | _284th_ DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| COOPER COLLINS, VIP MED SURG | § | |
| VENTURES, LLC, VIP SURG ASC, LLC | § | |
| and, 3083 IMAGING, LLC | § | |

## MARION FAWN CREIGHTON'S ORIGINAL PETITION
## REQUEST FOR EX PARTE TEMPORARY RESTRAINING ORDER
## AND TEMPORARY INJUNCTION

Marion Fawn Creighton respectfully requests that this Court enter a mandatory and prohibitive Temporary Restraining Order: (1) requiring VIP Med Surg Ventures, LLC ("**MSV**"), VIP Surg ASC, LLC ("**ASC**"), and 3083 Imaging, LLC ("**3083**" and, with MSV and ASC, the "**Companies**") to continue their operations in the normal course of business, (2) prohibiting each person acting for or on behalf of each Company from interfering with any of the Company's operations in the ordinary course of business, and (3) prohibiting each person acting for or on behalf of each of each Company from interfering with the ASC's negotiation of a sale of its assets on commercially reasonable terms. Ms. Creighton further requests that Julie McKay Smart and Phillip Wills, each of whom serves as a Manager of MSV, and Mrs. Smart who is currently is a co-Manager of ASC with Ms. Creighton of the ASC, be removed as Managers of each Company, that Ms. Creighton be restored as a Manager of MSV, ASC, and 3083 such that she will become the sole Manager of each Company through the duration of the trial of this case. Ms. Creighton also requests that MSV's Ground Lease be reinstated retroactively to March 7, 2019 and that none

of the elements of the Court's Order be modified by any person subject to the Order without Court approval.

Ms. Creighton seeks other injunctive relief to restore the parties to the last actual, peaceable, non-contested status that preceded the controversy as described below.

Ms. Creighton also seeks damages, personally and on behalf of each Company, and preliminary injunction to extend any temporary relief granted.

### Discovery Level and Rule 47 Statement

1.      Ms. Creighton asks that discovery in this case proceed under Level 3, Rule 190.4. Ms. Creighton seeks monetary and injunctive relief over $1,000,000 under Rule 47(c).

### Parties

2.      VIP Med Surg Ventures, LLC is a Texas limited liability company with its principle place of business in Conroe, Texas. It may be served with process by serving its registered agent for service of process, Brandon Creighton, at 11133 Interstate 45, Ste 320, Conroe, Texas 77304.

3.      VIP Surg ASC, LLC is a Texas limited liability company that operates an ambulatory surgery center at its principle place of business in Conroe, Texas. It may be served with process by serving its registered agent for service of process, Incorp Services, Inc. at 815 Brazos, Ste. 500, Austin, Texas 78701.

4.      3083 Imaging, LLC is a Texas limited liability company that operates an imaging center at its principle place of business in Conroe, Texas. It may be served with process by serving its registered agent for service of process, Incorp Services, Inc. at 815 Brazos, Ste. 500, Austin, Texas 78701

5.      Julie McKay Smart is a Texas resident who lives in Montgomery County. She can be served with process at 14838 Lake Mount Pleasant Road, Montgomery, Texas 77356.

6.      Phillip Wills is a Texas resident who lives in Montgomery County. He can be served with process at 15000 Mansions View Drive #21002 Conroe, TX 77384.

7.      Cooper Collins is a Texas resident who lives in Montgomery County. He can be served with process at 32126 Edgewater Dr., Magnolia, TX 77354.

## Jurisdiction and Venue

8.      This Court has personal jurisdiction over each Defendant because each one is a resident of Texas. This Court has subject matter jurisdiction because the relief sought is within this Court's jurisdiction.

9.      Venue is proper in this Court under section 15.002 of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions that give rise to each Plaintiff's claims occurred in Montgomery County, Texas.

## Pertinent Facts

10.     This lawsuit arises from a long and sordid history of business owners' conflicts of interest, sitting on both sides of the table in multiple negotiations and disputes, wrongfully taking Company money for personal use (then denying it), repeated breaches of contract, fraudulently forging signatures on important documents, and multiple instances of financial and legal bullying to pressure each Company's owners to bend to one person's will.

11.     Plaintiffs MSV, ASC, and 3083 are owned by four individual Member/Owners; (1) Cooper Collins, (2) Brandon Belanger, (3) Mrs. Smart, and (4) Ms. Creighton. Mrs. Smart and Ms. Creighton are healthcare professionals. Mrs. Smart is a registered nurse. Ms. Creighton has been an executive in the HCA Hospital system at Conroe Regional Medical Center, CEO of Apollo Hospital in The Woodlands, and Manager of the three Plaintiff Companies in this lawsuit.

12.     Ms. Creighton will provide an overview of the period between 2015 and late 2018, then provide a more detailed description of the various bad acts by several people between late 2018 and April 1, 2019, re3sulting in the need for the extraordinary relief sought here.

## 2015 THROUGH LATE 2018

13.     Ms. Creighton and Mrs. Smart were the driving forces behind the idea of creating a multiservice medical facility in North Conroe. They located land at the intersection of I-45 and Highway 3083 (the "*Site*") owned by Mr. Cooper Collins or one of the companies he is associated with. Mr. Collins is a local multi-millionaire who owns various companies, including a construction company – CSB Contractors, Inc. ("*CSB*") – that has been sued several times by unhappy clients for whom CSB built projects. At least two such cases are currently pending.

14.     Ms. Creighton and Mrs. Smart eventually joined with and Collins and Brandon Belanger, a former professional baseball player who invests with Mr. Collins in various projects, and all four became owners and some became managers of each of the Companies.[1]

15.     Through various intrigues and deceptions, Mr. Collins compelled the other three Members to hire CSB to construct a medical center building at the Site ("*Building*"). Construction began in 2015. CSB had never built a medical facility before, it's work was substandard, it failed to comply with federal requirements for an ASC, the building was over-budget, it was  a year behind schedule, and it failed *four* Accreditation Association for Ambulatory Health Care ("*AAAHC*") inspection surveys due to CSB's poor construction.

16.     One occupied, the Building's electrical system repeatedly failed, causing MSV to spend tens of thousands of dollars for fuel to run the generators needed to provide electricity. Providing a reliable electrical supply was CSB's obligation under the contract to build.

---

[1] Secretary of State filings showing them as Members or Managers and excerpts from each Company's Company Agreement are attached as Exhibit 1 to Ms. Creighton's affidavit.

17.     The HVAC system CSB installed failed to deliver as promised. It could not adequately heat, cool, and dehumidify the Building, which caused significant damage to a CT scanner and an MRI imaging machine due to unacceptable humidity. The poor work resulted in at least one surgeon complaining that he was sweating on his patient while operating in the ASC's operating room.

18.     On July 29, 2016, Mr. Collins wrongfully transferred $735,000 from MSV's LOC at JP Morgan Chase to a law firm in Tennessee, Harris Shelton Hanover Walsh, PLLC. MSV had no dealings with this law firm and Mr. Collins was not authorized to use MSV's funds for anything other than MSV's use. Indeed, Mr. Collins was not an MSV Manager and, under its Company Agreement, he had no right to transfer MSV's funds for any purpose. Excerpts from MSV's Company Agreement confirming that he was not authorized to take this action are attached as Exhibit 1.[2]

19.     Ms. Creighton contacted the bank, believing MSV was the victim of a cyber-attack, but the bank confirmed Mr. Collins called to authorize the transfer. When Ms. Creighton asked Mr. Collins if he had transferred this amount, he said No. When Ms. Creighton again asked the bank if they could confirm Mr. Cooper made the request, they confirmed that they had listened to the taped call and recognized Mr. Collins as the caller. She asked Mr. Collins a second time if he authorized the transfer – and he denied it again.

20.     Ms. Creighton then called the bank and asked it if had mistakenly transferred the funds from MSV's account when it should have come from Mr. Collins's personal account. The bank advised her that Mr. Collins did not have an account the money could have come from!

---

[2] To the best of Ms. Creighton's knowledge, Mr. Collins never confessed to Harris Shelton Hanover Walsh, PLLC that he was not authorized to deliver MSV's $735,000 to the Firm.

21.     When Ms. Creighton asked Mr. Collins a third time whether he had transferred the funds, Mr. Collins confessed. When Ms. Creighton demanded to know why he denied doing so twice before, he said, "You asked if I transferred $735,000, when I actually transferred $750,000."

22.     Mr. Collins lied when he defended his refusal to confess by saying Ms. Creighton inquired about the wrong amount of the transfer. The JP Morgan statement showing the transfer was $735,000 attached as Exhibit 2.

23.     Mr. Collins initially claimed, unilaterally, that the $735,000 was a loan to himself and that he would pay back at an unstated interest rate by December 31, 2017. Mr. Collins's electronic message confirming "his version" of these events is attached as Exhibit 3.

24.     Mr. Collins did not return the $735,000 by December 31, 2017. MSV was significantly harmed by losing access to this significant amount of money. Its cash flow was destroyed. Its ability to buy needed materials and supplies was critically cut short. Ms. Creighton personally infused over $400,000 of her own money into MSV to allow it to remain in business while it waited on Mr. Collins to repay his unapproved "loan."

25.     Mr. Collins did not repay this fraudulent loan by December 31, 2017. He simply crippled MSV and forced it to cut corners or allow others pay bills themselves, as Ms. Creighton did, to overcome the damage caused by for his defalcation.

26.     MSV signed a Ground Lease for use of the Site. The plan was for MSV to lease the Building from C-Cubed, and MSV would then sublease space to ASC, 3083, and an Urgent Care Center. A copy of the Ground Lease is attached as Exhibit 4.

27.     Finally, on May 7, 2018, Mr. Collins executed a Settlement Agreement with MSV and his solely owned construction company, C-Cubed, under which: (a) he would deliver $404,604.85 to MSV, (b) MSV would forgive the unpaid balance of his "loan of MSV's funds" to

himself, (c) he and C-Cubed released MSV for any amount MSV's owed for its use of the Site – *despite the absence of any written agreement ever obligating MSV to pay either Mr. Collins or C-Cubed for this*, (d) C-Cubed agreed MSV had "paid in full" all Lease Rent it owned under the Ground Lease through May 2018 and all property taxes through December 31,2017; (e) C-Cubed agreed to modify the Ground Lease between it and MSV to, among other things, confirm that MSV was only leasing a 2.384 acre section of the 12.2 acres described in the Lease, and (f) other mutual consideration. A copy of the Settlement Agreement is attached as Exhibit 5.

28.     Not surprisingly, despite Mr. Collins being the sole owner and sole Manager of C-Cubed, but consistent with Mr. Collins's self-dealings with these Companies, he never caused C-Cubed to modify the Ground Lease.

## RECENT PROBLEMS GIVING RISE TO THE NEED FOR INJUNCTIVE RELIEF

29.     When 3083 and ASC finally opened for business, more than a year late due to CSB's construction delays, they did not meet their financial performance goals. Much of this, of course, resulted from the substandard Building they occupied, the intermittent electric power outages they suffered, and the equipment malfunctions or equipment deterioration caused by the excess heat and humidity CSB's poor construction caused.

30.     In 2018 the four owners began looking for an exit strategy. They ultimately signed a Letter of Intent with two companies – one of which would buy the building and the real estate (Astoria Property Company, LLC) and a second that would buy the assets from MSV and ASC (Muve – Conroe, LLC). This sale was initially projected to close in December 2018 and was generally described as the "Muve Deal."

31.     In November, as the Muve sale date approached, Mr. Collins began a course of conduct that was irrational and harmful to the Companies – but which was arguably very profitable

to him. He began making demands and asserting himself into MSV's daily operations as if he was

a Manager as opposed to merely an Owner, including:

> Refusing to allow MSV to continue paying Ms. Creighton for her service as Manager of MSV, despite continuing to pay Mrs. Smart in her role as Manager. This violated state and federal wage and hour laws (requiring payment for an employee's work) and MSV's Company Agreement (which denied Mr. Collins the right to make any decisions in MSV's business). When Ms. Creighton asked why Mrs. Smart was paid and she was not, she was told, "Mrs. Smart needs money" or words to that effect. Nonetheless, MSV and Mr. Collins continued to require and allow Ms. Creighton to perform her Managerial duties – without pay.

> Demanding, personally or through another employee, that Ms. Creighton work off-site and not come to any Company's office at the Building. This happened after Mrs. Smart circulated an email in late November 2018 claiming Ms. Creighton "stormed into" her office, threatened her, and "lost control." Two witness who were present during this alleged event categorically denied that Ms. Creighton acted the way Mrs. Smart alleged and both say Ms. Creighton was by far the calmest and most controlled person during the conversation. None of the Owners or Managers had the right to demand that Ms. Creighton not come to her office to perform her duties as Manager.

> Sending threatening emails to MSV Members demanding payment of CSB's inflated and fraudulent charges or face eviction from the Building.

> Demanding that MSV pay the full property taxes for the Site despite the Ground Lease clearly requiring C-Cubed to pay the property taxes and get reimbursed from MSV.

> Threatening to foreclose on MSV's lease of the building despite *personally* signing an agreement under which MSV would pay its rent and property tax obligations when the Muve sale closed.

## A TRO IS NECESSARY

32.     The Muve Deal was extended several times and, as is often the case, the delays led

to stress and debate. It also placed increased financial pressure on MSV, ASC, and 3083, none of

which were meeting their financial projections. To pave the way for an anticipated extended 2019

closing date, all four Owner/Members signed an "Owners' Agreement" under which each one of

them agreed that MSV (a) would pay rent, late fees, and 2018 property taxes FROM the proceeds

of the Muve Deal. *Exhibit 6, Owners' Agreement, page 5 (Exhibit 2 to the Owners' Agreement).*

---

33.     The Muve Deal was ultimately set to close on March 8, 2019. Nonetheless, despite the imminent sale, Cooper Collins, C-Cubed's sole owner and Manager, locked MSV out of the Building around February 24th. The Muve Deal required MSV to deliver "Exclusive possession" of the Building at closing,[3] which was rendered impossible by Mr. Collins' personal decision to direct C-Cubed to lock MSV out for non-payment of rent and property taxes.

34.     As noted above, Mr. Collins personally signed the Owners' Agreement under which he personally agreed that MSV would pay those debts to himself – i.e., to the company he alone owned and managed – WITH proceeds from the sale closing.[4] At the moment he ordered C-Cubed to lock MSV out, the Muve Deal was still scheduled to close on March 8, 2019. His personal decision to direct C-Cubed to lock MSV out of the Building materially damaged MSV and ASC.

35.     To add insult to injury, the day the Muve Deal was scheduled to close, Mr. Collins directed C-Cubed to terminate MSV's lease of the Building. Exhibit 7, March 8, 2019 letter from C-Cubed purporting to terminate MSV's Lease. That left ASC, 3083, and an independent Emergency Center without the right to occupy the Building because they derived their right to be in the Building solely based on their status a MSV's subtenants.

36.     Even if the Muve Deal did not close on March 8th, a new LOI to purchase ASC had already been received by March 8th and is still waiting to be signed. Because the ASC never met its financial projections, the only way the Owners are likely to ever recover their investments, capital, or make any profit on the Companies is if the ASC sells its assets. Yet, Mr. Collins refuses to even sign the new LOI so ASC can begin negotiation and attempt to close a sale.

---

[3] Exhibit 12 – Section 4.2, page 2, This is the then-current draft of the Muve Deal.
[4] The Owners' Agreement between MSV's four Owners, said MSV would use the proceeds of the Sale to pay January and February rent and all 2018 property taxes. See Exhibit 2 to Owners' Agreement. The Owners' Agreement is attached is Exhibit 5.

37.     More importantly, in recent days he has threatened to close down the ASC and 3083. He, or others on his behalf, even refused to pay the light bill – resulting in Entergy coming within hours of cutting off power.

38.     Shutting their operations would leave valuable electronic equipment worth hundreds of thousands of dollars subject to high heat, humidity, and other dangers that could greatly diminish if not destroy their value and – as such – destroy the ASC and 3083's value to their Owners.

**On the Other Hand**:

39.     As the sole owner of C-Cubed, Mr. Collins arguably stands to make millions of dollars if he can force MSV, ASC, and 3083 out of the Building – although doing so would violate his duties to his fellow owners AND, since his domineering personality effectively allowed him to take control of personnel payments, electricity payments, and directly require personnel not to enter the Building, he would be in violation of a Manager's fiduciary duty to MSV to act solely in its best interest.

40.     In December of 2017, the Building and the equipment in it (which a Landlord might be able to seize and sell to collect unpaid rent) was appraised at $12 million. There is just over $7 million in debt on it today. If Mr. Collins directed C-Cubed to properly foreclose on MSV's Ground Lease, Mr. Collins – a multi-millionaire – could become the sole owner of a $12 million building for $7 million. That is not a bad investment.

41.     And, interestingly, *the day before* Mr. Collins caused C-Cubed wrongful foreclose on MSV's Ground Lease, he proposed that all the other Owner/Members give him their ownership interests in exchange for him paying all the debt and taking sole control of the Building. Just the result that is so equitably wrong.

# **Other Late Breaking Events**

## **MSV Fired Its Lawyer**

42.     MSV sued CSB, the construction company Mr. Collins owned part of, for its multiple breaches of its contract to construct the Building. MSV filed the suit in May of 2018 – mere days after Mr. Collins finally agreed to document and repay his unapproved $735,000 loan from MSV.

43.     Loyd Neal was MSV's attorney in that lawsuit. However, Mr. Collins was able to get other Members, though not Ms. Creighton, to go along with his plan to direct Mr. Neal not to take depositions or serve much discovery and to do as little as possible to prosecute MSV's multi-million dollar claims against CSB.

44.     As a result, with a trial date approaching and feeling unprepared for trial, Mr. Neal filed a Motion to Withdraw on March 4, 2019. *Exhibit 8, Motion to Withdraw*. At the time, Ms. Creighton was no longer an MSV Manager and had no authority to respond. Incredibly, no one from MSV responded to Mr. Neal's request (*Id. at ¶2, page 2*) and the Court granted the withdrawal. *Exhibit 9, Order Granting Withdrawal.*

45.     Now, as a result what clearly appears to be Mr. Collins's efforts, MSV has no counsel and will be unable to prosecute its claims against CSB and unable to defend CSB's claims against it.

46.     A truly beneficial result for Cooper Collins but one that should not be allowed.

47.     Of course, when MSV and ASC were recently sued on a promissory note it owed to Northwest Anesthesiology and Pain Services, P.A., and despite notice, no attorney appeared at a Temporary Injunction Hearing before Judge Bays to contest the emergency relief.

**Fraudulent Activity**

48.     In recent days a senior medical professional at ASC told Ms. Creighton that Mrs. Smart apparently committed extraordinarily wrongful, and possibly fraudulent, actions in her role as Manager of ASC. Ms. Creighton reviewed various ASC document and concluded that Mrs. Smart's actions could possibly expose ASC to civil and criminal charges. When Ms. Creighton and one of ASC's senior medical professionals spoke with Mrs. Smart about their concerns, she confessed to "egregious and horrible errors in judgment." While ASC's investigation of the events is ongoing and while it would serve no purpose to detail the nature or scope of action she took, it appears Mrs. Smart may have engaged in objectionable and totally impermissible conduct dozens of times without other Managers or Owners ever knowing it.

49.     Ms. Creighton was informed and now believes that one or more ASC employees were aware of Mrs. Smart's actions but were intimidated by her erratic behavior and irrational conduct and were afraid to report her because they feared losing their jobs.

50.     Mrs. Smart's credibility as an ASC Manager and an executive of any sort has been destroyed and she cannot be allowed to serve as Manager of any of the Companies until the full extent of her admitted misconduct is determined and restorative actions have been taken.

**MULITPLE EFFORTS TO RESOLVE THESE DISPUTES HAVE ALL FAILED**

51.     Between late November and the date of this filing, Ms. Creighton – through her attorney – have suggested, demanded, and encouraged all the parties to mediate. The personal acrimony between them leaves a face-to-face meeting a recipe for disaster. Mediation with a strong mediator, (a) one familiar with a Manger's fiduciary duty and the fiduciary duty of an Owner who exerts himself into a company's daily operations, (b) one who realizes the gross inequities of allowing Mr. Collins to oversee the construction of a sub-standard building, fail to correct its flaws,

then use his superior financial condition to try to take control of the fruits of everyone's labor, *might* be able to craft an agreement that everyone can sign off – even NWPA.

52.     But Mr. Collins has declined every request, opportunity, and encouragement to mediate and this case cannot be amicably resolved without his full commitment and participation.

## BASIS FOR DERIVATIVE CLAIMS

53.     MSV, ASSC, and 3083 are each Closely Held Limited Liability companies: (1) they each have fewer than 35 Members and (2) none of their ownership/membership interests are listed on a national securities exchange or regularly quoted in an over-the-counter market by any member of a national securities association. TEX. BUS. ORG. CODE §101.463(a). As a result, sections 101.452-101.459 of the Code governing when a Member may bring a derivative claim against each Company do not apply. Id. §101.463(b). The only requirement for bringing such a suit is that Ms. Creighton be a Member of each company when she files suit. Ms. Creighton is now and has always been a Member of each Defendant Company since they were formed.

54.     Under the Code, Ms. Creighton may bring part of her derivative claims as a direct action for her personal benefit. §101.463(c)(1); *In re LoneStar Logo & Signs, LLC*, 552 S.W.3d 342, 347 (Tex. App.—Austin 2018, no pet.) (relying on §101.463(a) to determine a Member's standing to bring derivative suit on behalf of LLC based solely on whether plaintiff was a Member when suit was filed and declining to consider whether plaintiff satisfies requirements in sections 101.452-101.459).

55.     The entities and the persons to be restrained or restored to the last peaceable status are the Companies, any person acting for them or on their behalf – including all Members and Managers – Ms. Creighton, and Mr. Collins. Ms. Creighton protested the actions described here and delivered notice to each other Member about the wrongful acts that have taken place and the

damage caused to the Companies. All other Members, and particularly Cooper Collins – refused to take action and are certain not to bring claims against Mr. Collins, Ms. Smart, or to act in the Companies' best interest regarding the matters Ms. Creighton complains of.

56.     Therefore, Ms. Creighton, a Member of each Company, has the right to assert each Company's claims in this lawsuit.

## LEGAL BASIS FOR TEMPORARY RESTRAINING ORDER

57.     If this Court does not enjoin MSV, ASC, and 3083 – along with all persons acting on their behalf or in concert with them – precluding any Defendant from interfering with the sale of any of the Companies in a commercially reasonable transaction, and returning the parties to the last actual, peaceable, non-contested status that preceded the controversy – subject to the limitations described below – (1) each Company will suffer irreparable harm, (2) the current proposed LOI will not result in a sale, and (3) the three Companies will implode. This would be the direct and proximate result of closing the ASC, excluding any of the Companies from the Building, or confirming that C-Cubed rightfully terminated MSV's Lease.

58.     The damage to each Company is imminent because if the Companies are denied the right to operate in the normal course of business, are denied access to their space in the Building, or are forced into ever more deeply compromised financial conditions, the entirety of their value will be destroyed. One or more of the other Member/Owners have argued several times that ASC should be shut down, making the eventual decision to close it imminent. The ability to project the future revenues and profits from Companies now on the threshold of being profitable and CURRENTLY having material sale value, will be impossible to determine with reasonable certainty – leaving Plaintiffs facing irreparable injury. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 210 (Tex. 2002).

59.     The loss to the Defendants will be nominal and should result in a minimal bond from Plaintiffs of not more than $500.

60.     Plaintiffs' evidence establishes their probable right to the relief requested and equity requires that an injunction be imposed to protect the value of each Company before that value is destroyed. A company shuttered for 2 weeks, during which it has no sales, provides no service, and generates no revenue, is almost always worth less than a going concern with ongoing operations. This is especially true in the medical field where physicians require timely scans, surgeries, etc., and will not deal with a facility that suddenly closed and might do so again.

61.     The purpose of a TRO is to preserve the status quo, which Texas courts define as "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (citation omitted). However, "[w]here the acts sought to be enjoined violate an express law, the status quo to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation." *City of San Antonio v. Vakey*, 123 S.W.3d 497, 502 (Tex. App.—San Antonio 2003, no pet.). Rather, "[i]n such instances, the status quo to be preserved by temporary injunction is the last actual, peaceable, non-contested status which preceded the pending controversy, and when it is determined that the law is being violated it is the province and the duty of the court to restrain it." *Rattikin Title Co. v. Grievance Committee*, 272 S.W.2d 948, 955 (Tex. Civ. App.-1954, no writ); see also *Houston Compressed Steel Corp. v. State*, 456 S.W.2d 768, 773 (Tex. App.—Houston [1st] 1970, no writ) (holding same).

62.     Here, the last peaceable non-contested status was before Cooper Collins began threatening to end MSV's access to the building, close ASC, and close 3083. It is before

Ms. Creighton was removed as a Manager of MSV and 3083, before MSV was locked out of the building, and before MSV's Lease for the Building was terminated.

63.     There is a real and present danger that unless these Companies are required to operate in the normal course of business and attempt to complete a sale of ASC's assets (and perhaps a sale of MSV's Leasehold interest in the Building), each Company will be irreparably damaged in ways that will be impossible to determine with any reasonable certainty. MSV has already been locked out and its Lease purportedly terminated, and its Lease is the single most important asset it has – without its leasehold rights, its value is negligible.

### Ex Parte Relief if Appropriate

64.     Because the actions complained about in this Petition have been ongoing, and have escalated in intensity and frequency over recent months, there is a substantial likelihood that people or entities subject to the injunctive relief sought here would take irreversible action and cause irreparable harm if they are given notice of this application for a TRO. Therefore, Plaintiffs seek an ex parte TRO followed by a preliminary injunction and a trial for damages.

### REQUEST FOR JURY TRIAL

65.     Plaintiff's request a jury trial and have paid the proper fee.

### REQUEST FOR DISCLOSURE

66.     Plaintiff requests that each Defendant disclose the information or material described in Rule 194.2 of the Texas Rules of Civil Procedure within 50 days of this Request.

## PRAYER FOR RELIEF

Plaintiffs Marion Fawn Creighton, individually and derivatively on behalf of VIP Med Surg Ventures, LLC, VIP Surg ASC, LLC, and 3083 Imaging, LLC, asks this Court to enter a

Temporary Injunction that enjoins Defendants from violating the status quo and restrains each of them as follows:

> Requiring MSV, ASC, and 3083 to continue their operations in the normal course of business,

> Prohibiting each person acting for or on behalf of MSV, ASC, or 3083 from interfering with any one of those Company's ability to operate in the ordinary course of business, including prohibiting Mr. Collins – the Owner and Manager of C-Cubed – from interfering with any tenant or subtenant's peaceful access to and use of the Building or causing C-Cubed to do so; and

> Prohibiting each person acting for or on behalf of MSV, ASC, or 3083 from interfering with ASC's negotiation of a sale of its assets on commercially reasonable terms.

To return the Parties to the last actual, peaceable, non-contested status that preceded the controversy, this Court should Order:

> That Ms. Creighton be immediately reinstated to her status as a Manager of MSV, ASC, and 3083;

> That each person acting for or on behalf of MSV, ASC, or 3083 is required to immediately (1) provide Ms. Creighton all keys, codes, account information, and business records; (2) authorize her to have access to all third party accounts, files, or other matters relating to each Company; and (3) give her access to all material necessary or needed, in Ms. Creighton's reasonable judgment, to allow her to fulfill her duties as Manager of each Company;

> Requiring Mr. Collins to cause C-Cubed to amend the Ground Lease in accordance with the May 2018 Settlement Agreement;

> Remove Julie McKay Smart and Phillip Wills, each of whom served as a Manager of MSV after Ms. Creighton was removed as Manager, as Managers of MSV;

> Remove Julie McKay Smart, who served as a Manager of ASC and 3083, as a Manager of each of those Companies;

> Require the Manager positions this Court Orders to remain unchanged until further Order; and

> Require each person acting for or on behalf of ASC to negotiate in good faith to complete a sale of ASC on commercially reasonable terms, if possible, within 60 days.

After trial, Plaintiffs ask this Court to enter an Order:

---

Awarding each Plaintiff all relief, equitable, legal, or otherwise, to which they may show themselves to be entitled including, but not limited to:

Awarding Ms. Creighton all accrued but unpaid salary for her role as Manager of any of the Companies for every period during which she performed Managerial services.

Respectfully submitted,

**THE MICHELS LAW FIRM**

By: */s/ Joe Michels*
    Joe Michels
    State Bar No. 14009550
    Ky Jurgensen
    State Bar No. 24071804
    250 Ed English Drive, Bldg 3, Suite A
    The Woodlands, Texas 77385
    Telephone: 281-210-1595
    Facsimile: 281-823-7484
    Joe.Michels@MichelsFirm.com
    Ky.Jurgensen@MichelsFirm.com

# Restated Company Agreement of
# VIP MedSurg Ventures LLC

## CONTENTS

Preamble ................................................................................................................1

Article 1: Definitions ............................................................................................1

Article 2: Organization .........................................................................................5

Article 3: Membership ..........................................................................................6

Article 4: Capital Contributions...........................................................................8

Article 5: Allocations and Distributions .............................................................10

Article 6: Management .........................................................................................12

Article 7: Confidential Information .....................................................................19

Article 8: Officers ...............................................................................................20

Article 9: Indemnification....................................................................................20

Article 10: Taxes .................................................................................................22

Article 11: Books, Records, Reports, and Bank Accounts .................................24

Article 12: Transfers ...........................................................................................24

Article 13: Buyout of Membership Interest ........................................................26

Article 14: Default of Member ............................................................................30

Article 15: Winding Up and Termination ...........................................................33

Article 16: Amendment or Modification .............................................................35

Article 17: General Provisions.............................................................................36

Signatures.............................................................................................................39

Schedule 1: Members of VIP MedSurg Ventures LLC .......................................40

Exhibit 1

# Restated Company Agreement of
# VIP MedSurg Ventures LLC

## PREAMBLE

This Restated Company Agreement ("Agreement") of VIP MedSurg Ventures LLC , a Texas limited liability company ("Company"), is entered into effective 15 June 2015 ("Effective Date"), by and between Marion Fawn Creighton, Julie McKay Smart, Brandon Belanger, and Cooper Collins (collectively referred to herein as the "Members" and individually as a "Member") and Marion Fawn Creighton and Julie McKay-Smart, as Managers  (collectively referred to herein as the "Managers" and individually as a "Manager").

## ARTICLE 1: DEFINITIONS

1.1    *Definitions.*    As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by, or under direct or indirect common control with that person.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member but who has not been admitted to the Company as a Member.

"Bankrupt" or "Bankruptcy" means with respect to any Person that (a) the Person (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for that Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against that Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of that Person or of all or any substantial part of that Person's properties or (b) against that Person, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof

# Restated Company Agreement of VIP MedSurg Ventures LLC

or with respect to which, without that Person's consent or acquiescence, a trustee, receiver, or liquidator of that Person or of all or any substantial part of that Person's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulations section 1.704–1(b)(2)(iv), of the regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Class" means a group of one or more Members or Membership Interests established in this Agreement which has certain relative rights, powers, duties, voting rights, or distribution rights, as set forth herein. Initially, there will be two Classes of Membership Interests: Class A Membership Interests and Class B Membership Interests. Except as specifically set forth in sections 5.1 and 5.2 of this Agreement, all Classes shall be identical with each other in every respect. The Company may establish additional Classes upon the unanimous vote of the Members. The rights, powers, or duties of a Class may be senior to the rights, powers, or duties of any other Class, including a previously established Class.

"Code" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Default Interest Rate" means a rate per year equal to the prime rate published in the *Wall Street Journal* on the day the rate is determined (or the most recent day on which the *Wall Street Journal* was published if the paper is not published on the day the rate is determined).

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the Code, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale or transfer of all or substantially all the Company's assets.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

## Restated Company Agreement of VIP MedSurg Ventures LLC

"Managers" means the person or persons named in the preamble of this Restated Company Agreement as a Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement but does not include any person who has ceased to be a Manager of the Company. A Manager is not required to be a resident of Texas or a Member of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement but does not include any person who has ceased to be a Member of the Company. The Company may establish classes or groups of one or more Members, each of which has certain rights, powers, and duties, including voting rights. These classes or groups may be established by the unanimous vote of the Members.

"Membership Interest" is a Member's right (a) to an allocable share of the Profits and Losses, income, gains, deductions, credits, and distributions of the Company and (b) to a distributive share of the assets of the Company. Membership Interest does not include the voting rights or management rights reserved to the Members under the terms of this Agreement (or the right to vote the Percentage Interests relating thereto) until the holder of the Membership Interest has been admitted to the Company as a Member as to that Membership Interest.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the increment of interest assigned to each Member in connection with and equal to that Member's Membership Interest for the purpose of voting under the terms of this Agreement. The sum of the Members' Percentage Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual, including, where applicable, the Company, a Member, or a Manager.\

"Preferred Return" means, with respect to any Member owning a Class A Membership Interest, an amount calculated as a cumulative, compounded per-year rate equal to five percent (5%) on the average daily balance of the unreturned Capital Contributions of such Member.

"Proceeding" means any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative.

"Profit and Loss" means, for each fiscal year of the Company (or other period for which

# Restated Company Agreement of VIP MedSurg Ventures LLC

Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Internal Revenue Code section 703(a), with the following adjustments:

a.        all items of income, gain, loss, and deduction required to be stated separately pursuant to Internal Revenue Code section 703(a)(1) shall be included in computing taxable income or loss;

b.        any tax-exempt income of the Company not otherwise taken into account in computing Profit or Loss shall be included in computing taxable income or loss;

c.        any expenditures of the Company described in Internal Revenue Code section 705(a)(2)(B) (or treated as such pursuant to Treasury Regulations section 1.704–1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss shall be subtracted from taxable income or loss;

d.        gain or loss resulting from any disposition of Company property shall be computed by reference to the book value of the property;

e.        in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account book depreciation (as allowable for federal income tax purposes); and

f.        if the book value of an asset of the Company is adjusted in accordance with the winding up and termination of the Company, any increase or decrease in the book value of the asset as a result of the adjustment shall be treated as gain or loss, respectively, from the disposition of the asset and shall be taken into account in computing Profits or Losses.

"Simple Majority" means fifty-one percent (51%) of the Percentage Interests of all Members participating in a vote. If a decision or action is set forth in this Agreement as being made or required by the Members and that decision or action does not specify what Percentage Interest vote is required, the decision or action shall be by a Simple Majority of the Members.

"Super Majority" means seventy-five percent (75%) of the Percentage Interests of all Members participating in a vote.

"Transfer" means any sale, assignment, conveyance, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of disposition of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the

# Restated Company Agreement of VIP MedSurg Ventures LLC

transferor's death, including by operation of law, court order, judicial process, foreclosure, levy, or attachment.

1.2     *Other Definitions.*   Other terms defined hereinafter are used herein as so defined.

## ARTICLE 2: ORGANIZATION

2.1     *Formation.*   The Company has been organized as a Texas limited liability company by filing a certificate of formation ("Certificate") with the Texas secretary of state on the Effective Date, which may be amended or restated from time to time.

2.2     *Name.*   The name of the Company is VIP MedSurg Ventures LLC, and all Company business must be conducted in that name or other names that comply with applicable law that a Simple Majority of the Members may select from time to time.

2.3     *Registered Agent and Office.*   The registered agent for the service of process is Brandon Creighton and the address is 11133 Interstate 45, Suite 320, Conroe, Texas, 77304.  The principal office of the Company shall be located at 11133 Interstate 45, Suite 320, Conroe, Texas, 77304.  The Company may have other offices and places of business at locations, both within and without the state of Texas, as the Managers may from time to time determine or as the business and affairs of the Company may require.

2.4     *Purposes.*   The purpose and business of the Company shall be participation in various healthcare related ventures and all related activities incidental thereto and the transaction of any other business or activity allowed under the Code that is approved by a Simple Majority of the Members. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this section 2.4. The Company may not, however, (a) engage in a business or activity that is expressly unlawful or prohibited by a law of the State of Texas or cannot lawfully be engaged in by the Company under those laws; or (b) operate as a bank, trust company, savings association, insurance company, cemetery organization (except as authorized under the Texas Health and Safety Code), or abstract or title company governed by title 11 of the Texas Insurance Code.

2.5     *Powers.*   The Company shall have all powers necessary, suitable, or convenient for the accomplishment of the purposes of the Company, including, without limitation, to (a) make and perform all contracts; (b) engage in all activities and transactions; and (c) have all powers available to a limited liability company under (i) the Code, (ii) any other laws of the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

# Restated Company Agreement of VIP MedSurg Ventures LLC

2.6     *Foreign Qualification.*    Before the Company conducts business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify or continue the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

2.7     *Term.*    The Company will commence as provided in the Certificate and will continue in existence perpetually or until the termination of the Company in accordance with the provisions of Article 15 of this Agreement or the Code.

2.8     *No State-Law Partnership.*    The Members intend that the Company not be a partnership (including a limited partnership) or a joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than applicable tax laws, and this Agreement may not be construed to suggest otherwise.

## ARTICLE 3: MEMBERSHIP

3.1     *Initial Members, Capital Contributions, Membership Interests, and Percentage Interests.* Each person listed on Schedule 1 (a copy of which is attached hereto and incorporated herein) is hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date. Set forth opposite the name of each Member listed on Schedule 1 is that Member's initial Capital Contribution, Membership Class, his Membership Interest, and his Percentage Interest. Schedule 1 may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Schedule 1 shall (a) supersede all prior Schedule 1s, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.

3.2     *Additional Members.*    Additional persons may be admitted to the Company as Members on terms and conditions as shall be determined by unanimous consent of the Members. The terms of admission or issuance must specify the Membership Interests, Percentage Interests, and Capital Contributions applicable thereto.

3.3     *Member Rights.*    Except as otherwise specifically provided in this Agreement, no Member shall have the right to (a) sell, transfer, or assign its interest in the Company; (b) require

# Restated Company Agreement of VIP MedSurg Ventures LLC

partition of the property of the Company; (c) compel the sale of Company assets; or (d) cause the winding up of the Company.

3.4     *Representations and Warranties of Members*

a.      Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity, (i) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (ii) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (iii) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (iv) all necessary actions by the board of directors, shareholders, Members, or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (v) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

b.      Each Member further hereby represents and warrants to the Company and each other Member that (i) the Member is familiar with the existing or proposed business, financial condition, properties, operations, and prospects of the Company; (ii) the Member has asked the questions and conducted the due diligence concerning the acquisition of his Membership Interest in the Company that he has desired to ask and conduct, and all those questions have been answered to the Member's full satisfaction; (iii) the Member has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Company; (iv) the Member understands that owning the Membership Interest in the Company involves various risks, including the restrictions on transfers as set forth in Article 12 and Article 13 of this Agreement, the lack of any public market for the Membership Interests, the risk of owning the Membership Interest for an indefinite time, and the risk of losing his entire investment in the Company; (v) the Member is able to bear the economic risk of the investment; (vi) the Member is acquiring the Membership Interest in the Company for investment, solely for his own beneficial account and not with a view to, or any present intention of, directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution, or otherwise disposing of the Membership Interest; and (vii) the Member acknowledges that the Membership Interests have not been registered under the Securities Act, or any other applicable federal or state securities laws, and that the Company has no intention, and shall not have any obligation, to register or to obtain

# Restated Company Agreement of VIP MedSurg Ventures LLC

an exemption from registration for the Membership Interests or to take action so as to permit sales pursuant to the Securities Act.

3.5     *No Authority.*   Except as otherwise specifically provided in this Agreement, no Member has the authority or power to (a) transact business in the name of or on behalf of the Company; (b) bind or obligate the Company; or (c) incur any expenditures on behalf of the Company.

3.6     *Withdrawal, Resignation, Retirement and Expulsion.*

a.      Except as otherwise specifically provided in this Agreement, a Member does not have the right or power to withdraw, resign, or retire from the Company as a Member.

b.      Except as otherwise specifically provided in this Agreement, the Company, or the remaining Members, may not expel a member from the Company.

## ARTICLE 4: CAPITAL CONTRIBUTIONS

4.1     *Initial Capital Contributions.*   Each Member has made the initial Capital Contribution to the Company for the Membership Interest, Percentage Interest, and Membership Class set forth opposite that Member's name on Schedule 1 attached hereto.

Marion Fawn Creighton promises and agrees to make a contribution of management and consulting services valued at $5,000 (Five Thousand Dollars) to the Company. The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of the Member.

Julie McKay-Smart promises and agrees to make a contribution of management and consulting services valued at $5,000 (Five Thousand Dollars) to the Company. The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of the Member.

Brandon Belanger promises and agrees to make a contribution of $250,000 (Two hundred Fifty Thousand Dollars) to the Company on or before 1 July 2015. The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of the Member.

Cooper Collins promises and agrees to make a contribution of $250,000 (Two hundred Fifty Thousand Dollars) to the Company on or before 1 July 2015. The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of

# Restated Company Agreement of VIP MedSurg Ventures LLC

the Member.

4.2     *Additional Contributions*

Brandon Belanger promises and agrees to make a contribution of $250,000 (Two hundred Fifty Thousand Dollars) to the Company on or before 30 November 2015 The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of the Member.

Cooper Collins promises and agrees to make a contribution of $250,000 (Two hundred Fifty Thousand Dollars) to the Company on or before 30 November 2015 The Member is obligated to make the contribution without regard to the death, disability, or other change in circumstances of the Member.

No Member shall be required to make any additional Capital Contributions other than those specifically described in Schedule 1 or this section 4.2 unless unanimously agreed to by all Members or otherwise required to do so by the Code.

4.3     *Return of Capital Contributions.*   Capital Contributions shall be expended in furtherance of the business of the Company. No Member is entitled to the return of any part of his Capital Contributions or to be paid interest in respect of either his Capital Account or his Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member. This section 4.3, however, is subject to section 5.2 of this Agreement.

4.4     *Capital Accounts.*   A Capital Account shall be established on behalf of each Member. The Capital Account on behalf of each Member—

    a.     shall consist of (i) the amount of money contributed by that Member to the Company and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under section 752 of the Internal Revenue Code);

    b.     shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulations section 1.704–1(b)(2)(iv)(g) but excluding income and gain described in Treasury Regulations section 1.704–1(b)(4)(i); and

    c.     shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the

# Restated Company Agreement of VIP MedSurg Ventures LLC

Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulations section 1.704–1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulations section 1.704–1(b)(4)(i) or 1.704–1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulations section 1.704–1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulations sections 1.704–1(b)(2)(iv) and 1.704–1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulations section 1.704–1(b)(2)(iv)(g). On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee in accordance with the provisions of Treasury Regulations section 1.704–1(b)(2)(iv)(*l*).

4.5     *Ownership of Assets.*   All assets and property of the Company shall be owned by the Company, subject to the terms and provisions of this Agreement, and no Member, individually, shall have any ownership of those assets or property. Legal title to all assets and property of the Company shall be held and conveyed in the name of the Company.

## ARTICLE 5: ALLOCATIONS AND DISTRIBUTIONS

5.1     *Allocations*

a.     Until the time that each Member owning a Class A Membership Interest has received a return of one hundred percent (100%) of his initial and additional, if any, cash Capital Contributions made to the Company plus his Preferred Return, all items of income, gain, loss, deduction, and credit shall be allocated to the Members in accordance with their Membership Interests, to the exclusion of any Member owning a Class B Membership Interest. Thereafter, as may be required by section 704(c) of the Internal Revenue Code and Treasury Regulations section 1.704–1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Members in accordance with their Membership Interests.

## Restated Company Agreement of VIP MedSurg Ventures LLC

b.      All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; this allocation, however, must be made in accordance with a method permissible under section 706 of the Internal Revenue Code and the regulations thereunder.

5.2     *Distributions*

a.      Until the time that each Member owning a Class A Membership Interest has received the return of one hundred percent (100%) of his initial or additional, if any, cash Capital Contribution made to the Company plus his Preferred Return, all distributions shall be made to the Members in accordance with their Membership Interests, to the exclusion of any Member owning a Class B Membership Interest.

b.      From time to time (but at least once each calendar quarter) a Simple Majority of the Members shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Company shall distribute to the Members, subject to section 5.2(a) above, in accordance with their Membership Interests, an amount in cash equal to that excess.

c.      From time to time by vote of a Simple Majority of the Members, the Members may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Membership Interests and may be made subject to existing liabilities and obligations. However, until such time as each Member owning a Class A Membership Interest has received the return of one hundred percent (100%) of his initial or additional, if any, cash Capital Contribution made to the Company plus his Preferred Return, all distributions made in accordance with this section 5.2(c) shall be made to those Members in accordance with their Membership Interests, to the exclusion of any Member owning a Class B Membership Interest. Immediately before such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulations section 1.704–1(b)(2)(iv)(f).

# Restated Company Agreement of VIP MedSurg Ventures LLC

5.3     *Prohibited Distributions.*   Distributions may not be made to Members if, immediately after making the distribution, the Company's total liabilities exceed the fair value of the Company's total assets as set forth in Code section 101.206 ("Prohibited Distribution"). For the purposes of calculating the Prohibited Distribution, the liabilities of the Company do not include a liability related to the Member's Membership Interest. A Member who receives a Prohibited Distribution is not required to return the Prohibited Distribution unless the Member had knowledge of the violation of this section 5.3 or the Code. A Prohibited Distribution does not include an amount constituting reasonable compensation for present or past services or a reasonable payment made in the ordinary course of business under a bona fide retirement plan or another benefits program.

## ARTICLE 6: MANAGEMENT

6.1     *Management by Managers.*   Except for situations in which the approval of the Members is required by this Agreement or by provisions of applicable law, and subject to the provisions of section 6.2 of this Agreement, the Managers shall have the sole and exclusive control of the management, business, and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company, including, without limitation, the following:

      a.      entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

      b.      opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

      c.      maintaining the assets of the Company in good order;

      d.      collecting sums due the Company;

      e.      to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

      f.      selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

# Restated Company Agreement of VIP MedSurg Ventures LLC

g.      obtaining insurance for the Company, the Members, and the Managers as deemed necessary for the operations being conducted by the Company; and

h.      establishing a seal for the Company if appropriate.

6.2      *Actions and Decisions Requiring Member Consent.*    Notwithstanding any power or authority granted the Managers under the Code, the Certificate, or the provisions of section 6.1 of this Agreement, the Managers may not make any decision or take any action for which the consent of a Simple Majority interest, Super Majority interest, or unanimous interest is expressly required by the Certificate or this Agreement, without first obtaining that consent, and specifically, the Managers may not make any decision or take any action listed below in sections 6.2(a), 6.2(b), or 6.2(c) without first obtaining the consent described therein:

a.      *Simple Majority Approval.*    The following decisions and actions require the approval of a Simple Majority of the Members:

i.      acquiring, disposing of, encumbering or changing the ownership status of any intellectual property belonging to the Company;

ii.      performing any action not apparently for carrying out the ordinary course of business of the Company;

iii.      borrowing money or otherwise committing the credit of the Company or incurring any indebtedness or voluntary prepayments or extensions of debt; and

iv.      encumbering the Company's assets.

b.      *Super Majority Approval.*    The following decisions and actions require the approval of a Super Majority of the Members:

i.      causing or permitting the Company to dispose of any asset with a fair market value or book value in excess of $15,000;

ii.      causing or permitting the Company to enter into or engage in any transaction that is unrelated to the Company's purpose set forth in the Certificate and in section 2.4; and

iii.      causing or permitting the Company to become Bankrupt.

c.      *Unanimous Approval.*    The following decisions and actions require the

# Restated Company Agreement of VIP MedSurg Ventures LLC

unanimous approval of the Members:

      i.      entering into a Fundamental Business Transaction and

      ii.      doing any act that would make it impossible to carry on the ordinary business of the Company (except in connection with the winding up of the Company).

6.3      *Reliance by Third Parties.*    No third party dealing with the Company shall be required to ascertain whether a Manager is acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Managers as binding the Company. If a Manager acts outside the authority set forth in this Agreement or as provided in the Certificate or the Code, he shall be liable to the Members for any damages arising out of his unauthorized actions.

6.4      *Duties and Time Devoted to Business.*    Each Manager shall carry out his duties in good faith, in a manner that is in the best interest of the Company, and with the care that an ordinarily prudent manager in a like position would use under similar circumstances. Each Manager shall devote the time to the business of the Company that he, in his discretion, deems necessary for the efficient carrying on of the Company's business.

6.5      *Conflicts of Interest.*    Subject to the other express provisions of this Agreement and to the Code, each Manager, Member, and Officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager, or officer the right to participate therein. The Company may transact business with any Manager, Member, officer, or Affiliate thereof, provided the contract or transaction is fair to the Company as of the time it is authorized or ratified by a Simple Majority of the Members.

6.6      *Vacancies; Removal; Resignation.*    A Manager shall hold office until his successor has been duly elected and qualified; until his position is eliminated by a decrease in the number of Managers of the Company; or until the earlier resignation, removal, or death of the Manager. Any Manager position to be filled for any reason, including as a result of an increase in the number of Managers, may be filled by election at an annual or special meeting of Members called for that purpose by a vote of a Super Majority of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. No person shall be eligible to serve as a Manager of the Company until that person has accepted the provisions of

# Restated Company Agreement of VIP MedSurg Ventures LLC

this Agreement in writing. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or by written consent adopted in accordance with this Agreement, any Manager may be removed, with or without cause, by a Super Majority of the Members. Any Manager may resign at any time. The resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Members. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.7     *Compensation.*   For their services in the management of the Company and its operations, the Managers or Members may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members.

6.8     *Reimbursement.*   The Managers and Members are not required to advance any funds to pay costs and expenses of the Company. If a Manager or Member advances such funds, however, the Manager or Member shall be entitled to reimbursement for out-of-pocket costs and expenses incurred in the course of his service hereunder, including the portion of his overhead reasonably allocable to Company activities.

6.9     *Meetings of Managers*

a.     Meetings of the Managers shall be held at least annually or more often at the request of one or more Managers. Meetings may be called by any Manager on three (3) days' written notice transmitted electronically to each Manager and Member. The notice must include the date, time, and location (unless the meeting is being held in accordance with section 6.9(e) below) of the meeting. The notice need not include the business to be transacted at, nor the purpose of, the meeting.

b.     A majority of the Managers shall constitute a quorum for the transaction of business of the Company, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. Any Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent is entered in the minutes of the meeting or unless he files his written dissent to the action with the person acting as secretary of the meeting before the adjournment of the meeting or delivers his dissent to the Company immediately after the adjournment of the meeting. The right to dissent shall not apply to a Manager who voted in favor of the action.

c.     Meetings of the Managers may be held at a place or places as shall be determined

# Restated Company Agreement of VIP MedSurg Ventures LLC

by a majority of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of the meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

d.       The Managers shall keep minutes of their meetings, which shall be placed in the records of the Company. A copy of the minutes shall be transmitted to each Member within three (3) Business days of the meeting.

e.       Managers may participate in and hold a meeting by using a conference telephone or similar communications equipment, another suitable electronic communications system, including videoconferencing technology or the Internet, or any combination, if the telephone or other equipment or system permits each Manager participating in the meeting to communicate with all other Managers participating in the meeting. The notice of a meeting held in accordance with this section 6.9(e) shall set forth the form of communications system to be used and the means of accessing the system. If voting is to take place at the meeting, the Company must implement reasonable measures to verify that every person voting at the meeting is sufficiently identified and shall keep a record of any vote or other action taken. Participation in the meeting shall constitute attendance and presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. A copy of the any such consent shall be transmitted to each Member within three (3) Business days of the execution of that consent.

f.       A Manager may vote at a meeting by a written proxy executed by that Manager and delivered to another Manager. A proxy shall be revocable unless it is stated to be irrevocable.

g.       Each Member shall have the right to attend any meeting of the Managers.  Each member shall be entitled to receive, even if the Member does not attend the Manager's meeting, all materials or information related to such meeting, as well as a copy of the minutes of the meeting when produced.

6.10   *Manager Action without Meeting.*   Any action permitted or required by the Code, the Certificate, or this Agreement to be taken at a meeting of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers. Every written consent shall bear the date of signature of each Manager who signs the consent,

# Restated Company Agreement of VIP MedSurg Ventures LLC

and the consent may be in one or more counterparts. A telegram, telex, cablegram, facsimile, e-mail, or similar transmission by the Manager, or a photographic, photostatic, facsimile, or similar reproduction of a writing signed by the Manager, shall be regarded as signed by the Manager for purposes of this section 6.10. The consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the secretary of state of Texas, and the execution of the consent shall constitute attendance or presence in person at a meeting of the Managers. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.11    *Meetings of Members*

a.      Unless otherwise required by law or provided in the Certificate or this Agreement, a Simple Majority of the Members shall constitute a quorum for the transaction of business of the Company, and the act of a Simple Majority of the Members present at a meeting at which a quorum is present shall be the act of the Members, unless a greater number is specified in this Agreement. Any Member who is present at a meeting of the Members at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent is entered in the minutes of the meeting or unless he files his written dissent to the action with the person acting as secretary of the meeting before the adjournment thereof or delivers his dissent to the Company immediately after the adjournment of the meeting. The right to dissent shall not apply to a Member who voted in favor of the action.

b.      Meetings of the Members may be held at a place or places as shall be determined from time to time by resolution of the Members. Attendance of a Member at a meeting shall constitute a waiver of notice of the meeting, except where a Member attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

c.      Meetings of the Members shall be held at times that shall be designated from time to time by resolution of Members owning Percentage Interests of at least ten percent (10%). The chairperson of the meeting will be a Member selected by a Simple Majority of the Members present at the meeting. The Members may take any action whether or not the action is included in the notice of meeting.

d.      Written notice stating the place, day, and hour of the meeting, the purpose or purposes of the meeting, and the communication system to be used for the meeting, if any, shall be delivered either personally or by mail to each Member of record entitled to

# Restated Company Agreement of VIP MedSurg Ventures LLC

vote at the meeting not less than ten (10) days or more than sixty (60) days before the date of the meeting. The record date shall be the date notice of the meeting is given as provided herein. Notwithstanding the foregoing, written notice of a meeting is not required if the provisions of Code section 6.053 are met.

e.      Members may participate in and hold a meeting by using a conference telephone or similar communications equipment, another suitable electronic communications system, including videoconferencing technology or the Internet, or any combination, if the telephone or other equipment or system permits each Member participating in the meeting to communicate with all other Members participating in the meeting. If voting is to take place at the meeting, the Company must implement reasonable measures to verify that every person voting at the meeting is sufficiently identified and shall keep a record of any vote or other action taken. Participation in the meeting shall constitute attendance and presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

f.      A Member may vote at a meeting by a written proxy executed by that Member and delivered to another Member. A proxy shall be revocable unless it is stated to be irrevocable.

6.12    *Member Action without Meeting.*    Any action permitted or required by the Code, the Certificate, or this Agreement to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Members. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. The record date determining the Members entitled to sign the written consent shall be set forth in the written consent, or if no date is designated, the date the consent is delivered to the principal office of the Company. A telegram, telex, cablegram, facsimile, e-mail, or similar transmission by the Member, or a photographic, photostatic, facsimile, or similar reproduction of a writing signed by the Member, shall be regarded as signed by the Member for purposes of this section 6.12. The consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Texas secretary of state, and the execution of the consent shall constitute attendance or presence in person at a meeting of the Members. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

# Restated Company Agreement of VIP MedSurg Ventures LLC

6.13   *Liability of Members and Managers.*   Members and Managers shall not be liable as Members or Managers for the debts, obligations, or liabilities of the Company, including a debt, obligation, or liability under a judgment, decree, or order of a court. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Code shall not be grounds for imposing personal liability on a Member or Manager for liabilities of the Company.

6.14   *Committees of the Managers.*   The Managers may designate one or more committees of the Managers consisting of one or more Managers or Members. The Managers may also designate a Manager or Member to serve as an alternate committee member if a committee member is absent or disqualified. A committee formed hereunder may exercise the authority of the Managers as specified in the resolution by the Managers in forming the committee. The designation of a committee does not relieve the Managers of any responsibility imposed by law or this Agreement. The Managers may remove a committee member for any reason. Committee meetings shall be set by the committee. The act of a majority of the committee members shall be the act of the committee.

## ARTICLE 7: CONFIDENTIAL INFORMATION

7.1   *Confidential Information.*   The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information he receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (a) compelled by law (but all Members thus compelled must notify the Manager and all other Members promptly of any request for that information, before disclosing it, if practicable); (b) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this section 7.1; or (c) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.2   *Specific Performance.*   The Members acknowledge that breach of the provisions of section 7.1 of this Agreement may cause irreparable injury to the Company for which monetary

# Restated Company Agreement of VIP MedSurg Ventures LLC

damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of section 7.1 of this Agreement may be enforced by specific performance.

## ARTICLE 8: OFFICERS

8.1  *Qualification.*   A Simple Majority of the Members may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the state of Texas, a Member, or a Manager. Any officers so designated shall have the authority and perform the duties as the Members may, from time to time, delegate to them. The Members may assign titles to particular officers. Unless the Members decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of the title shall constitute the delegation to the officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to the officer by the Members in accordance with this section 8.1. Each officer shall hold office until his successor shall be duly designated and qualify for the office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Members. Any number of offices may be held by one person.

8.2  *Compensation.*   The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by a Simple Majority of the Members. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

8.3  *Resignation.*   Any officer may resign as such at any time. The resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Members. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

8.4  *Removal.*   Any officer may be removed as such, either with or without cause, by a Simple Majority of the Members.

## ARTICLE 9: INDEMNIFICATION

9.1  *Right to Indemnification.*   Subject to the limitations and conditions as provided in this Article 9, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation

# Restated Company Agreement of VIP MedSurg Ventures LLC

that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company shall be indemnified by the Company to the fullest extent permitted by the Code against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements, and reasonable expenses (including, without limitation, attorney's fees) actually incurred by the person in connection with the Proceeding, and indemnification under this Article 9 shall continue for a person who has ceased to serve in the capacity which initially entitled the person to indemnity hereunder. The rights granted under this Article 9 shall be deemed contract rights, and no amendments, modification, or repeal of this Article 9 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising before any such amendment, modification, or repeal. It is expressly acknowledged that the indemnification provided in this Article 9 could involve indemnification for negligence or under theories of strict liability. A Member or Manager shall not, however, be indemnified if the actions or conduct of the Member or Manager that gave rise to the litigation, actions, or conduct are for the following:

a.      intentional or willful misconduct or a knowing violation of the law;

b.      gross negligence;

c.      a breach of the duty of loyalty to the Company or its Members;

d.      an act or omission not in good faith that constitutes a breach of duty;

e.      a transaction from which the Member or Manager received an improper benefit to the detriment of the Company, regardless of whether the benefit resulted from an action taken within the scope of the Member's or Manager's duties; or

f.      an act or omission for which the liability of a governing person is expressly provided by an applicable statute.

Notwithstanding anything to the contrary in this Article 9, the Company shall indemnify the parties as set forth herein in this Article 9 if the person is wholly successful, on the merits or otherwise, in the defense of the Proceeding.

9.2   *Advance Payment.*   The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person entitled to be indemnified under section 9.1 of this Agreement who was, is, or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination about the person's ultimate entitlement to

# Restated Company Agreement of VIP MedSurg Ventures LLC

indemnification. The payment of the expenses incurred by any such person in advance of the final disposition of a Proceeding, however, shall be made only upon delivery to the Company of a written affirmation by that person of his good-faith belief that he has met the standard of conduct necessary for indemnification under this Article 9 and a written undertaking, by or on behalf of the person, to repay all amounts so advanced if it shall ultimately be determined that the indemnified person is not entitled to be indemnified under this Article 9 or otherwise.

9.3     *Indemnification of Officers, Employees, and Agents.*   The Company, by adoption of a resolution by a Simple Majority of the Members, may indemnify and advance expenses to an officer, employee, or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to a Manager or Member under this Article 9.

9.4     *Exclusivity of Rights.*   The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right which a Member or Manager or other person indemnified under this Article 9 may have or hereafter acquire under any law (common or statutory), under any provision of the Certificate, this Agreement, or another agreement, or under a vote of disinterested Members, or otherwise.

9.5     *Insurance.*   The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is or was a Member, Manager, officer, employee, or agent of the Company against any expense, liability, or loss, whether or not the Company would have the power to indemnify the person against the expense, liability, or loss under this Article 9.

# ARTICLE 10: TAXES

10.1     *Tax Returns.*   The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in section 10.2 of this Agreement. Each Member shall furnish to the Managers all pertinent information in his possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

10.2     *Tax Elections.*   The Company shall make the following elections on the appropriate tax returns:

> a.     to adopt the calendar year as the Company's fiscal year;

> b.     to adopt the cash method of accounting for keeping the Company's books and

# Restated Company Agreement of VIP MedSurg Ventures LLC

records;

c.      if a distribution of Company property as described in section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

d.      to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company under section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by section 709(b) of the Internal Revenue Code; and

e.      any other election the Members may deem appropriate and in the best interest of the Members.

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1, subtitle A, of the Internal Revenue Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

10.3 *Tax Matters Partner.*   The Managers shall designate one of the Managers to be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Internal Revenue Code. Any Manager who is designated tax matters partner shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of section 6223 of the Internal Revenue Code. Any Manager who is designated tax matters partner shall inform each Member of all significant matters that may come to his attention in his capacity as tax matters partner by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Manager who is designated tax matters partner may not take action contemplated by sections 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority of the Members, but this sentence does not authorize the Manager (or any other Manager) to take any action left to the determination of an individual Member under sections 6222 through 6232 of the Internal Revenue Code.

# Restated Company Agreement of VIP MedSurg Ventures LLC

## ARTICLE 11: BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

11.1    *Maintenance of Books.*    The Company shall keep at its principal office (a) books and records of accounts; (b) minutes of the proceedings of its Members, the Managers, and each committee of the Managers; (c) a current record of the name, mailing address, and Membership Interest, Membership Interest Class, and Percentage Interest of each Member of the Company; (d) a current record of the Members in each class, if any; (e) income tax returns for each of the seven (7) preceding tax years along with state and local tax information; (f) a copy of the Certificate, including any amendments or restatements; and (g) a copy of this Restated Agreement, including any amendments or restatements. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article 4 of this Agreement. The calendar year shall be the accounting year of the Company.

11.2    *Access to Books and Records.*    A Member shall have reasonable access to the books and records set forth in section 11.1 of this Agreement for any reasonable purpose. A Member may, at any reasonable time, examine the books and records and copy them at the Member's expense. Notwithstanding the foregoing, on written request by a Member, the Company shall provide a free copy of the Certificate and any amendments thereto and restatements thereof, the Agreement and any amendments thereto and restatements thereof, and income tax returns of the Company for each of the seven (7) preceding tax years. Managers shall have reasonable access to the books and records set forth in section 11.1 of this Agreement for purposes reasonably related to the Manager's management duties for the Company.

11.3    *Accounts.*    The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member or Manager. Company funds may, however, be invested in a manner the same as or similar to a Manager's or Member's investment of their own funds or investments by their Affiliates.

## ARTICLE 12: TRANSFERS

12.1    *Limited Right to Transfer.*    No Member or Assignee (referred to in this Article 12 as the "Assignor") shall make any Transfer of all or any part of his Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the other Members; (b) as provided by Article 13 of this Agreement; (c) as a Defaulting Member as provided by section

# Restated Company Agreement of VIP MedSurg Ventures LLC

14.1(f) of this Agreement; or (d) upon winding up or termination, as provided by Article 15 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void ab initio.

12.2    *Rights of an Assignee of a Membership Interest*

    a.      Unless the Assignee of a Membership Interest becomes a Member of the Company, the Assignee shall be entitled only (i) to receive an allocation of income, gain, loss, deduction, credit, or similar items and to receive distributions to which the assignor is entitled to the extent these items were assigned; (ii) to receive reasonable information or account of transactions of the Company; and (iii) to make reasonable inspection of the books and records of the Company for any proper purpose. The Assignee shall have no right (i) to participate in the operations or management of the Company; (ii) to become a Member of the Company; or (iii) to exercise any rights of a Member of the Company.

    b.      If an Assignee becomes a Member of the Company, the Assignee is (i) entitled, to the extent assigned, to the same rights and powers granted or provided to a Member of the Company by this Agreement or the Code; (ii) subject to the same restrictions and liabilities placed or imposed on a Member of the Company by this Agreement or the Code; and (iii) liable for the Assignor's obligation to make contributions to the Company and any other liabilities of the Assignor to the Company, but only to the extent the Assignee had knowledge of such on the date of becoming a Member or such could be ascertained from the terms of this Agreement.

    c.      The Assignor continues to be a Member of the Company and is entitled to exercise any unassigned rights or powers until the Assignee becomes a Member of the Company. An Assignor is not released from the assignor's liability to the Company for liabilities not assigned to Assignee as set forth in section 12.2(b)(iii) of this Agreement.

12.3    *Legal Opinion.*   For the right of a Member to transfer a Membership Interest or any part thereof or of the Assignee or any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Members that states (a) the Transfer is exempt from registration under federal and state securities laws; (b) the Transfer will not cause the Company to be in violation of federal and state securities laws; (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury regulations; and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the

# Restated Company Agreement of VIP MedSurg Ventures LLC

Internal Revenue Code or Treasury regulations. The Members, however, may waive the requirements of this section 12.3.

12.4    *Admission as a Member.*    An Assignee has the right to be admitted to the Company as a Member along with receiving the Membership Interest and Percentage Interest so transferred to the person, upon the following conditions:

> a.    the Assignor making the Transfer grants the Assignee the right to be so admitted;

> b.    the Transfer is consented to in accordance with section 12.1 of this Agreement; and

> c.    a written, signed, and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Members, and the instrument contains (i) the agreement by the Assignee to be bound by all the terms and provisions of this Agreement; (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws; (iii) the Membership Interests, Membership Class, and Percentage Interests being transferred; and (iv) the name, address, and any other pertinent information of the Assignee necessary for an amended Schedule 1 and to make distributions.

12.5    *Reasonable Expenses.*    The Assignor and the Assignee shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Transfer (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in section 12.3 of this Agreement) on or before the tenth (10th) day after the receipt of the Company's invoice for the amount due. If payment is not made by the date due, interest shall accrue on the unpaid amount from the date due until paid at a rate per year equal to the Default Interest Rate.

## ARTICLE 13: BUYOUT OF MEMBERSHIP INTEREST

13.1    *Termination of Marital Relationship.*    If the marital relationship of a Member is terminated by death or divorce and the Member does not succeed to all the Member's spouse's community or separate interest, if any, in the Membership Interest (the spouse is referred to hereafter in this Article 13 as the "Assignee Spouse"), the Member shall have the option to purchase at Fair Value (as determined in accordance with the terms of section 13.6 of this Agreement) the Assignee Spouse's interest in the Membership Interest to which the Member

# Restated Company Agreement of VIP MedSurg Ventures LLC

does not succeed. This option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise this option within this period, the remaining Members, in such proportions as they mutually agree or in proportion to their respective Membership Interests, shall have the option to purchase the subject Membership Interest at Fair Value for a period of ninety (90) days. If the remaining Members do not exercise their options on the entire subject Membership Interest, the Company shall be obligated to purchase all, and not less than all, of the subject Membership Interest at Fair Value.

13.2   *Death of Member.*   Commencing upon the death of a Member, the surviving Members, in such proportions as they mutually agree or in proportion to their respective Membership Interests, shall for a period of ninety (90) days thereafter have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member). If the surviving Members do not exercise their options to purchase the entire deceased Member's Membership Interest, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value.

13.3   *Bankruptcy of Member.*   If any Member becomes Bankrupt, the Company shall have the option, exercisable by notice from the Members to the Bankrupt Member (or his representative) at any time before the expiration of one hundred eighty (180) days after receipt of notice of the occurrence of the event causing him to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of the option is given by the Members). The exercise of the option, however, shall require the approval of the unanimous consent of the other Members. If that notice of the exercise of the option is given by the Members to the Bankrupt Member (or his representative), the Bankrupt Member shall sell his interest to the Company as provided by this Article 13.

13.4   *Insufficient Surplus.*   If the Company does not have sufficient surplus to permit it lawfully to purchase the Membership Interest under section 13.1, 13.2, or 13.3 of this Agreement at the time of the closing, the other Members may take action to vote their respective Membership Interests to reduce the capital of the Company or to take other steps that may be appropriate or necessary to enable the Company lawfully to purchase the Membership Interest.

13.5   *Exercise of Option.*   Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise the option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price

# Restated Company Agreement of VIP MedSurg Ventures LLC

anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

13.6     *Determination of Fair Value.*   The "Fair Value" of a Membership Interest means the amount the Member holding the interest would receive if the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests in accordance with this Agreement. If the Fair Value of a Membership Interest is to be determined under this Agreement, the Members shall select a qualified independent appraiser ("Independent Appraiser") to make the determination, and the Managers and Members shall make the books and records available to the Independent Appraiser for that purpose. The determination of Fair Value made by the Independent Appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest. If the sale of the Member's ownership interest is due to the death or divorce of the Member or death of a Member's spouse, then in addition to the Independent Appraiser selected by the Members, the spouse, the estate of the selling Member, or the estate of the deceased spouse may select its own appraiser ("Seller's Appraiser"). Should the Seller's Appraiser determine a Fair Value of the interest in a different amount than the Independent Appraiser, the Seller's Appraiser and the Independent Appraiser shall select a third appraiser ("Third Appraiser"), who will make a determination of the Fair Value. In this circumstance, the determination of Fair Value made by the Third Appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

13.7     *Fees and Expenses of Appraiser.*   In the case of a purchase and sale of Membership Interest under section 13.1 or 13.2 of this Agreement, the fees and expenses of the appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under section 13.3 or 14.1 of this Agreement (the Bankruptcy or default of a Member), the fees and expenses of the appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing the fees and expenses from the purchase price to be paid to the Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of the appraiser shall be shared equally by the purchaser and seller.

13.8     *Right-to-Withdraw Option.*   If a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by section 13.6 of this Agreement, the Member may elect to terminate his right to purchase within fifteen (15) days following his receipt of the determination of Fair Value by delivery of written notice to the Company, the Assignee, and any other party involved in the purchase of whom the Member has been made aware. In such an event, the initial payment shall be returned to the

# Restated Company Agreement of VIP MedSurg Ventures LLC

Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Membership Interests.

13.9    *Terms of Purchase*

a.      The closing date for any sale and purchase made in accordance with this Article 13 shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

b.      Payment of the purchase price for a Membership Interest may be made by the Company or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing and (ii) the balance of the purchase price, bearing interest at the Default Interest Rate determined on the date of closing, to be paid in thirty-six (36) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of the obligation at any time or times in advance of maturity without penalty. If the Company becomes a party to a Fundamental Business Transaction, the obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to the transaction.

c.      At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

d.      In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation, and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such document that may be reasonably necessary to effectuate and evidence the purchase and

## Restated Company Agreement of VIP MedSurg Ventures LLC

sale, and release as provided by this section 13.9.

13.10 *Third Party's Offer.* If a Member desires to sell all or any portion of his Membership Interest to another person (other than an existing Member and referred to hereafter in this section 13.10 as the "Third Party"), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from the Third Party to purchase the Membership Interest, the selling Member shall promptly deliver a copy of the Third Party's offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party's offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party's offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party's offer. Consent by the Members to the sale of the interest to the Third Party shall not be deemed consent to admission of the Third Party as a Member, and it is agreed that substitution is governed by section 12.4 of this Agreement.

## ARTICLE 14: DEFAULT OF MEMBER

14.1 *Failure to Contribute.* If a Member does not contribute, by the time required, all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

    a. The Company may take action (including, without limitation, court proceedings) that the other Members ("Nondefaulting Members") may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member.

    b. The Company may permit the Nondefaulting Members in proportion to their Membership Interests or in such other percentages as they may agree (the "Lending Member," whether one or more) to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

# Restated Company Agreement of VIP MedSurg Ventures LLC

i.      the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member in accordance with the applicable provisions of this Agreement;

ii.     the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member;

iii.    the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member;

iv.     all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal);

v.      the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in section 14.2 of this Agreement; and

vi.     the Lending Member has the right, in addition to the other rights and remedies granted to it under this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member.

c.      The Company may exercise the rights of a secured party under the Uniform Commercial Code of the State of Texas.

d.      The Company may reduce the Defaulting Member's Membership Interest or other interest in the Company.

e.      The Company may subordinate the Defaulting Member's Membership Interest to the Defaulting Member.

# Restated Company Agreement of VIP MedSurg Ventures LLC

     f.     The Company may force a sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article 13.

     g.     The Company may forfeit the Defaulting Member's Membership Interest.

     h.     The Company may exercise any other rights and remedies available at law or in equity.

14.2   *Security.*   Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article 14, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member in accordance with section 14.1(b) of this Agreement, a security interest in, and a general lien on, its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. It is expressly agreed that the security interest created thereby shall be governed by chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article 14. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Members or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article 14. At the option of the Members or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

14.3   *Compromise or Release.*   The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the Code or this Agreement may be compromised or released only with the approval of the unanimous consent of the Members. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation may enforce the original obligation if the obligation is signed by the Defaulting Member and is not amended or canceled to reflect the compromise or release.

# Restated Company Agreement of VIP MedSurg Ventures LLC

## ARTICLE 15: WINDING UP AND TERMINATION

15.1    *Events Requiring Winding Up.*    The Company shall begin to wind up its affairs upon the first of the following to occur:

a.    the expiration of any period of duration fixed for the Company in the Certificate;

b.    the execution of an instrument approving the termination of the Company by unanimous consent of the Members;

c.    the occurrence of any event that terminates the continued membership of the last remaining Member of the Company, provided, however, that the Company is not required to wind up if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member, or the legal representative's or successor's designee, agrees to continue the Company and to become a Member as of the date of termination;

d.    entry of a decree of judicial dissolution of the Company; or

e.    the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

No other event will cause the Company to wind up.

15.2    *Liquidation.*    As soon as possible following an event requiring winding up of the Company, the Managers shall act as liquidator or may appoint one or more Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Code. The Company may, however, continue its business wholly or partly, including delaying the disposition of the property of the Company, for the limited period necessary to avoid unreasonable loss of the Company's property or business. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties to the extent necessary to wind up its business with all the power and authority of the Members. The steps to be accomplished by the liquidator follow:

a.    as promptly as possible after that event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is

## Restated Company Agreement of VIP MedSurg Ventures LLC

completed, as applicable;

b.        the liquidator shall cause the notice described in Code section 11.052 to be delivered to each known claimant against the Company;

c.        the liquidator shall pay, satisfy, or discharge from Company funds all the debts, liabilities, and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in an amount and for a term that the liquidator may reasonably determine); and

d.        all remaining assets of the Company shall be distributed based on their respective Membership Interests to the Members as follows:

i.        the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

ii.        with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

iii.        Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause 15.2(d)(iii)), and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation), it being understood that the holders of Class A Membership Interests shall receive their Initial Capital Contribution, Additional Capital Contribution, and Preferred Return prior to any distributions to Members of any other Class of Membership Interest in the manner set forth in Sections 5.1 and 5.2 above.

# Restated Company Agreement of VIP MedSurg Ventures LLC

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed before the date of termination, and those costs, expenses, and liabilities shall be allocated to the distributee in accordance with this section 15.2. Upon completion of all distributions to the Member, the distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company.

15.3     *Deficit Capital Accounts.*   Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including noncash items such as depreciation) or distributions of money in accordance with this Agreement to all Members in proportion to their respective Membership Interests, upon termination of the Company that deficit shall not be an asset of the Company and that Member shall not be obligated to contribute that amount to the Company to bring the balance of that Member's Capital Account to zero.

15.4     *Revocation.*   If an event described in section 15.1(b) of this Agreement occurs or any other voluntary decision is made by the Members to wind up the Company, before the termination of the Company, a Super Majority of the Members may revoke the winding up and continue the Company's business.

15.5     *Cancellation.*   Should an event requiring winding up occur, other than as a result of the event set forth in section 15.1(a), the Members by unanimous consent may cancel the event no later than one (1) year after the event and continue the Company's business. Should the Company's period of duration expire, the Members by unanimous consent may cancel the expiration no later than three (3) years after such and extend the Company's period of duration and continue its business.

15.6     *Certificate of Termination.*   On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the Code may require or permit) shall execute, acknowledge, and cause to be filed a certificate of termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE 16: AMENDMENT OR MODIFICATION

This Agreement, the Certificate, or any restated certificate of formation, may be amended or modified from time to time only with a written instrument executed by unanimous consent of

# Restated Company Agreement of VIP MedSurg Ventures LLC

the Members.

## ARTICLE 17: GENERAL PROVISIONS

17.1   *Construction.*   Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. If there is only one Member, references to Members in the plural should be construed as singular; likewise, if there is only one Manager, references to Managers in the plural should also be construed as singular. The singular form of other nouns, pronouns, and verbs shall include the plural and vice versa.

17.2   *Offset.*   Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment, unless the Company has been notified by such Party of a bona fide dispute concerning any amounts owed and the disputing party has paid all undisputed amounts owed.

17.3   *Notices.*   Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or another address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managers must be given at the following address:

**VIP MedSurg Ventures, LLC**

11133 Interstate 45

Suite 320

Conroe, Texas, 77304.

Whenever any notice is required to be given by law, the Certificate, or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of notice.

17.4   *Effect of Waiver or Consent.*   A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance

# Restated Company Agreement of VIP MedSurg Ventures LLC

by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

17.5   *Binding Effect.*   Subject to the restrictions on Transfers set forth in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. Unless and until properly admitted as a Member, however, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the Code to assignees.

17.6   *Governing Law.*   This Agreement is governed by and shall be construed in accordance with the laws of the State of Texas, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the laws of another jurisdiction.

17.7   *Severability.*   If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby, and that provision shall be enforced to the greatest extent permitted by law.

17.8   *Further Assurances.*   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

17.9   *Indemnification by Members.*   To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

17.10   *Counterparts.*   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

17.11   *Invalidity of Provisions.*   If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by

# Restated Company Agreement of VIP MedSurg Ventures LLC

modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

17.12   *Entire Agreement; Supersedes Other Agreements.*   This Agreement includes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written, including the Company Agreement dated 2 June 2015.

**Signature Page Follows**

THIS SPACE INTENTIONALLY BLANK

# Restated Company Agreement of VIP MedSurg Ventures LLC

### SIGNATURES

IN WITNESS WHEREOF, the Members and Managers have adopted and executed this Company Agreement of VIP MedSurg Ventures LLC as of the Effective Date.


_____

Marion Fawn Creighton, Manager & Member


_____

Julie McKay-Smart, Manager & Member


_____

Cooper Collins, Member


_____

Brendon Belanger, Member

# Restated Company Agreement of VIP MedSurg Ventures LLC

## SCHEDULE 1: MEMBERS OF VIP MEDSURG VENTURES LLC

| Members' Names and Addresses | Capital Contributions | Membership Interest, (Voting) Percentage Interest, and Class of Interest |
|---|---|---|
| Marion Fawn Creighton<br><br>2113 Cresent Mill<br>Conroe, TX 77304 | Initial Capital Contribution: Management And Consulting Services Valued At $5000 | 20%, all as Class B Membership Interest<br><br>20% (Voting) Percentage Interest |
| Julie McKay-Smart<br><br>29321 South Plum Creek Dr<br>Spring, TX 77396 | Initial Capital Contribution: Management And Consulting Services Valued At $5000 | 20%, all as Class B Membership Interest<br><br>20% (Voting) Percentage Interest |
| Brendon Belanger<br><br>12002 Live Oak Dr.<br>Magnolia, TX. 77354 | Initial Capital Contribution: $250,000 Due 1 July 2015<br><br>Additional Capital Contribution: $250,000 Due 30 November 2015 | 30%, all as Class A Membership Interest<br><br>30% (Voting) Percentage Interest |
| Cooper Collins<br><br>32126 Edgewater Dr<br>Magnolia TX 77354 | Initial Capital Contribution: $250,000 Due 1 July 2015<br><br>Additional Capital Contribution: $250,000 Due 30 November 2015 | 30%, all as Class A Membership Interest<br><br>30% (Voting) Percentage Interest |

Cooper -Please approve the letter below and send
to valexander@abercrombiecpa.com

She would like to complete our 2016 tax returns for MedSurg and the ASC so that we can focus on
our personal returns.

Thank you
Fawn

To Whom it May Concern:

Please let this email serve as notice for a banking
error on July 29, 2016.

i made a transfer request from my personal line of
credit on July 29, 2016.  In error this request was
drawn down from the MedSurg Ventures Line Of
Credit (Acct Number 626370063 ) in the amount of
$735,000.   This will now be considered a loan from
the company to me.  I will reimburse the MedSurg
Ventures account $735,000 with interest by
December 31, 2017.  Let this email also serve as
permission to remove the $735,000 from the
MedSurg Ventures 2016 tax return.

Cooper Collins

Exhibit 2



Exhibit 3

## GROUND LEASE

**THIS GROUND LEASE** ("**Lease**") is entered into by and between **C-CUBED HOLDINGS, LLC**, a Texas limited liability company ("**Landlord**"), and **VIP MEDSURG VENTURES, LLC**, a Texas limited liability company ("**Tenant**").

## R E C I T A L S:

A.       Landlord is the owner of that certain tract of land located in Conroe, Texas, and being more fully depicted and described in **Exhibit A** attached hereto (such land owned by Landlord, as may be increased or decreased in Landlord's discretion from time to time; provided, that if such increase or decrease adversely affects any of Tenant's rights under this Lease, increases Tenant's obligations under this Lease, or decreases Tenant's rights under this Lease, then Landlord shall not increase or decrease such land without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion, being referred to herein as the "**Medical Center**").

B.       Landlord desires to lease to Tenant a portion of the Medical Center, being that certain tract of land situated at or about FM 3083 and Anderson Crossing Lane, in Conroe, Texas, containing approximately 531,510 Square feet and being legally described in **Exhibit B** attached hereto (the "**Land**"), and Tenant desires to rent the Land from Landlord.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

### ARTICLE 1

### Lease of Property

1.1       **Land Leased**.  Landlord, in consideration of the rents, covenants, agreements and conditions herein set forth, hereby leases to Tenant, and Tenant hereby rents and leases from Landlord, the Land, together with (i) the non-exclusive right to all of Landlord's rights, interests, estates and appurtenances thereto and (ii) the non-exclusive right to all other rights, titles, interests and estates, if any, inuring to the benefit of the Land in adjacent streets and roads.  Landlord agrees to take no voluntary action that would (a) cause the Premises not to have access to and from the publicly-dedicated right(s) of way currently known as FM 3083 and Anderson Crossing Lane or (b) adversely affect ingress and egress upon and across that certain driveway marked as "Critical Access" on the Site Plan (the "Critical Access Drive"); provided, however, the "Critical Access Drive" will not include any portions of such hatched area that becomes a publicly dedicated road accepted by the applicable governmental authority.  The Premises is located as shown on the Site Plan also attached hereto as **Exhibit A** (the "**Site Plan**"), but without waiving Landlord's right to increase or decrease the Business Center or change the improvements shown on such Site Plan from time to time, subject to the restrictions in this Lease and the Declaration (defined below); provided, that if such increase or decrease adversely affects any of Tenant's rights under this Lease, increases Tenant's obligations under this Lease, or decreases Tenant's rights under this Lease, then Landlord shall not increase or decrease the Business Center without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion.

1.2       **Premises Defined**.  The Land and the rights, interests, estates and appurtenances leased to Tenant pursuant to **Section 1.1**, together with all buildings, structures, signage, parking, and other improvements now or hereafter constructed or installed upon the Land (collectively, the "**Improvements**"), are hereinafter collectively referred to as the "**Premises**".

1.3       **Habendum**.  TO HAVE AND TO HOLD the Premises, unto Tenant, its successors and assigns, for the term set forth in **Article 2**, subject to termination as herein provided, and subject to and upon the covenants, agreements, terms, provisions and limitations herein set forth.



Exhibit 4

## ARTICLE 2

### Term of the Lease

2.1 **Effective Date Defined**. The date upon which the last of the parties hereto executes this Lease is hereinafter referred to as the "**Effective Date**".

2.2 **Inspection Period and Initial Term**. The "**Inspection Period**" is hereinafter referred to as the period of time commencing on the Effective Date and ending at 11:59 pm, Conroe, Texas time, on the date that is sixty (60) days after the Effective Date. The "**Initial Term**" is hereinafter referred to as the period of time commencing on the expiration of the Inspection Period and ending at 11:59 pm, Conroe, Texas time, on the date that is ninety (30) days after the expiration of the Inspection Period. If Tenant has been unable to obtain the Building Approvals (defined below) prior to expiration of the Initial Term, Tenant shall have the right to extend the Initial Term for two (2) periods of thirty (30) days each, upon written notice to Landlord delivered on or before the then expiration of the Initial Term (as it may have been previously extended). References to the Initial Term herein shall mean, as extended, unless the context clearly indicates otherwise. If Tenant is unable to obtain its Building Approvals (as defined below) within the first sixty (60) days of the Initial Term, then Landlord may elect, at its sole cost and operating under the direction of Tenant, may assist Tenant in obtaining the Building Approvals.

Tenant's Contingencies shall be defined as:

a. Tenant's receipt of all permits and approvals for the construction of Tenant's approximately 19,487 square foot free medical (or similar facility of the same or different size consistent with the Permitted Use so long as such size complies with the Declaration), with related improvements, at the Premises in accordance with the Tenant's site plan attached as **Exhibit F** (as amended from time to time, the "**Tenant Site Plan**"), and in accordance with those plans and specifications approved by Landlord where required under this Lease, including (without limitation) zoning and land-use, site plan and architectural, platting and replatting, Prototypical Sign Package (as defined below)and building permit approvals and issuance (collectively, the "**Building Approvals**"). **Prototypical Sign Package** shall mean (i) directional/additional signage for the "Emergency" drop-off and "Ambulance Entrance" areas, (ii) a free-standing pylon or monument sign on the Land (limited to 8 feet in height), and (iii) building signage. Other than the stated height limitation on Tenant's pylon sign, Tenant shall be allowed the maximum signage permitted by local governing authorities for the Premises and the Permitted Encumbrances.

b. Tenant's receipt of the following, duly executed by the relevant parties and acknowledged where applicable: (i) a recorded memorandum of lease, with all recording fees paid by Tenant, substantially in the form attached hereto as **Exhibit G**; (ii) a subordination, non-disturbance and attornment agreement, in form and substance reasonably acceptable to Tenant, Landlord and Landlord's lender, with each of the existing lenders having a lien upon the Premises, if any; and (iii) title affidavits, certificates, lien waivers, corporate resolutions and other documents and information reasonably requested by the Title Company (hereinafter defined) in support of the Leasehold Policy;

c. Reserved.

d. Absence of or resolution to Tenant's satisfaction of all wetlands, hazardous waste and other adverse environmental conditions;

e. Availability of all utilities to boundary line(s) of the Premises and adequacy of such utilities for Tenant's intended use of the Premises consistent with the Permitted Use;

f. Tenant's receipt of all final licenses and approvals required from all applicable regulatory agencies and authorities necessary to unconditionally authorize Tenant to build and operate a free standing emergency care facility (or similar facility consistent with the Permitted Use) on the Premises as intended by Tenant, including (without limitation) approvals from the applicable Department of Health and Safety and Department of Licensing or similar governing bodies in the applicable jurisdictions (collectively, the "**Regulatory Approvals**");

g. Final approval of the architectural control committee, property owners' association or similar governing body, if any; and

h.     Receipt by Landlord of all required permits and approvals for the construction of the Landlord's Site Improvements (hereinafter defined).

Tenant shall be obligated to use good faith and commercially reasonable efforts to satisfy, or cause the satisfaction of, all of the Contingencies (with the exception of item b.(i) to the extent of Landlord's responsibilities with respect to same, item b.(ii) with respect to Landlord's lenders, item b.(iii) to the extent pertaining to Landlord or parties claiming by, through or under Landlord, and item h., each of which are Landlord's responsibility) on or prior to the expiration of the Initial Term. Upon expiration of the Initial Term, all of Tenant's Contingencies will be deemed waived, except for the Landlord's obligations described in this paragraph, provided that such waiver does not limit or otherwise affect the rights and responsibilities contained elsewhere in this Lease.

2.3     **Original Term**. The period of time commencing on the first day following the expiration of the Initial Term (the "**Term Commencement Date**") and ending at 11:59 pm, Conroe, Texas time on the last day of the 180th month after the Rent Commencement Date (as defined below) is hereinafter referred to as the "**Original Term**".

2.4     **Renewal Terms**. Tenant shall have the right to renew this Lease for two (2) additional periods of five (5) years each (each of which is referred to herein as a "**Renewal Term**"), upon the same terms and conditions as the Original Term except that the number of renewal options shall be reduced by the renewal option then being exercised and any renewal options previously exercised. Also, the lease amount may increase consistent with growth/ inflationary index and to cover operation cost, taxes, maintenance, etc.

Tenant shall exercise its right to renew this Lease by delivering written notice to Landlord on or before one hundred eighty (180) days prior to the end of the Original Term or the applicable Renewal Term of its intention to renew this Lease (each, an "**Exercise Notice**"). If Tenant fails timely to deliver such Exercise Notice, Tenant's right to renew shall terminate, and this Lease shall expire as of the end of the Original Term or the applicable Renewal Term, as the case may be.

2.5     **Term**. The Initial Term, Original Term and any Renewal Term, if applicable, are referred to herein collectively as the "**Term**".

## ARTICLE 3

### Rent

3.1     **Rent Commencement Date and Lease Year Defined**.     The "**Rent Commencement Date**" shall mean the earlier to occur of: (a) the date upon which Tenant opens for business to the public at the Premises; or (b) the date that is 150 days after the last to occur of (i) the expiration of the Initial Term or (ii) Landlord has completed all of Landlord's Site Improvements as contemplated by this Lease. "**Lease Year**" shall mean each consecutive period of twelve (12) full calendar months, following the Rent Commencement Date. If the Rent Commencement Date is a date other than the first day of a calendar month, the first Lease Year shall include that fractional portion of the calendar month in which the Rent Commencement Date occurs and the first full twelve (12) months thereafter, and the last Lease Year shall end on the expiration or earlier termination of this Lease. At the request of either party hereto, Landlord and Tenant agree to execute, within fifteen (15) days following receipt of a written request from the other party, the Rent Commencement Date Letter attached hereto as **Exhibit C** acknowledging the actual Rent Commencement Date.

3.2     **Initial Rent**. Within three (3) business days following the Effective Date of this Lease, Tenant shall deliver to Landlord an amount equal to **ONE HUNDRED AND NO/100 DOLLARS ($100.00)** ("**Initial Rent**"), as rent for the Initial Term.

3.3     **Base Rent**. Tenant shall pay rent ("**Base Rent**") to Landlord in the amounts set forth below for the periods set forth below:

(a) Commencing on the Term Commencement Date and continuing through the day immediately preceding the Rent Commencement Date, Base Rent shall equal $150,000.00 annually, and shall be payable in equal monthly installments of $12,500.00.

(b) Commencing on the Rent Commencement Date and continuing through the fifth (5th) Lease Year, Base Rent shall be equal to $150,000.00 annually, and shall be payable in equal monthly installments of $12,500.00.

(c) Commencing on the first day of the sixth (6th) Lease Year and continuing through the tenth (10th) Lease Year, Base Rent shall be equal to $165,000.00 annually, and shall be payable in equal monthly installments of $13,750.00.

(d) Commencing on the first day of the eleventh (11th) Lease Year and continuing through the fifteenth (15th) Lease Year, Base Rent shall be equal to $181,500.00 annually, and shall be payable in equal monthly installments of $15,125.00.

(e) If Tenant exercises its right to renew the Lease as set forth in **Section 2.4**, Base Rent for the applicable Renewal Term shall be payable, in equal monthly installments, as follows:

| | | |
|---|---|---|
| First Renewal Term | $190,575.00 annually | $15,881.25 monthly |
| Second Renewal Term | $200,103.72 annually | $16,675.31 monthly |

3.4    **Additional Rent and Rent Defined**. The term "**Additional Rent**" shall mean all amounts required to be paid by Tenant under the terms of this Lease other than Initial Rent and Base Rent. The term "**Rent**" shall mean the Initial Rent, Base Rent and Additional Rent.

3.5    **Payment of Rent**. Base Rent shall be paid to Landlord by Tenant in monthly installments in advance on the first day of each calendar month in lawful money of the United States of America without notice or demand at the original or changed address of Landlord as set forth in **Section 16.1** or to such other persons or at such other addresses as Landlord may designate from time to time in writing to Tenant. If the Rent Commencement Date or termination or expiration date of this Lease is other than the first day of a month, Tenant shall be required to pay a pro rata portion of the monthly installment of Base Rent for any partial month. Initial Rent and Additional Rent shall be paid as herein set forth. Subject to Tenant's offset rights, termination rights, and other remedies expressly set forth in this Lease, the obligations of Tenant to pay Rent and the obligations of Landlord under this Lease are independent obligations.

3.6    **No Abatement**. Except as otherwise expressly provided in this Lease, no happening, event, occurrence or situation during the Term, whether foreseen or unforeseen, and however extraordinary, shall relieve Tenant from its obligations hereunder to pay Rent, or entitle Tenant to an abatement of Rent or, except as otherwise expressly set forth elsewhere herein, to any right of set-off or deduction whatsoever.

3.7    **Late Charge**. If Tenant fails to pay any installment of Base Rent on or before the tenth (10th) day of the calendar month for two (2) or more calendar months in any Lease Year, or in the event Tenant fails to pay more than four (4) installments of Base Rent on or before the tenth (10th) day of the calendar month during the Term, then Tenant shall pay to Landlord, in addition to the installment of Base Rent, five percent (5%) of such installment, as a late payment fee, beginning with the second (2nd), or fifth (5th), as applicable, late installment and upon any subsequent late installments during the applicable Lease Year.

3.8    **Payment of Rent Upon Assignment of Landlord's Interest**. Landlord promptly shall give written notice to Tenant if Landlord assigns its interest in, or its right to receive Rent under, this Lease to a third party or if any third party other than Landlord is ever entitled to collect any amounts payable by Tenant hereunder.

(a) Until Tenant receives written notice from Landlord of any assignment or transfer of the right to collect Rent, together with a copy of the fully executed deed or other transfer document, payment of Rent by Tenant in accordance with the provisions of this **Article III** shall satisfy Tenant's obligations under the Lease.

(b) If Landlord gives Tenant written notice that a third party is entitled to receive any payments of Rent and Tenant thereafter pays such sum(s) to the party named in the notice, Tenant shall be deemed to have discharged its obligation under this Lease with respect to such sum(s).

(c) If Landlord's interest in this Lease is ever owned by more than one person, firm, corporation or entity, such parties shall arrange among themselves for the joint execution of a notice specifying one such party or agent and an address therefor for the receipt of notices to Landlord under this Lease and to which all payments to Landlord under this Lease shall be made, and notices delivered and payments made by Tenant in accordance with such jointly executed notice shall constitute notice and payment to all parties included within the term "Landlord". Until Tenant receives written notice signed by all such parties, payment of Rent by Tenant in accordance with the provisions of this **Article III** shall satisfy Tenant's obligations under the Lease.

(d) If Landlord intends to sells its interest in the Premises to an unrelated third party, Landlord shall advise Tenant of the terms and conditions of sale by written notice.

## ARTICLE 4

### Impositions, Utilities, Net Lease

4.1 **Impositions Defined**. The term "**Impositions**" shall mean all taxes, assessments, use and occupancy taxes, water and sewer charges, rates and rents, charges for public utilities, excises, levies, license and permit fees and other charges by any public authority, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, which shall or may during the Original Term and any applicable Renewal Term be assessed, levied, charged, confirmed or imposed by any public authority upon, or accrue, or become a lien on (i) the Land or any part thereof; (ii) the buildings or improvements now or hereafter constructed on the Land; (iii) the appurtenances to the Premises or the sidewalks or streets adjacent thereto; (iv) the rent and income received by or for the account of Tenant from any sublessees or for any use or occupation of the Premises, or any taxes payable on the rentals payable by Tenant under this Lease which are in lieu of ad valorem taxes; (v) such franchises, licenses and permits as may be pertinent to the use of the Premises; or (vi) any documents to which the Tenant is a party creating or transferring an interest or estate in the Premises. Impositions shall not include any income tax, capital levy, estate, succession, inheritance or transfer taxes or similar tax of Landlord; any franchise tax imposed upon any owner of the fee of the Premises; or any income, profits or revenue tax, assessment or charge imposed upon the rent (except as expressly set forth above) or other benefit received by Landlord under this Lease by any association having jurisdiction over the Land, any municipality, county, state, the United States of America or any other governmental body, subdivision, agency or authority having jurisdiction over the Land or Tenant (hereinafter all of the foregoing bodies are collectively referred to as "**Governmental Authorities**"). Notwithstanding anything to the contrary contained herein, if at any time during the Term of this Lease, in lieu of and/or in substitution for all or any portion of any ad valorem taxes, there shall be levied, assessed or imposed on Landlord: (a) a capital levy, margin tax or other tax directly on the Rents or other amounts received from the ownership or operation of the Premises; and/or (b) a tax, assessment, levy or charge measured by or based, in whole or in part upon such Rents or other amounts from the Premises, the Land and/or the improvements located thereupon, then all such taxes, assessments, levies or charges or the part thereof so measured or based, shall be deemed to be included within the term "Impositions" for the purposes hereof.

4.2 **Tenant's Impositions Obligation**. Commencing on the Rent Commencement Date and continuing throughout the remainder of the Term, Tenant will pay all Impositions on or before thirty (30) days prior to delinquency. Impositions that are payable by Tenant for the tax year in which the Rent Commencement Date occurs, as well as during the year in which the Term ends, shall be apportioned so that Tenant shall pay its proportionate share of the Impositions payable by Tenant for such periods of time. Landlord shall pay to Tenant, within thirty (30) days following demand therefor, Landlord's proportionate share of all Impositions payable by Tenant for the tax year in which the Rent Commencement Date occurs. Tenant shall pay to Landlord, within thirty (30) days following demand therefor, Tenant's proportionate share of all Impositions payable by Tenant for the tax year in which the Term ends; provided that if the tax rate has not been established for the year in which the Term ends, Tenant shall pay Tenant's proportionate share, as estimated by Landlord, and the parties shall re-prorate the Impositions upon determination of the tax rate for such year. Where any Imposition that Tenant is obligated to pay may be paid pursuant to law in installments, Tenant may pay such Imposition in installments as and when such installments become due. Tenant shall, if so requested, deliver to Landlord evidence

of due payment of all Impositions Tenant is obligated to pay hereunder, concurrently with the making of such payment.

If the Land is not separately assessed, but are assessed as part of a larger parcel which includes the Land, then until such time as the Land is separately assessed, Landlord agrees to pay all Impositions upon such larger parcel prior to the last date that the same may be paid without penalty or interest, or if a discount shall be available for early payment, prior to the last day that such discount is available. Without cost to Tenant, Landlord shall bear all interest, penalties, late charges and lost discount amounts incurred as a result of Landlord's failure to timely pay any installment of Impositions. Tenant shall pay to Landlord the Impositions applicable solely to the Land and/or Premises as levied or assessed by the applicable taxing authority which shall be determined by reference to the records of said taxing authority, including, without limitation, any work sheets and other documents compiled by the assessor. In the event it is not possible to determine the Impositions applicable to the Land and/or Premises by reference to the foregoing records, Tenant shall pay to Landlord its proportionate share of the Impositions assessed against the larger parcel, which shall be calculated as follows: (i) as to any Impositions assessed against Land, Tenant shall pay Tenant's proportionate share of the Impositions assessed against the land comprising the larger parcel based on a fraction, the numerator of which shall be the number of acres (to the nearest 1/100th of an acre) in the Land and the denominator of which shall be the total number of acres assessed in such tax bill (to the nearest 1/100th of an acre); and (ii) as to any Impositions assessed against buildings, Tenant shall pay Tenant's Proportionate Share of the Impositions; provided, however, that if the tax parcel of which the Premises are a part includes a disproportionately large amount of land area (when compared to the relative floor area of buildings located on such tax parcel versus the floor area located on other tax parcels that are part of the common development), then the amount of Impositions payable by Tenant shall be equitably adjusted to account for such disproportionate relationship. Tenant shall pay its Proportionate Share of any such Impositions (exclusive of any interest and penalties) to Landlord within thirty (30) days of receipt from Landlord of a bill for the same (unless such taxes are being lawfully contested or deferred or a legitimate dispute exists over the calculation of Tenant's proportionate share of such taxes), but no sooner than fifteen (15) days prior to the applicable due date.

4.3 **Tax Contest**. Tenant may, at its sole cost and expense, contest the validity or amount of any Imposition for which it is responsible; provided that Tenant shall indemnify and hold Landlord harmless from any loss, cost, claim or expense (including reasonable attorneys' fees) incurred by Landlord in connection with such contest. So long as Tenant diligently pursues the contest, the payment of the Imposition being contested may be deferred, as permitted by law, during the pendency of such contest. Nothing herein contained, however, shall be construed to allow any Imposition to remain unpaid for such length of time as would permit the Premises, or any part thereof, to be sold or seized by any Governmental Authority for the nonpayment of same and Landlord shall have the right to pay the disputed amount of any such Impositions in order to prevent the sale of the Land (or any portion thereof) or the foreclosure of any lien created thereby, and such amount paid by Landlord shall, after demand upon Tenant, become immediately due and payable by Tenant and shall constitute additional Rent hereunder. Landlord will, at the request of Tenant, cooperate in such contest, provided that Landlord is not required to incur any expense in connection with any such contest. TENANT SHALL INDEMNIFY AND HOLD LANDLORD HARMLESS FROM AND AGAINST ALL ACTUAL COSTS, DAMAGES AND EXPENSES ACTUALLY INCURRED IN THE PROSECUTION OF ANY SUCH PROCEEDING OR CONTEST BROUGHT BY TENANT. Tenant's indemnity obligation under this **Section 4.3** shall survive the expiration or earlier termination of this Lease.

4.4 **Landlord Site Improvements, Tenant's Work and Utilities**.

(a) **Landlord's Obligations**. Landlord shall design, permit and construct, all at Landlord's sole cost and expense, the improvements (collectively, "**Landlord's Site Improvements**"), described in **Exhibit H** attached hereto and made a part hereof:

Landlord shall be obligated to commence Landlord's Site Improvements on or before that date which is fifteen (15) days following the expiration of the Initial Term, and complete same on or before that date which is one hundred twenty (120) days following the expiration of the Initial Term. In the event Landlord fails to either commence or complete Landlord's Site Improvements when required (subject to Force Majeure and delays caused by Tenant), Tenant, after giving Landlord thirty (30) days written notice and opportunity to cure (plus such additional time as may be required to cure provided Landlord has commenced to cure and is diligently pursuing such cure)

shall have the right to perform same (and Landlord hereby grants to Tenant any necessary temporary construction easements over and across the Shopping Center located outside the Premises as may be reasonably necessary to perform such work), and if Landlord fails to reimburse Tenant for the reasonable documented costs incurred by Tenant to perform such work within thirty (30) days after written demand accompanied by reasonable supporting documentation, to thereafter deduct the cost thereof from the next maturing installment(s) of Rent coming due under this Lease, together with interest thereon at the Default Rate, from the date incurred until the date paid.

Landlord's Site Improvements will be completed by Landlord in a lien-free and good and workmanlike manner, in accordance with all applicable laws.

(b)     **Tenant's Development**.  Subject to the terms and conditions of this Lease, including Tenant's right to terminate this Lease during the Initial Term, Tenant, at its sole cost and expense, shall construct (or authorize the construction of) a building and related site improvements on the Land, including (without limitation) sidewalk, signage, parking facilities and landscaping. To the extent required in connection with Tenant's use and operation of the Premises, Tenant shall be responsible, at its sole cost and expense, for repairing and maintaining all utility lines, connections and facilities on the Premises and shall pay all charges for gas, electricity, telephone and other communication services and all other utilities and similar services rendered or supplied to the Premises, and all water rents, sewer service charges or other similar charges levied or charged against, or in connection with, the Premises.

## ARTICLE 5

### Inspection Period and Initial Term

5.1     **Documents to be Supplied by Landlord**.  Within five (5) business days following the Effective Date of this Lease, Landlord shall deliver to Tenant the following documents related to the Land to the extent they are in the possession or control of Landlord, which documents are delivered without representation or warranty of Landlord as to the accuracy or completeness thereof, although Landlord agrees to notify Tenant of any inaccuracies or incomplete items of which Landlord has actual notice and the foregoing disclaimer does not limit or affect Landlord's express representations in this Lease:

(a) **Reports**. The most current environmental report or study which Landlord has in its possession evidencing the current environmental status and condition of the Land ("**Environmental Report**").

(b) Intentionally Deleted.

(c) **Survey**. Landlord's existing on-the-ground survey for the Land or larger parcel with which the Land has been surveyed ("**Survey**"). In addition, Tenant shall have the right to obtain surveys of the Land at any time during the Term at Tenant's sole cost and expense.

(d) **Landlord's Reports**. All environmental reports beyond those referenced above and engineering reports, tests, studies, or other non-confidential and non-proprietary reports relating to the Land and the Shopping Center, including (without limitation) soils tests and reports and sign criteria, in the possession of Landlord or its property manager or their agent (collectively, the "**Landlord's Reports**").

(e) **Tax Information**. Real estate tax bills for the most recent year, along with all documentation regarding any pending protests or claims associated with same.

(f) **Notices**. All notices regarding the Land, in Landlord's possession, received from any Governmental Authority.

(g) **Agreements**.     Other than the Title Documents addressed above, all contracts, leases, licenses or other agreements that will be binding upon the Premises or Tenant at any time after the Effective Date.

(h) **Governmental Approval**. Any civil engineering plans for the Land or Premises that have been approved by one or more applicable Governmental Authorities, and any other approvals by any Governmental Authority that affects the Land or Premises.

5.2    **Title Review Period**.  Tenant may obtain, at Tenant's sole cost and expense, a current, updated commitment for title insurance ("**Commitment**") issued by Republic Title of Texas, Inc., 2626 Howell Street, 10th Floor, Dallas, Texas 75204 ("**Title Company**"), covering Tenant's leasehold estate in the Land and improvements to be constructed on the Land, together with copies of all liens, encumbrances and other matters affecting Landlord's title to the Land ("**Title Documents**").  During the first 45 days of the Inspection Period (the "**Title Review Period**"), Tenant shall have the right to deliver to Landlord written notice of any objection which Tenant may have with respect to the Commitment, Survey and/or Title Documents.  If Tenant fails to object in writing to any items reflected in such documents within the Title Review Period, then all such items shall be deemed waived by Tenant and shall be Permitted Encumbrances (hereinafter defined).  If Tenant objects in writing to any of the items reflected in the Commitment, Survey or Title Documents, Landlord may, but has no obligation to, within ten (10) days following Landlord's receipt of Tenant's written objections ("**Title Cure Period**") in which to remove or cure, or commit to cure prior to the expiration of the Initial Term, to Tenant's reasonable satisfaction, any matters to which Tenant has objected.  Landlord shall, prior to the expiration of the Initial Term, cure to Tenant's reasonable satisfaction all matters that Landlord commits in writing to cure hereunder.  If Landlord fails to cure (or commit to cure prior to the expiration of the Initial Term) any one or more of such items during the Title Cure Period, then Tenant shall have the right (i) to terminate this Lease by written notice to Landlord within ten (10) days after the expiration of the Title Cure Period, in which event the Initial Rent shall be retained by Landlord and the parties shall have no further rights or obligations to the other hereunder or (ii) waive the objection to such matters that Landlord has not cured or committed in writing to cure and proceed with this Lease.  If Tenant does not terminate this Lease during the respective 10-day period under clause (i) above, then Tenant shall be deemed to have elected the waiver under clause (ii) as of the expiration of such 10-day period.  If Tenant elects not to terminate this Lease, then Tenant may cause the Title Company to issue updates of the Commitment from time to time during the Inspection Period and Initial Term.  Tenant shall have the right to object to any exceptions other than the Permitted Encumbrances shown on any such updated Commitment, such objections to be provided within ten (10) days after Tenant's receipt of the respective updated Commitment.  If Landlord fails to cure (or commit to cure prior to the expiration of the Initial Term) such items, Tenant shall again have the right to terminate this Lease, provided that the Initial Term has not expired, or waive the objection.  The time periods for objecting to and curing the additional exceptions and for terminating the Lease shall be the same as those set forth above, commencing with the date Tenant receives the updated Commitment; provided, however, Tenant will be deemed to have timely objected to any further encumbrances first disclosed by any such update. "**Permitted Encumbrances**" shall mean (i) the Declaration and CCRs (defined below), (ii) those encumbrances of record in the real property records of Montgomery County, Texas listed on **Exhibit D** attached hereto and made a part hereof, and (iii) any encumbrances reflected in the Commitment (or any update to same requested and received by Tenant prior to the last day of the Initial Term as contemplated above) to which Tenant does not object within the applicable period described above or to which any objection has been waived by Tenant, but shall not include any matters that Landlord cures or commits in writing to cure or is otherwise obligated to cure by this Lease.

5.3    **Inspections and Approvals**.  During the Inspection Period and Initial Term, Tenant shall have the right (i) to conduct non-invasive soil, engineering, environmental and other tests with regard to the Land (typical soil borings for geotechnical testing are deemed to be "non-invasive"); investigate the availability of utilities, the applicable governmental requirements relating to signage and construction of improvements on the Land, the availability of necessary permits and licenses relating to signage and construction of any improvements; and determine generally the desirability and utility of the Land for Tenant's purposes; and (ii) to obtain, or authorize the procurement of, all Building Approvals and Regulatory Approvals.  Tenant shall have the right, at any time prior to the expiration of the Initial Term during the Inspection Period or Initial Term, in its sole and absolute discretion, to terminate this Lease by delivery of written notice to Landlord, in which event the Initial Rent shall be retained by Landlord and, except as set forth in the following sentence, the parties shall have no further rights or obligations to the other hereunder.  Tenant promptly shall repair and restore all damage to the Land and Shopping Center resulting from Tenant's inspections of the Land under this **Section 5.3** and any access or entry of the Land associated with same, return all property information provided by Landlord and Tenant will indemnify and hold Landlord harmless from and against all losses, claims, costs, damages and liabilities arising out of or in connection with any entry upon the Land by Tenant and its agents, servants, employees and contractors in connection with its inspections under this **Section 5.3**.

Tenant's indemnity obligations under this Section will survive the termination of this Lease. During the performance of any such inspections or tests, Tenant shall maintain or cause any entity conducting any testing and inspections on Tenant's behalf to maintain commercial general liability insurance with a limit of not less than $1,000,000 and worker's compensation insurance as required by the law of the State of Texas. If Tenant fails to give Landlord written notice of termination on or prior to the date of expiration of the Inspection Period, then Tenant's right to terminate this Lease pursuant to this **Section 5.3** during the Inspection Period shall be deemed to have been waived by Tenant; provided, that, notwithstanding the foregoing, such waiver shall not affect Tenant's right to terminate this Lease during the Initial Term as provided in this Lease. Further, if (A) all of the required Building Approvals and Regulatory Approvals have not been received by Tenant and any other applicable party on or before the expiration of the Initial Term, or (B) pursuant to Tenant's inspection of the Land, Tenant determines that the Land is not suitable for Tenant's purposes in Tenant's sole and absolute discretion, then in either such event, Tenant shall have the right to terminate this Lease by delivery of written notice to Landlord at any time prior to the expiration of the Initial Term, in which event the Initial Rent shall be retained by Landlord, and, except as set forth above, the parties shall have no further rights or obligations to the other hereunder. If Tenant does not deliver written notice to Landlord of its election to terminate this Lease prior to the expiration of the Initial Term, then the conditions of this Section shall be deemed to have been fully satisfied, and Tenant may not thereafter terminate this Lease pursuant to this Section. Tenant will use commercially reasonable efforts to obtain its Building Approvals and Regulatory Approvals. Tenant will promptly deliver copies of Building Approvals and Regulatory Approvals to Landlord as they are obtained.

     5.4   **Title Policy**. Tenant may cause the Title Company to issue to Tenant a Leasehold Owner Policy of Title Insurance, in form acceptable to Tenant and insuring Tenant's leasehold interests as evidenced by this Lease subject only to the Permitted Encumbrances, covering the Land and the appurtenant easements in the amount of the value of the Land and the cost of the improvements to be constructed on the Land (the "**Leasehold Policy**"). Landlord agrees to cooperate with Tenant and Title Company and to execute and deliver any and all documents as are reasonably requested by Tenant and/or Title Company in order to effectuate the issuance of the Leasehold Policy; provided, however, Landlord shall not be obligated to incur any cost or expense in connection therewith (beyond reasonable costs incidental to the review, execution and delivery of any such documents) or execute any documents beyond customary affidavits, appropriate authorizing resolutions, and indemnities necessary in order for the Title Company to issue the Leasehold Policy free from certain standard title exceptions. The premium to the Title Company for such Leasehold Policy will be the responsibility of Tenant.

## ARTICLE 6

### Landlord's Warranties and Covenants

     6.1   **Warranties**.

     (a)   **Title**. Landlord warrants and represents to Tenant that as of the Effective Date it has good and indefeasible fee simple title to the Land and Business Center and has full right, power and authority to enter into this Lease. Landlord further warrants that as of the Effective Date there are no mortgages or other liens (other than the lien for real estate taxes not yet due and payable and liens for which Landlord is providing an SNDA described below) affecting the Land which are superior to this Lease or which could result in the termination of this Lease except those listed on **Exhibit D** attached hereto.

     (b)   Landlord further represents and warrants to Tenant as of the Effective Date to Landlord's current actual knowledge with no duty of investigation:

     (i)   Except for the Declaration and other Permitted Encumbrances, no Non-Governmental Approvals (defined below) are required or other documents are needed to allow Tenant to construct the Improvements and/or to use the Premises for the Permitted Use. In the event Tenant shall give Landlord written notice prior to the end of the Initial Term that any non-governmental third party approvals are required or other documents are needed, in Tenant's reasonable opinion, to allow the construction of such improvements and/or to use the Premises for the Permitted Use (the "**Non-Governmental Approvals**"), then to the extent that such Non-Governmental Approvals (e.g., easements) need to be recorded, and Landlord has the authority to

record such document, Landlord agrees that each such document will be recorded in the form reasonably approved by Tenant and Landlord, at or prior to the expiration of the Initial Term.

(ii)     The Premises is not subject to common area maintenance or any similar impositions pursuant to any reciprocal easement agreement or similar document, or otherwise, except the Declaration and Permitted Encumbrances;

(iii)     Landlord has not entered into any agreement with any governmental entity and is not otherwise legally obligated to construct or install any off-site improvements for the benefit of the Premises, the construction or installation of which are a condition to the issuance of a building permit for any improvements to be constructed on the Premises or the final certificate of occupancy for such improvements;

(iv)     The Premises is not currently encumbered by, and Landlord has no plans to encumber the Premises with, a tax increment financing plan, a transportation development district, and/or any similar type of arrangement, except None;

(v)     There is no existing, pending or, to the Landlord's current actual knowledge, contemplated, threatened or anticipated (A) condemnation of all or any part of the Premises, (B) widening, addition of medians to, change of grade or limitation on use of streets abutting or serving the Premises, or (C) special tax or assessment levied or to be levied against the Premises;

(vi)     The Premises has either direct access to and from a public street or road or indirect access to a public street or road through a permanent insurable easement (which is to be included as an insured parcel in the Leasehold Policy at Tenant's expense);

(vii)     There are no other leases, tenancies or licenses covering any part of the Premises;

(viii)     Landlord has no current actual knowledge or notice of any violation of any building, zoning, environmental or other governmental statute, ordinance or regulation pertaining to the Premises, and no current actual knowledge or notice of any administrative or legal proceedings pending or threatened pertaining to the Premises;

(ix)     To Landlord's current actual knowledge as of the Effective Date (with no duty to investigate), and except as disclosed in the Environmental Report, (A) the Premises is not in violation of any applicable Environmental Laws (defined below), (B) there are no underground storage tanks on or under the Premises, and (C) Landlord has not received any notice that the Premises is in violation of any applicable Environmental Laws; and

(x)     The Premises is or prior to the date Landlord delivers possession of the Premises to Tenant, will be, a separate parcel for ad valorem tax purposes, covered by one real estate tax parcel number, which parcel includes only the land comprising the Premises and is not included within a larger parcel of land for real property tax assessment purposes.

Subject to Landlord's compliance with the terms and conditions of this Lease and the performance by Landlord of its obligations under this Lease including, without limitation, Landlord's Site Improvements, Tenant shall be deemed to have accepted the Premises from Landlord upon delivery in the condition required by this Lease in its "As-Is", "Where-Is" condition and "With All Faults", and Landlord makes no representation or warranty of any kind, whether express or implied with respect to the Premises except as expressly provided above or elsewhere in this Lease, and Landlord and Tenant expressly disclaim any implied warranty as to the habitability, fitness or suitability of the Premises for Tenant's intended commercial purpose.

6.2     **Common Areas, Ingress and Egress**.  As used in this Lease, "**Common Areas**" has the meaning given in the Declaration. Landlord agrees to keep or cause to be kept the Common Areas within the Shopping Center that are located outside of the boundaries of the Land in good condition and repair and otherwise in accordance with the Declaration. Reference is hereby made to the Declaration of Use Restrictions dated _____ (the "**CCR's**") and recorded under Clerk's File No. _____ in the Official Public Records of Real Property of Montgomery County, Texas (the "**Records**") and the Easement with Covenants and Restrictions Affecting Land dated _____, recorded as Document Number _____ in the Records (as amended, the "**Declaration**").  Landlord and Tenant acknowledge and agree that the Premises and Shopping

Center are subject to the Declaration and Landlord agrees to enforce the rights of Tenant and the Premises under the Declaration and the CCR's (including, without limitation, parking, access, easement, and signage rights benefitting the Land) and to not consent to or permit any amendment to the Declaration or the CCR's that would adversely affect any such rights or any of Tenant's rights under this Lease, increase Tenant's obligations under this Lease, or decrease Tenant's rights under this Lease, without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion. Tenant hereby agrees to comply with the provisions of the Declaration, CCR's and Permitted Encumbrances applicable to the Premises throughout the Term of this Lease, and to reimburse Landlord for all charges assessed or attributable to the Premises under the Declaration, including the Pro Rata Share (as defined in the Declaration) charged to the Premises for the maintenance, repair and replacement of the Common Facilities (as defined in the Declaration) and any other Shopping Center expenses or operating costs arising under the Declaration and CCR's (Landlord agreeing not to enter into any new recorded instrument or amend any existing recorded instrument in such a manner that would adversely affect any of Tenant's rights under this Lease, increase Tenant's obligations under this Lease, decrease Tenant's rights under this Lease, or increase the costs to be paid by Tenant pursuant to this subparagraph).

## ARTICLE 7

### Construction

7.1    **Construction of New Improvements**. Tenant shall have the right, exercised in its sole and absolute discretion from time to time and at any time, but subject to **Section 4.4** with respect to the initial Improvements and the terms of this **Article 7**, at its sole cost and risk, to cause the construction or reconstruction of new improvements on the Land, the demolition and removal of any improvements or portions of improvements situated upon the Land, and the construction of replacement improvements for improvements so removed. Any improvements constructed by Tenant on the Land shall be constructed in accordance with applicable law, Permitted Encumbrances, and the Construction Standards (defined below).

7.2    **Alterations**. At any time and from time to time, Tenant may perform or authorize the performance of such alteration, expansion, renovation, repair, refurbishment and other work with regard to any Improvements as Tenant may elect in its sole and absolute discretion, provided that such work is performed in accordance with applicable law, Permitted Encumbrances, and the Construction Standards.

7.3    **Construction Standards and Liens**.

(a) **Standards**.    Any Improvements shall be constructed, and any alteration, renovation, repair, refurbishment or other work with regard thereto shall be performed, in accordance with the following standards ("**Construction Standards**"):

(1) All such construction or work shall be performed in a good and workmanlike manner in accordance with good industry practice for the type of work in question.

(2) All such construction or work shall be done in compliance with all applicable deed restrictions, building codes, ordinances and other laws or regulations of Governmental Authorities.

(3) No construction or work shall be commenced until all licenses, permits and authorizations required of all Governmental Authorities having jurisdiction are obtained and a copy thereof has been provided to Landlord.

(4) Tenant shall have obtained and shall maintain in force and effect the insurance coverage required in **Article 9** with respect to the type of construction or work in question.

(5) After commencement, such construction or work shall be prosecuted with due diligence to its completion.

(6) Tenant shall provide its own trash container or containers for construction debris; shall promptly remove all construction and related debris from the Premises immediately following completion of construction; shall conduct no core drillings

during business hours; shall not unreasonably interfere with the use or occupancy of the Business Center by other tenants or occupants; shall perform such work or cause the performance of such work in such a manner as shall not obstruct the access to the Shopping Center or the premises of any other tenant or occupant within the Shopping Center. Tenant shall indemnify, defend and hold harmless Landlord from and against any and all liability, costs, damages (including, without limitation, any damage to the Premises, Common Area or any part of the Shopping Center), expenses (including, without limitation, reasonable attorneys' fees) and any and all liens resulting from such work, except to the extent arising out of the negligence or willful misconduct of Landlord, or Landlord's agents, employees or contractors.

(b)     Prior to the commencement of construction of the initial Improvements, Tenant must deliver to Landlord for approval proposed final plans and specifications for same, which proposed final plans and specifications must be complete and sufficient to obtain a building permit and must be based upon the Tenant Site Plan; provided, that, notwithstanding the foregoing or anything in this Lease to the contrary, Landlord shall not have any approval rights over Tenant's interior improvements. Landlord cannot unreasonably withhold, condition or delay its approval of such proposed final plans and specifications, provided that such plans and specifications are based upon the Tenant Site Plan and do not violate the Declaration. Such approval by Landlord is not a representation or warranty that such plans and specifications comply with the Declaration, matters of record or applicable laws affecting the Premises. If Landlord disapproves of such proposed final plans and specifications, Landlord must state with specificity the items to which Landlord objects and the changes that would make the proposed final plans and specifications acceptable. If Landlord does not withhold its approval in the manner set forth above within twenty (20) days after Tenant delivers the proposed final plans and specifications to Landlord, then Tenant may send a second request for approval, which request must include a statement in bold capital letters at the top of such notice: "FAILURE TO RESPOND TO THIS REQUEST IN FIVE (5) BUSINESS DAYS WILL BE DEEMED CONSENT." If Landlord does not provide a reasonable disapproval in the manner set forth above within 5-business days after such second request, then Landlord will be deemed to have approved of the proposed final plans and specifications. If Landlord disapproves of the proposed final plans and specifications, then Tenant will have five (5) business days in which to submit revised proposed final plans and specifications. Landlord and Tenant will continue to exchange plans and specifications and comments, subject in all cases to the time periods set forth above, until the final plans and specifications have been approved. Landlord and Tenant agree to negotiate in good faith until they have reached an agreement; provided, however, if they are unable to reach agreement prior to the end of the Initial Term, the Initial Term shall be automatically extended for thirty (30) days to allow the parties to complete the negotiations. In the event the parties are unable to reach agreement on or before the end of the additional thirty (30) day period, then in such event this Lease shall terminate unless both parties agree in writing to further extend the Initial Term for a reasonable period to complete the negotiations. The approved designs, plans, specifications, and materials for the Improvements are referred to from time to time as the "**Tenant's Plans and Specifications**."

Notwithstanding anything to the contrary contained herein or in this Lease, at Tenant's sole cost Tenant shall have the right to install a roof mounted or ground mounted natural gas generator required by protected loads, up to 200kva, and additional HVAC units as needed, subject to compliance with the Construction Standards. Tenant shall have the right to provide power to parking lot lights located upon the Premises. If Tenant elects to do so it shall pay all costs related thereto. Tenant further reserves the right to bring additional or alternate electrical, gas, telco/data service or capacity to the Premises and Improvements to Tenant's equipment, so long as such service is within existing easements and does not adversely affect areas of the Shopping Center outside of the Land or common utility lines serving property other than the Premises.

Further, notwithstanding anything to the contrary contained herein or in this Lease, with Landlord's prior written approval (not to be unreasonably withheld, conditioned or delayed), and subject to comliance with the Construction Standards, Tenant shall be permitted to make alterations to the Premises that are desirable in Tenant's reasonable opinion for the operation of a free standing emergency room facility, including, but not limited to modifications to the parking area, dumpster, sidewalks, landscaping and building exterior, as necessary to accommodate covered ambulance and/or patient entrance(s) which may include canopies required by state law, specifically a canopy for the ambulance drop off and a canopy for the patient drop off, such canopies to require a minimum of four (4) parking spaces.

Tenant shall landscape the areas adjacent to its building in a manner consistent with the Declaration and Tenant's Plans and Specifications. The installation of such landscaping shall be completed not later than Tenant's occupancy or completion of its building, whichever occurs first, and maintained thereafter by Tenant at its sole cost and expense in accordance with the Declaration.

(c) **Mechanic's and Materialmen's Liens**. Tenant shall have no right, authority or power to bind Landlord or any interest of Landlord in the Premises or the Shopping Center for any claim for labor or for material or for any other charge or expense incurred by or on behalf of Tenant in constructing any Improvements or performing any alteration, expansion, renovation, repair, refurbishment or other work with regard thereto, nor to render Landlord's interest in the Premises or Shopping Center liable for any lien or right of lien for any labor, materials or other charge or expense incurred by or on behalf of Tenant in connection therewith. Tenant shall not be considered the agent of Landlord in the construction, erection or operation of any such Improvements by or on behalf of Tenant. If any liens or claims for labor or materials supplied or claimed to have been supplied to the Premises are filed in connection with Tenant's work, Tenant shall cause either the release or discharge thereof or otherwise bond around such liens or claims within thirty (30) days following Tenant's receipt of notice of such liens or claims, and Tenant shall indemnify and save Landlord harmless from and against all actual costs and damages, including reasonable attorneys' fees, resulting therefrom. In the event Tenant fails to timely take such action, then Landlord may pay the lien claim, and any amounts so paid, including reasonable expenses, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has invoiced Tenant therefor, together with reasonable supporting documentation.

7.4 **Tenant's Equipment and Architectural Features Defined**. The term "**Tenant's Equipment**" means all trade fixtures and personal property now or hereafter located at or within the Premises, including, without limitation, furnishings, furniture, equipment not permanently attached to the Improvements, sign faces, computers, computer related equipment on property, liebert units, cabling, tubing, pneumatic tubing, safes, security systems, communications equipment and other equipment or property useful to Tenant in its operations which are not permanently attached to the Improvements, and, in certain circumstances, vaults, for use in connection with the conduct of Tenant's business regardless of the manner in which they are installed. The term "**Architectural Features**" is defined as any non-structural, external architectural features constituting part of the Improvements that are installed by or on behalf of Tenant in connection with Tenant's authorized development and construction activities under this Lease (whether initial construction or subsequent reconstruction), including (without limitation) Tenant's raised marquee or tower feature or extended canopy or portico in connection with Tenant's branding and operations.

7.5 **Ownership and Removal of Tenant's Equipment**. Tenant's Equipment and Architectural Features shall be solely the property of Tenant. Subject to **Section 16.11**, upon the expiration of the Term or earlier termination of this Lease, Tenant shall cause to be removed all Tenant's Equipment from the Premises, and at its discretion, Tenant may cause to be removed any one or more of the Architectural Features; provided, however, that Tenant shall repair any damage caused by such removal of Tenant's Equipment or Architectural Features. If Tenant fails to remove all Tenant's Equipment upon the expiration of the Term or earlier termination of this Lease and such failure continues for ten (10) days following Tenant's receipt of written notice from Landlord regarding same, then all of Tenant's Equipment remaining on the Premises shall become the property of Landlord without any credit or compensation to Tenant, and Tenant shall reimburse Landlord for all costs of removal and disposal of such equipment within thirty (30) days following receipt by Tenant of demand from Landlord. The obligation described in the preceding sentence shall survive the expiration or earlier termination of the Term. If Tenant does not remove any one or more of the Architectural Features upon the expiration of the Term or earlier termination of this Lease and such Architectural Features thereafter remain for thirty (30) days following Tenant's receipt of written notice from Landlord regarding same, then all of such remaining Architectural Features shall become the property of Landlord without any credit or compensation to Tenant.

7.6 **Ownership of Improvements**. During the Term, all Improvements shall be solely the property of Tenant. Upon the expiration of the Term or earlier termination of this Lease, subject to Tenant's rights in this Lease with respect to Tenant's Equipment and Architectural Features, Tenant shall at Tenant's election either: (a) only upon Landlord's request, cause the Improvements to be razed and the Land to be delivered with the surface in clean condition; or (b) leave the Land and Improvements in their "As-Is" condition. If Landlord does not provide written

notice to Tenant to cause Tenant to raze the Improvements under clause (a) at least 60 days prior to such expiration or earlier termination of this Lease, then Landlord shall be deemed to have elected to waive its right under clause (a).

## ARTICLE 8

### Use, Maintenance and Repairs

8.1     **Use**. Subject to the terms and provisions hereof, Tenant shall have the right to use and enjoy the Premises as an emergency care center and for other outpatient medical care, healthcare and counseling services or urgent care clinic, including but not limited to a freestanding emergency care facility and all activities incidental or ancillary to any of the foregoing (the "**Permitted Use**"), provided, however, Tenant shall have the right, with Landlord's written consent, not to be unreasonably withheld or delayed, to use the Premises for any other lawful purpose, provided that such use (i) is a first class retail, restaurant, medical, office, or service use, (ii) does not require materially more parking upon the Premises, (iii) does not violate the Permitted Encumbrances, CCR's or the Declaration, and (iv) does not violate any exclusive right given to any tenant of the Shopping Center then existing pursuant to an executed lease at the time of the commencement of such alternative use (collectively, "**Other Uses**"). Tenant shall not use or occupy the Premises, or knowingly permit the Premises to be used or occupied, for Other Uses in a manner which would (i) make it impossible to obtain the insurance required to be furnished by Tenant hereunder, (ii) constitute a public or private nuisance or (iii) violate any (A) use clauses contained in other leases covering property in the Shopping Center of which Tenant has knowledge and which are valid and executed as of the Effective Date, (B) existing deed restrictions affecting the Land as of the Effective Date, or (C) present or future, ordinary or extraordinary, foreseen or unforeseen, laws, regulations, ordinances or requirements of any Governmental Authority. Landlord covenants that it will enforce the use restrictions contained in the Declaration and CCRs applicable to the Shopping Center. Notwithstanding anything to the contrary in this Lease, in no event will Tenant occupy the Premises for any of the Exclusive or Prohibited Uses listed on **Exhibit E** attached hereto and made a part hereof.

Notwithstanding anything to the contrary in this Lease, if any applicable law or regulation exists, is adopted or revised in such a manner that Tenant's use of the Premises for the Permitted Use is adversely affected, and Tenant cannot lawfully continue to conduct its operations for the Permitted Use, then Tenant shall have an automatic right to terminate this Lease at any time that such condition exists upon ninety (90) days written notice to Landlord. If Tenant exercises such termination right, Tenant shall pay Landlord, concurrently with delivery of the termination notice, a termination fee equal to the sum of (i) the unamortized portion of the Broker commissions paid by Landlord as provided in **Section 16.22**, plus (ii) the demolition cost of Tenant's building. Amortization of Broker commissions will be based upon straight-line amortization over the Original Term. Upon such termination, except as otherwise expressly provided in this Lease, the parties shall have no further rights or obligations under this Lease.

Tenant shall complete construction of the initial Improvements and open for business to the public in the Premises for the Permitted Use, fully staffed and with all exterior signage in place, on or before that date which is twelve months after expiration of the Initial Term (the "**Opening Covenant**"). If Tenant fails to satisfy the Opening Covenant within two years after the Rent Commencement Date, then thereafter Landlord has the right to terminate this Lease by written notice delivered to Tenant at any time prior to Tenant satisfying the Opening Covenant, in which event this Lease will terminate upon the date that is thirty (30) days after Tenant's receipt of such notice and Tenant shall immediately surrender the Premises to Landlord and both parties shall be released from all obligations under this Lease thereafter. As a condition to Landlord's exercise of its termination right in this paragraph after a failure to satisfy the Opening Covenant, Landlord must pay to Tenant, on or prior to the effective date of the termination of this Lease by Landlord, an amount equal to the unamortized portion of Tenant's construction costs for the improvements constructed by Tenant at the Premises (but for purposes of such calculation, such initial construction costs prior to amortization are not to exceed $6,000,000.00). The amortization of such construction costs will be on a straight-line basis over a period of fifteen (15) years.

After satisfying the Opening Covenant, nothing herein shall be construed as an obligation for Tenant to continuously operate its business in the Premises or operate its business during particular days or hours. Without limitation on the foregoing, Tenant shall have the right to remove

Tenant's Equipment and cease operations in the Premises at any time and at Tenant's sole discretion. However, the right to cease to operate its business shall not affect Tenant's obligation to pay all amounts due hereunder and to perform all covenants and obligations hereunder. In the event at any time after the date Tenant initially opens for business to the public, Tenant shall fail to operate its business in the Premises for more than 365 consecutive days and no portion of the period of such failure to operate is due to casualty, condemnation, remodeling or repair performed in compliance with this Lease, transitioning an assignee or subtenant (not to exceed 180 days), force majeure, Landlord default or other delays caused by Landlord or any other cause beyond Tenant's reasonable control (a "**Disallowed Cessation**"), then Landlord shall have the right to (i) continue this Lease and accept Tenant's payment of Rent and allow Tenant to remain in possession of the Premises, or (ii) notify Tenant of Landlord's election to terminate this Lease as a result of such Disallowed Cessation by providing written notice to Tenant specifying such election at any time prior to Tenant's recommencement of business operations within the Premises (a "**Cessation Notice**"). As a condition to Landlord's exercise of its termination right in this paragraph after a Disallowed Cessation, Landlord must pay to Tenant, on or prior to the effective date of the termination of this Lease by Landlord, an amount equal to the unamortized portion of Tenant's construction costs for the improvements constructed by Tenant at the Premises (but for purposes of such calculation, such initial construction costs prior to amortization are not to exceed $6,000,000.00). The amortization of such construction costs will be on a straight-line basis over a period of fifteen (15) years. If Landlord timely provides such a Cessation Notice to Tenant and Tenant has not recommenced business operations in the Premises on or before the date that is thirty (30) days after Tenant's receipt of such Cessation Notice, then this Lease shall terminate effective on the expiration of such 30-day period, in which event Tenant shall immediately surrender the Premises to Landlord and both parties shall be released from all obligations under this Lease thereafter. Furthermore, in no event shall Tenant be liable to Landlord as a result of leasing or acquiring any other real property or improvements or as a result of opening or operating any other store, whether an emergency care center or otherwise, and whether adjacent to the Land or in any other area (collectively, "**Off-Site Activities**"), and Tenant shall not be limited or restricted in any way from any such Off-Site Activities.

8.2 **Maintenance and Repairs.**

(a) Subject to Tenant's rights under **Article 7**, Tenant shall keep the Premises in a reasonably clean and sanitary condition, make all repairs thereto, including, without limitation, the interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen and shall maintain and keep the Premises and the sidewalks and curbs, parking areas and drive aisles around the Premises in the condition Tenant deems appropriate for Tenant's use and occupancy of the Premises and otherwise in compliance with the Declaration. Tenant will not do, knowingly permit or suffer any waste, damages, disfigurement or injury to or upon the Premises or any part thereof, but this Section shall not be construed as limiting Tenant's rights under **Article 7**.

(b) Landlord shall have no obligation to maintain or repair the Premises. Tenant's maintenance obligations hereunder shall be performed by Tenant in accordance with the applicable provisions of the Declaration, and otherwise in compliance with all applicable laws. LANDLORD HAS NO DUTY OR OBLIGATION OF ANY KIND TO MAKE ANY REPAIRS OR REPLACEMENTS OR PROVIDE MAINTENANCE OF ANY KIND TO THE LAND, THE PREMISES, ANY IMPROVEMENTS CONSTRUCTED THEREON (INCLUDING ANY OF TENANT'S PERSONAL PROPERTY) OR THE COMMON AREAS LOCATED ON THE LAND, OR OTHERWISE MAINTAIN OR KEEP THE SAME IN GOOD CONDITION. TENANT IS SOLELY RESPONSIBLE FOR SAME. Landlord shall maintain or cause to be maintained the Common Areas of the Shopping Center in accordance with the applicable provisions of the Declaration, and otherwise in compliance with all applicable laws. This paragraph is not intended to limit or otherwise affect Landlord's express representations and covenants elsewhere within this Lease, all of which are hereby preserved for the benefit of Tenant

8.3 **Parking.** Notwithstanding anything to the contrary contained herein and for the avoidance of doubt, Tenant and Tenant's agents, employees, contractors, licensees, customers and invitees shall have the non-exclusive right to park in all parking spaces located upon the Land and otherwise utilize such parking lots, such parking to include, without limitation, the right to park vehicles overnight on the Land. The parking lot located on the Premises, at Tenant's election, shall be lit from dusk until dawn, seven (7) days per week.

## ARTICLE 9

### Insurance and Indemnity

9.1   **Insurance**.

(a)   Tenant shall, at its sole cost and expense, keep and maintain in force comprehensive general liability insurance, including contractual liability specifically applying to the provisions of this Lease, with limits of not less than $2,000,000 with respect to bodily injury or death to any number of persons in any one accident or occurrence and with respect to property damage in any one accident or occurrence with respect to the Premises.

(b)   Landlord shall, at its sole cost and expense, keep and maintain in force or cause to be kept and maintained in force, the insurance required by the Declaration.

9.2   **Policies**. All insurance maintained by Tenant in accordance with the provisions of this Article shall be issued by companies reasonably satisfactory to Landlord. Each party's liability insurance shall show the other party as an additional insured. In addition, within a reasonable time after Landlord notifies Tenant in writing of Landlord's mortgagee, such mortgagee shall be named as an additional insured under the policies maintained by Tenant pursuant to **Section 9.1(a)** above. All insurance policies required under this Article shall be written as primary non-contributory policies. Each party shall furnish to the other party a certificate of insurance for all insurance policies required to be carried by that party under this Article and Tenant shall include a certificate of the insurance carrier that such insurance shall not be canceled or modified without at least fifteen (15) days advance written notice to the Landlord. If Tenant fails to maintain the required insurance, and such failure continues for more than ten (10) days following Tenant's receipt of Landlord's written notice, Landlord may, but shall not be obligated to, obtain such insurance and be reimbursed for the reasonable cost thereof within thirty (30) days of written demand therefor (which demand shall be accompanied by reasonable supporting documentation).

9.3   **Tenant's Indemnity**.   EXCEPT FOR ANY ACTION FOR WHICH LANDLORD OWES AN OBLIGATION TO TENANT (OR RELEASES TENANT) ELSEWHERE IN THIS LEASE, TENANT SHALL INDEMNIFY AND HOLD HARMLESS LANDLORD, ITS SUCCESSORS AND ASSIGNS ("TENANT INDEMNIFIED PARTIES") FROM ALL CLAIMS, SUITS, ACTIONS AND PROCEEDINGS WHATSOEVER ("CLAIMS"), WHICH MAY BE BROUGHT OR INSTITUTED ON ACCOUNT OF OR GROWING OUT OF ANY AND ALL INJURIES OR DAMAGES, INCLUDING DEATH, TO PERSONS OR PROPERTY OCCURRING ON THE PREMISES OR RELATING TO THE USE OR OCCUPANCY OF THE PREMISES (OTHER THAN CLAIMS RESULTING FROM LANDLORD'S VIOLATION OF THIS LEASE OR ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THIRD PARTIES THEN ACTING SUBJECT TO LANDLORD'S DIRECTION OR CONTROL), AND ALL LOSSES, LIABILITIES, JUDGMENTS, SETTLEMENTS, COSTS, PENALTIES, DAMAGES AND EXPENSES RELATING THERETO, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF DEFENDING AGAINST, INVESTIGATING AND SETTLING THE CLAIMS COVERED HEREBY. TENANT SHALL ASSUME ON BEHALF OF THE TENANT INDEMNIFIED PARTIES AND CONDUCT WITH DUE DILIGENCE AND IN GOOD FAITH THE DEFENSE OF ALL CLAIMS COVERED HEREBY AGAINST ANY OF THE TENANT INDEMNIFIED PARTIES. MAINTENANCE OF THE INSURANCE REFERRED TO IN THIS ARTICLE SHALL NOT AFFECT TENANT'S OBLIGATIONS UNDER THIS SECTION. TENANT SHALL BE RELIEVED OF ITS OBLIGATION OF INDEMNITY TO THE EXTENT OF THE AMOUNT ACTUALLY RECOVERED FROM ONE OR MORE OF THE INSURANCE CARRIERS OF TENANT OR LANDLORD AND EITHER (I) PAID TO LANDLORD OR (II) PAID FOR LANDLORD'S BENEFIT IN REDUCTION OF ANY LIABILITY, PENALTY, DAMAGE, EXPENSE OR CHARGE ACTUALLY IMPOSED UPON, OR INCURRED BY, LANDLORD IN CONNECTION WITH THE CLAIMS COVERED HEREBY. TENANT SHALL HAVE THE RIGHT TO CONTEST THE VALIDITY OF ANY CLAIMS COVERED HEREBY, IN THE NAME OF LANDLORD OR TENANT, AS TENANT MAY DEEM APPROPRIATE, PROVIDED THAT THE EXPENSES THEREOF SHALL BE PAID BY TENANT, OR TENANT SHALL CAUSE THE SAME TO BE PAID BY ITS INSURER.

9.4 **Landlord's Indemnity.** **EXCEPT FOR ANY ACTION FOR WHICH TENANT OWES AN OBLIGATION TO LANDLORD (OR RELEASES LANDLORD) ELSEWHERE IN THIS LEASE, LANDLORD SHALL INDEMNIFY AND HOLD HARMLESS TENANT, ITS SUCCESSORS AND ASSIGNS (THE "<u>LANDLORD INDEMNIFIED PARTIES</u>") FROM ALL CLAIMS WHICH MAY BE BROUGHT OR INSTITUTED ON ACCOUNT OF OR GROWING OUT OF LANDLORD'S VIOLATION OF THIS LEASE OR OUT OF ANY AND ALL INJURIES OR DAMAGES, INCLUDING DEATH, TO PERSONS OR PROPERTY RELATING TO THE USE OR OCCUPANCY OF THE COMMON AREAS IN PORTIONS OF THE SHOPPING CENTER, EXCLUSIVE OF THE PREMISES (OTHER THAN CLAIMS RESULTING FROM TENANT'S VIOLATION OF THIS LEASE OR ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THIRD PARTIES THEN ACTING SUBJECT TO TENANT'S DIRECTION OR CONTROL), AND ALL LOSSES, LIABILITIES, JUDGMENTS, SETTLEMENTS, COSTS, PENALTIES, DAMAGES AND EXPENSES RELATING THERETO, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF DEFENDING AGAINST, INVESTIGATING AND SETTLING THE CLAIMS COVERED HEREBY. LANDLORD SHALL ASSUME ON BEHALF OF THE LANDLORD INDEMNIFIED PARTIES AND CONDUCT WITH DUE DILIGENCE AND IN GOOD FAITH THE DEFENSE OF ALL CLAIMS COVERED HEREBY AGAINST ANY OF THE LANDLORD INDEMNIFIED PARTIES. MAINTENANCE OF THE INSURANCE REFERRED TO IN THIS ARTICLE SHALL NOT AFFECT LANDLORD'S OBLIGATIONS UNDER THIS SECTION. LANDLORD SHALL BE RELIEVED OF ITS OBLIGATION OF INDEMNITY TO THE EXTENT OF THE AMOUNT ACTUALLY RECOVERED FROM ONE OR MORE OF THE INSURANCE CARRIERS OF LANDLORD OR TENANT AND EITHER (I) PAID TO TENANT OR (II) PAID FOR TENANT'S BENEFIT IN REDUCTION OF ANY LIABILITY, PENALTY, DAMAGE, EXPENSE OR CHARGE ACTUALLY IMPOSED UPON, OR INCURRED BY, TENANT IN CONNECTION WITH THE CLAIMS COVERED HEREBY. LANDLORD SHALL HAVE THE RIGHT TO CONTEST THE VALIDITY OF ANY CLAIMS COVERED HEREBY, IN THE NAME OF TENANT OR LANDLORD, AS LANDLORD MAY DEEM APPROPRIATE, PROVIDED THAT THE EXPENSES THEREOF SHALL BE PAID BY LANDLORD, OR LANDLORD SHALL CAUSE THE SAME TO BE PAID BY ITS INSURER.**

9.5 **Subrogation.** Anything in this Lease to the contrary notwithstanding, with respect to any damage that may occur to the Improvements or any other improvements located on the Shopping Center or any personal property of such party therein or thereon, to the extent such damages are covered by property insurance benefitting Landlord or Tenant (as applicable) and the proceeds of such insurance are payable and made available to the damaged party to compensate it for the damage at issue, Landlord and Tenant (as applicable) waive all rights against the other for recovery, claims, actions or causes of action for any such damage. The foregoing releases shall not apply to property losses or damages in excess of policy limits or to losses or damages not covered by insurance due to a deductible clause in the policy. For purposes of this **Section 9.5**, Tenant shall be deemed to maintain property insurance equal to the full replacement cost of the Premises and shall release Landlord to the extent of such deemed coverage.

9.6 **Coverage.** All insurance described in this Article may be obtained by Tenant by endorsement or equivalent means under any blanket insurance policies maintained by Tenant provided that the coverage and other terms of such insurance otherwise comply with this Article. Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right to self-insure against any risk for which it is required to carry insurance under this Article; provided that (i) Tenant, together with its affiliated owners, have an aggregate liquid net worth of at least $100,000,000.00 determined pursuant to generally accepted accounting principles consistently applied, and (ii) Tenant maintains a program of self-insurance and (iii) upon request from Landlord, Tenant provides Landlord with evidence reasonably satisfactory to Landlord confirming the satisfaction of clauses (i) and (ii) above.

## ARTICLE 10

### Casualty Loss

10.1 **Tenant's Rights**. If during the last two (2) years of the Term any Improvements are wholly or partially destroyed or damaged by fire or any other casualty, then Tenant shall have the right, exercised in Tenant's sole and absolute discretion, to terminate this Lease. Upon such termination, the parties shall have no further rights, duties, or obligations under this Lease; provided, however, if Tenant elects to terminate this Lease under this Section, then Tenant shall (i) cause the Improvements to be razed and the Land to be delivered with the surface in clean condition, and (ii) pay Landlord the Base Rent due through the end of the then current Term. If Tenant is not entitled to terminate this Lease pursuant to this **Section 10.1** or if Tenant elects not to terminate this Lease under this Section, then Tenant shall repair, replace, restore and reconstruct any Improvements existing on the Land immediately prior to such casualty (or improvements substantially similar to such Improvements) or to construct such other improvements upon the Land to the extent in compliance with this Lease, including Landlord's reasonable approval of exterior elevations and site plan for such improvements and compliance with any applicable Construction Standards.

10.2 **Notice of Damage**. Tenant shall notify Landlord of any material destruction or damage to the Premises promptly after obtaining knowledge of same.

## ARTICLE 11

### Condemnation

11.1 **Total Taking**. Should the entire Premises be taken (which term, as used in this Article, shall include any conveyance in avoidance or settlement of eminent domain, condemnation or other similar proceedings) by any Governmental Authority, corporation or other entity under the right of eminent domain, condemnation or similar right, then Tenant's right of possession under this Lease shall terminate as of the date of taking possession by the condemning authority, and the award therefor will be distributed as follows: (i) first, to the payment of all reasonable fees and expenses incurred in collecting the award, (ii) second, to Tenant in an amount equal to the unamortized cost of the Improvements (assuming that the Improvements are amortized over the Original Term of the Lease), and (iii) the balance of the award shall be equitably apportioned between Landlord and Tenant based on the then respective fair market values of Landlord's interest in the Premises (appraised by reference to all relevant factors including the income stream derivable by Landlord under this Lease and the then present value of Landlord's reversionary interest in the entire Premises after expiration of the Original Term) and Tenant's interest in the Premises (appraised by reference to all relevant factors, including the income stream derivable by Tenant from the Premises for the remainder of the Original Term). After the determination and distribution of the condemnation award as herein provided, the Lease shall terminate, and the parties shall have no further rights, duties or obligations under the Lease.

11.2 **Partial Taking**. Should a portion of the Premises be taken by any Governmental Authority, corporation or other entity under the right of eminent domain, condemnation or similar right, such that (i) any portion of the vertical Improvements intended for occupancy are taken or, in Tenant's reasonable judgment, so much of the Improvements shall be taken so as to make it economically unsound to use the remainder for the uses and purposes contemplated hereby, or (ii) so much of the Premises shall be taken so as to cause Tenant's available parking spaces to be less than those required by any Governmental Authority immediately prior to the effects of such taking action or less than an amount reasonably necessary for Tenant's operation of a Permitted Use, or (iii) any one or more of Tenant's access points to the Premises is taken (unless at least one access point to the Premises is not taken and Landlord is able to promptly thereafter provide to Tenant perpetual and irrevocable rights to alternative additional access point(s) reasonably equivalent to the access point(s) so taken in Tenant's sole discretion) or so much of the Premises is taken such that Tenant can no longer reasonably or lawfully operate its business in the Premises as an emergency care facility or as otherwise currently operated, then at Tenant's election in Tenant's sole and absolute discretion, and only by written notice to Landlord delivered within 120 days after such taking, this Lease shall terminate as of the date of taking of possession by the condemning authority in the same manner as if the whole of the Premises had thus been taken, and the award therefor shall be distributed as provided in **Section 11.1.** Should any other partial taking of the

Premises occur or if Tenant does not elect for this Lease to terminate as contemplated in the preceding sentence, then this Lease nevertheless shall continue in effect as to the Premises, or the remainder thereof, as the case may be.

11.3   **Award on Partial Taking**.  In the event of a partial taking where this Lease is not terminated, and as a result thereof Tenant will need to restore, repair or refurbish the remainder of the Premises in order to put them in a usable condition, then (i) the award shall first be paid to Tenant for payment of such restoration, repair and refurbishment, and (ii) the remainder shall be apportioned and paid as provided in (i) and (iii) of **Section 11.1**, considering the respective interests of Landlord and Tenant in the portion of the Premises taken.  If a portion of the Premises is taken and no repair or restoration work is required because thereof, the award therefor shall be apportioned and paid as provided in (i) and (iii) of **Section 11.1**, considering the respective interests of Landlord and Tenant in the portion of the Premises taken.

11.4   **Temporary Taking**.  If the whole or any portion of the Premises is taken for temporary use or occupancy, the Term shall not be reduced or affected, and Tenant shall continue to pay the Rent in full (but subject to an Equitable Takings Adjustment for the period of such temporary taking).  Except to the extent Tenant is prevented from so doing pursuant to the terms of the order of the condemning authority, Tenant shall continue to perform and observe all of the other covenants, agreements, terms and provisions of this Lease.  In the event of any temporary taking, Tenant shall be entitled to receive the entire amount of any award therefor unless the period of temporary use or occupancy shall extend beyond the expiration of the Term.  If it so extends, then after payment to Tenant therefrom for the estimated cost of the Improvements taken or damaged (to the extent that any such award is intended to compensate for loss or damage to the Improvements), such award shall be apportioned between Landlord and Tenant in the same ratio that the portion of such period falling before the day of expiration and that part falling after, bear to such entire period.

11.5   **Notice of Taking, Cooperation**.  Landlord and Tenant shall immediately notify the other of the commencement of any eminent domain, condemnation or other similar proceedings with regard to the Premises.  Landlord and Tenant covenant and agree to fully cooperate in any condemnation, eminent domain, or similar proceeding in order to maximize the total award receivable in respect thereof.  Any termination of this Lease pursuant to this **Article 11** shall not affect the rights of Landlord and Tenant to any such award.

## ARTICLE 12

### Assignment and Subletting

### 12.1   Tenant's Right to Assign.

(a) Tenant may assign its rights and obligations hereunder with Landlord's prior approval to any entity controlling, controlled by or under common control with Tenant or into which Tenant may be merged or consolidated, or to VIP SURGICAL, LLC or any affiliate thereof, or to any entity to whom Tenant may sell all or substantially all of Tenant's assets, or to any licensee, franchisee, or franchisor of Tenant, or any franchisee of Tenant's franchisor ("**Affiliated Transferee**"), and Tenant shall be relieved of liability under this Lease following an express acceptance of such assignment by the Affiliated Transferee. Notwithstanding anything to the contrary contained herein, the transfer of stock among existing shareholders, to or among family members, or to trusts for the benefit of any of such parties, or to corporations owned or controlled by any of such parties, or by and among affiliates of any of such parties, or the transfer of stock in connection with a public offering of stock, or any transfer of stock if Tenant is a public corporation, or a private placement of more or less than a controlling interest in Tenant shall not be deemed an assignment, subletting or other transfer of Tenant's interest in and to this Lease within the purview of this paragraph.  Further, notwithstanding anything to the contrary contained herein, this Lease shall contain no provision restricting or referring in any manner to a change in control or change in shareholders, directors, management or organization of Tenant, or any subsidiary, affiliate or associate of the parent of Tenant, or to the issuance, sale, purchase or disposition of the shares of Tenant, or any subsidiary, affiliate or associate of the parent of Tenant.

(b) Except as provided above with respect to an Affiliated Transferee, Tenant may not assign its rights hereunder without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed in any case. If Landlord approves (or is deemed to have approved) any assignment or subletting under this subsection (b), then the assigning Tenant shall be relieved of liability for the obligations of the "Tenant" under this Lease. Landlord shall indicate its written approval or disapproval of any proposed assignee within thirty (30) days after Tenant gives to Landlord notice of the proposed assignment, including the identity of the proposed assignee and reasonably sufficient information as to the proposed assignee and proposed use to enable Landlord to evaluate such assignee's character, reputation and financial strength and to determine compliance of the intended use. If Landlord fails to indicate its approval or disapproval within such thirty (30) day period, Tenant may send a second request which notice will include a statement in bold capital letters at the top of such request: "FAILURE TO RESPOND TO THIS REQUEST IN FIVE (5) BUSINESS DAYS WILL BE DEEMED CONSENT" and if Landlord thereafter fails to respond to such second request within five (5) business days after such second request, Landlord's consent will be deemed given. Any assignment of Tenant's rights under this Lease that are not in accordance with this Section shall be void.

(c) In connection with Tenant's financing arrangements, Tenant shall have the absolute right from time to time during the Term hereof and without Landlord's approval, whether written or otherwise, to (i) grant and assign to Tenant's lenders, a mortgage or other security interest in Tenant's interests in this Lease and/or the Premises, and/or otherwise collaterally assign to Tenant's lenders, Tenant's interests in this Lease and/or the Premises, and/or (ii) grant and assign to Tenant's lenders, a mortgage or other security interest in and to any or all of Tenant's Equipment located upon the Premises, and/or (iii) assign this Lease to Tenant's financing source who shall then, in turn, sublease the Premises back to original Tenant named herein or an Affiliated Transferee of such original Tenant pursuant to a sublease authorized herein (with Landlord hereby consenting to such sublessee continuing to pay the Rent due hereunder directly to Landlord). Landlord agrees to execute such confirmation certificates and other documents (except amendments to this Lease unless Landlord hereafter consents) as Tenant's lenders may reasonably request in connection with any such financing. In no event, however, shall Tenant be permitted to grant a security interest in and to Landlord's fee simple title to the Land, and in the event Tenant's lender or its designee under an operative security instrument becomes the owner of the leasehold estate, subject to the terms of any applicable SNDA, any further assignment by such lender or designee must otherwise satisfy the terms and conditions of this Article 12 as if such lender or designee was the original Tenant hereunder.

12.2 **Tenant's Right to Sublease**.

(a) Tenant may freely execute subleases with regard to the Improvements provided only that (i) the lease term of each such sublease (including all renewal and extension rights of any kind or type) shall not extend past the stated expiration date of the Term, unless Landlord consents in writing thereto, which consent shall not be unreasonably withheld or delayed and (ii) such sublease shall be expressly subject to the terms and provisions of this Lease.

(b) Each sublease for space in the Improvements shall specifically provide that the sublessee's rights thereunder are subject to Landlord's rights under this Lease. Tenant shall give a copy of each sublease to Landlord upon request therefor by Landlord from time to time.

(c) As used in this Lease the term "**sublease**" shall include any leases, licenses, occupancy agreements, franchise or other similar rights, agreements or arrangements of whatever nature relating to the use or occupancy of any part of the Premises, including (without limitation) any rights granted by Tenant to a third-party operator of the business within the Premises.

## ARTICLE 13

### Environmental Provisions

13.1 **Definitions.** For purposes of this Lease the following terms shall have the following meanings:

(a) **"Environmental Laws"** means applicable federal, state and local laws, codes, ordinances, rules and regulations relating to protection of the public health, welfare and the environment, including, without limitation, those laws relating to the storage, handling and use of chemicals and other hazardous materials, those relating to the generation, processing, treatment, storage, transport, disposal or other management of waste materials of any kind and those relating to the protection of environmentally sensitive areas.

(b) **"Hazardous Material"** means "hazardous substance," "pollutant or contaminant," and "petroleum" and "natural gas liquids," as those terms are defined or used in Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act (**"CERCLA"**) or in other applicable Environmental Laws and "asbestos".

(c) **"Release"** means depositing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing.

13.2 **Landlord's Representations and Warranties.** Landlord hereby represents and warrants that as of the Effective Date of this Lease:

(a) To its current actual knowledge and except as set forth in the Environmental Report delivered to Tenant prior to the Effective Date, the Medical Center and the Land are not in violation of any applicable Environmental Laws as of the date of this Lease.

(b) To its current actual knowledge and except as set forth in the Environmental Report delivered to Tenant prior to the Effective Date, there has been no Release of any Hazardous Materials on, onto or from the Medical Center or the Land that has resulted in or that could likely result in a violation of any Environmental Law or in the creation of liability or obligations, including, without limitation, notification, deed recordation or remediation, under any Environmental Law. To Landlord's current actual knowledge and except as set forth in the Environmental Report delivered to Tenant prior to the Effective Date, the Medical Center has not contained and contains no underground or aboveground storage tanks, no "PCBs" or "PCB items," as those terms are defined in 40 C.F.R. §761.3, and no asbestos.

(c) Landlord agrees to indemnify and hold Tenant, its directors, officers, stockholders, employees, agents, attorneys, consultants, contractors and its successors and assigns, harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, judgments, administrative orders, remediation requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, reasonable attorneys' fees and expenses), arising out of (i) any material misrepresentation of Landlord contained in this Section or (ii) any breach by Landlord of its obligations under this Section, (iii) any presence or Release of any Hazardous Material on the Land or other portion of the Medical Center on or after the Effective Date, except to the extent introduced by Tenant, or Tenant's agents, employees or contractors when subject to Tenant's direction or control or (iv) any presence or Release of any Hazardous Material on the Land or other portion of the Medical Center prior to the Effective Date of this Lease. This indemnification will survive the termination or expiration of this Lease.

13.3 **Tenant's Representations, Warranties and Covenants.** Tenant hereby represents, warrants and covenants that:

(a) Tenant agrees not to knowingly permit the Release of any Hazardous Material on, onto or from the Premises or the Shopping Center that results in a violation of any Environmental Law or in the creation of liability or obligations (including, without limitation, notification or deed recordation or remediation) under any Environmental Law.

(b) Tenant further agrees not to handle, use or otherwise manage any Hazardous Material in violation of any Environmental Laws. Tenant shall (except to the extent of Landlord's express obligations, representations and indemnities in this Lease with respect to Environmental Laws) comply with all Environmental Laws in connection with the Premises and Tenant's use of the Premises, and Tenant shall make all notifications, and shall obtain

and maintain in full force all permits, licenses, registrations, or similar authorizations, required under any Environmental Law for the operations or activities of Tenant at the Premises.

(c) If Tenant is in breach of any of its agreements set forth in this Section, Tenant, at its sole expense, shall take all action required, including environmental cleanup of the Premises, to comply with the covenants herein or applicable legal requirements and, in any event, shall take all action deemed necessary under all applicable Environmental Laws.

(d) Tenant agrees to indemnify and hold Landlord, its directors, officers, stockholders, partners, joint venturers, employees, agents, attorneys, consultants, contractors and its successors and assigns, harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, judgments, administrative orders, remediation requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, reasonable attorneys' fees and expenses), arising out of (i) any breach by Tenant of its obligations under this Section, or (ii) any Release of any Hazardous Material on the Premises or Medical Center by Tenant, or Tenant's agents, employees or contractors when subject to Tenant's direction or control. This indemnification will survive the termination or expiration of this Lease.

## ARTICLE 14

### Warranty of Peaceful Possession

14.1    **Peaceful Possession**.  Landlord covenants that Tenant, on paying the Rent and performing and observing the covenants and agreements herein contained and provided to be performed by Tenant, shall and may peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term and may exercise all of its rights hereunder, subject only to the provisions of this Lease, the Permitted Encumbrances and applicable governmental laws, rules and regulations.  Landlord agrees to warrant and forever defend Tenant's right to such occupancy, use and enjoyment and the title to the Premises against the claims of any and all persons whomsoever lawfully claiming the same, or any part thereof, by, through or under Landlord, but not otherwise, subject only to provisions of this Lease, the Permitted Encumbrances and all applicable governmental laws, rules and regulations.  Without limitation on the breadth of the foregoing, Landlord shall not terminate, or consent to or permit any amendments or other modifications to any Permitted Encumbrances that would have an adverse effect on the Premises or the rights of the Tenant under the respective Permitted Encumbrance, or on Tenant's rights under this Lease or the use of the Premises, without Tenant's consent in its sole discretion.

## ARTICLE 15

### Default and Remedies

15.1    **Tenant's Default**.  Each of the following shall be deemed a "**Tenant's Default**" by Tenant hereunder and a material breach of this Lease:

(a) If Tenant fails to pay any installment of Rent on the date upon which the same is due to be paid and such default continues for ten (10) days after Tenant is given a written notice specifying such default.

(b) If Tenant fails to keep, perform or observe any of the covenants, agreements, terms or provisions contained in this Lease that are to be kept or performed by Tenant other than with respect to payment of Rent or other liquidated sums of money and Tenant fails to commence and take such steps as are necessary to remedy the same within thirty (30) days after Tenant is given written notice specifying the same, or having so commenced, thereafter fails to proceed diligently and with continuity to remedy the same.

(c) If any petition is filed against Tenant under any bankruptcy or insolvency law or under the reorganization provisions of any law of like import or if a receiver of Tenant, or of all or substantially all of the property of Tenant, is appointed without acquiescence, and such petition or appointment is not discharged or stayed within sixty (60) days after the happening of such event.

(d) If Tenant makes an assignment of its property for the benefit of creditors or files a voluntary petition under any bankruptcy or insolvency law, or seeks relief under any other law for the benefit of debtors.

(e) If Tenant fails to maintain the insurance required of Tenant hereunder, and such failure continues for more than ten (10) days following Tenant's receipt of written notice form Landlord.

15.2   **Landlord's Remedies**.  If a Tenant's Default occurs, Landlord may, at any time thereafter prior to the curing thereof and without waiving any other rights hereunder or available to Landlord at law or in equity (Landlord's rights being cumulative, and all such rights at law or in equity being expressly reserved by Landlord), do any one or all of the following:

(a) Landlord may terminate this Lease by giving Tenant written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice with the same force and effect and to the same extent as if the effective date of such notice were the day originally fixed in **Article 2** for the expiration of the Term.  Landlord, its agent or representatives, shall have the right, without further demand or notice, to re-enter and take possession of the Premises and remove all persons and property therefrom with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof. In the event of such termination, Tenant shall be liable to Landlord for damages in an amount equal to (i) the discounted present value (using a discount rate of ten percent (10%)) of the amount by which the Rent reserved hereunder for the remainder of the stated Term exceeds the then net fair market rental value of the Premises for such period of time, plus, (ii) all expenses incurred by Landlord enforcing its rights hereunder and any and all other actual damages incurred by Landlord in connection with such default.

(b) Landlord may terminate Tenant's right to possession of the Premises and enjoyment of the rent, issues and profits therefrom without terminating this Lease or the leasehold estate created hereby, re-enter and take possession of the Premises and remove all persons and property therefrom with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof, and lease, manage and operate the Premises and collect the rents, issues and profits therefrom all for the account of Tenant, and credit to the satisfaction of Tenant's obligations hereunder the net rental thus received (after deducting therefrom all reasonable costs and expenses of repossessing, leasing, managing and operating the Premises).  If the net rental so received by Landlord exceeds the amounts necessary to satisfy all of Tenant's obligations under this Lease, nevertheless Landlord shall retain such excess.  In no event shall Landlord be liable for failure to so lease, manage or operate the Premises or collect the rentals due under any subleases and any such failure shall not reduce Tenant's liability hereunder.  If Landlord elects to proceed under this Section, it may at any time thereafter elect to terminate this Lease as provided in **Section 15.2(a)**.

(c) Landlord may exercise any and all other remedies available at law or in equity in connection with such default by Tenant.

(d) Notwithstanding anything to the contrary contained herein, in the event of a default by Tenant hereunder, Landlord hereby covenants and agrees to use reasonable efforts to mitigate its damages, which reasonable efforts shall include, without limitation, using commercially reasonable efforts to relet the Premises upon commercially reasonable terms. In addition, notwithstanding anything to the contrary contained in this Lease, Landlord shall not have any right to (a) sue Tenant for any consequential, punitive or incidental damages (including, without limitation, any claims for lost profits and/or lost business opportunity, or (b) sue Tenant for any costs to renovate the Premises for any prospective Tenant which are in excess of those costs which are reasonably necessary to convert the Premises to so-called "vanilla-shell" condition.  Further, in no event shall Tenant be liable for any cost, expense or fee incurred by Landlord in connection with a default by Tenant hereunder, unless such cost, expense or fee is reasonably incurred.

15.3   **Landlord's Default**.  It shall be deemed a "**Landlord's Default**" hereunder and a material breach of this Lease if Landlord fails to keep, perform or observe any of the covenants,

agreements, terms or provisions contained in this Lease that are to be kept or performed by Landlord and Landlord fails to commence and take such steps as are necessary to remedy the same within thirty (30) days after Landlord is given written notice specifying the same, or having so commenced, thereafter fails to proceed diligently and with continuity to remedy the same.

15.4 **Tenant's Remedies**. If a Landlord's Default occurs, Tenant may, at any time thereafter (i) pursue any remedy available at law or in equity (including without limitation maintaining and action for damages or pursuing injunctive relief) or (ii) incur any expense reasonably necessary to perform the obligation of Landlord specified in such notice and deduct such reasonable expense from the Rent or other charges next becoming due in the event Landlord fails to reimburse Tenant for the same within thirty (30) days following Landlord's receipt of Tenant's written demand therefor together with reasonable supporting documentation. Notwithstanding anything to the contrary in this Lease, in no event may Tenant sue Landlord for any consequential, punitive or incidental damages (including, without limitation, any claims for lost profits and/or lost business opportunity).

## ARTICLE 16

### Miscellaneous

16.1 **Notices**. Any notice provided for or permitted to be given hereunder must be in writing and may be given by (i) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this Section or (ii) delivering the same to the party to be notified or (iii) by depositing same with a nationally-recognized overnight courier service for delivery on the next business day or (iv) fax or email on a business day if a conforming copy of such notice is deposited no later than the same day in accordance with the method set forth in clause (iii) immediately above. Notice given in accordance with clause (i) or (ii) shall be effective upon receipt at the address of the addressee, as evidenced by the executed postal receipt or other receipt for delivery. Notice given in accordance with clause (iii) shall be effective on the date of deposit with the overnight courier with instruction for delivery on the next business day. Notice given in accordance with clause (iv) shall be effective as of the date and time reflected by the confirmation of sending that is generated by the sending fax machine or by the copy of the email produced in the sending party's "sent" file or similar electronic storage. For purposes of notice the addresses of the parties hereto shall, until changed, be as follows:

Landlord:


Tenant:


with a copy to:


The parties hereto shall have the right from time to time to change their respective addresses for purposes of notice hereunder to any other location within the United States by giving a notice to such effect in accordance with the provisions of this Section.

16.2 **Performance of Tenant's Obligations**. If Tenant fails to perform or observe any of its covenants, agreements or obligations hereunder for a period of thirty (30) days after notice of such failure is given by Landlord, then Landlord shall have the right, but not the obligation, at its sole election (but not as its exclusive remedy), to perform or observe the covenants, agreements or obligations which are asserted to have not been performed or observed at the expense of Tenant and to recover all costs or expenses incurred in connection therewith, together with interest thereon at ten percent (10%) per annum from the date expended until repaid. Any performance or observance by Landlord pursuant to this Section shall not constitute a waiver of the Tenant's failure to perform or observe.

16.3 **Intentionally Deleted**.

16.4 **Modification and Non-Waiver**. No variations, modifications or changes herein or hereof shall be binding upon any party hereto unless set forth in writing executed by both parties

VIP MEDSURG VENTURES, LLC **Ground Lease** – **Page 24**

hereto. No waiver by either party of any breach or default of any term, condition or provision hereof, including without limitation the acceptance by Landlord of any Rent at any time or in any manner other than as herein provided, shall be deemed a waiver of any other or subsequent breaches or defaults of any kind, character or description under any circumstance. No waiver of any breach or default of any term, condition or provision hereof shall be implied from any action of any party, and any such waiver, to be effective, shall be set out in a written instrument signed by the waiving party.

16.5   **Governing Law**. This Lease shall be construed and enforced in accordance with the laws of the State where the Premises is located.

16.6   **Number and Gender; Caption; References**. Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings in this Lease are for convenience of reference and shall not affect the construction or interpretation of this Lease. Whenever the terms "hereof," "hereby," "herein" or words of similar import are used in this Lease they shall be construed as referring to this Lease in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Any reference to a particular "Article" or "Section" shall be construed as referring to the indicated article or section of this Lease.

16.7   **Estoppel Certificate**. Landlord and Tenant shall execute and deliver to each other, within a reasonable time following written request therefor by the other party (not to exceed twenty (20) days), a certificate addressed as indicated by the requesting party and stating:

(a) whether or not this Lease is in full force and effect;

(b) whether or not this Lease has been modified or amended in any respect, and submitting copies of such modifications or amendment;

(c) whether or not, to the best of the certifying party's knowledge, there are any existing defaults hereunder known to the party executing the certificate, and specifying the nature thereof;

(d) whether or not, to the best of the certifying party's knowledge, any particular article, section or provision of this Lease has been complied with; and

(e) such other factual matters regarding the lease as may be reasonably requested.

16.8   **Exhibits**. All exhibits and addenda attached hereto are incorporated herein for all purposes.

16.9   **Severability**. If any provision of this Lease or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, and the basis of the bargain between the parties hereto is not destroyed or rendered ineffective thereby, the remainder of this Lease, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

16.10 **Attorney Fees**. If litigation is ever instituted by either party hereto to enforce, or to seek damages for the breach of, any provision hereof, the prevailing party therein shall be promptly reimbursed by the other party for all attorneys' fees reasonably incurred by the prevailing party in connection with such litigation.

16.11 **Surrender of Premises; Holding Over**.

(a) Except as provided elsewhere in this Lease, if Tenant shall remain in possession of the Premises after any early termination of this Lease, such possession shall be as a tenant under a month-to-month tenancy under the same terms and conditions as provided in this Lease, except that such tenancy shall be terminable upon thirty (30) days written notice (the "**Termination Notice**") by either party. If Tenant shall remain in possession of the Premises after the termination of this Lease pursuant to a Termination Notice, Tenant shall pay holdover Base Rent at one hundred fifty percent (150%) of the Base Rent, but otherwise shall be subject to all of the obligations of Tenant under this Lease.

(b) Upon the expiration of the Term or earlier termination of this Lease (as affected by the limited holdover rights of Tenant immediately above), Tenant shall peaceably quit, deliver up and surrender the Premises. Upon the expiration of the Lease according to this subsection (b), Landlord may, without further notice, enter upon, re-enter, possess and repossess itself of the Premises by force, summary proceedings, ejectment or otherwise, and may dispossess and remove Tenant from the Premises and may have, hold and enjoy the Premises and all rental and other income therefrom, free of any claim by Tenant with respect thereto (in all events subject to Tenant's express rights with respect to Tenant's Equipment and the Architectural Features). If Tenant does not surrender possession of the Premises by the end of the Term, such action shall not extend the Term, Tenant shall be a tenant at sufferance and, during such time of occupancy, Tenant shall pay to Landlord, as damages, an amount equal to one hundred fifty percent (150%) of the amount of Base Rent that was being paid immediately prior to the end of the Term.

16.12 **Relation of Parties**. It is the intention of Landlord and Tenant to hereby create the relationship of landlord and tenant, and no other relationship whatsoever is hereby created. Nothing in this Lease shall be construed to make Landlord and Tenant partners or joint venturers or to render either party hereto liable for any obligation of the other.

16.13 **Force Majeure**. As used herein "**Force Majeure**" shall mean the occurrence of any event (other than failure to obtain financing for, failure to refinance or cessation of disbursements under existing financing for, the purchase, construction, demolition, repair or ownership of the Land or Improvements) which prevents or delays the performance by Landlord or Tenant of any obligation imposed upon it hereunder (other than payment of Rent) and the prevention or cessation of which event is beyond the reasonable control of the obligor. If Tenant or Landlord shall be delayed, hindered or prevented from performance of any of its obligations (other than to pay Rent) by reason of Force Majeure (and Tenant, or Landlord, as applicable, shall not otherwise be in default hereunder) the time for performance of such obligation shall be extended for the period of such delay, provided that the following requirements are complied with by the party who was delayed (the "**Delaying Party**"): (i) Delaying Party shall give prompt written notice of such occurrence to the other party and (ii) Delaying Party shall diligently attempt to remove, resolve or otherwise eliminate such event, keep the other party advised with respect thereto, and commence performance of its obligations hereunder immediately upon such removal, resolution or elimination. Anything contained in or inferable from this Lease to the contrary notwithstanding, Tenant shall not be relieved by any event of Force Majeure from Tenant's obligations to pay Rent hereunder, nor shall the Term be extended thereby.

16.14 **Entire Agreement**. This Lease constitutes the entire agreement of the parties hereto with respect to its subject matter, and all prior agreements with respect thereto are merged herein. Any agreements entered into between Landlord and Tenant of even date herewith are not, however, merged herein.

16.15 **Recordation**. Landlord and Tenant will, at the request of the other, promptly execute a Memorandum of Lease substantially in the form of **Exhibit G** attached hereto, which shall be filed for record in the Official Public Records of the County where the Premises is located. This Lease shall not be filed for record. If this Lease terminates in accordance with the provisions hereof, Tenant will deliver, in recordable form, a termination of the Memorandum of Lease.

16.16 **Successors and Assigns**. This Lease shall constitute a real right and covenant running with the Premises, and, subject to the provisions hereof pertaining to Tenant's rights to assign, sublet or encumber, this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Whenever a reference is made herein to either party, such reference shall include the party's successors and assigns.

16.17 **Landlord's Joinder**. Landlord agrees to join with Tenant in the execution of such applications for permits and licenses from any Governmental Authority as may be reasonably necessary or appropriate to effectuate the intents and purposes of this Lease, provided that no such application shall constitute an encumbrance of or with respect to the Premises, and Landlord shall not incur or become liable for any obligation as a result thereof.

16.18 **No Third Parties Benefited**. The terms and provisions of this Lease are for the sole benefit of Landlord and Tenant, and no third party is intended to benefit herefrom.

16.19 **Survival**. Any terms and provisions of this Lease pertaining to rights, duties or liabilities extending beyond the expiration or termination of this Lease shall survive the end of the Term.

16.20 **Landlord's Lien**. Landlord hereby waives and releases any statutory or contractual landlord's lien with respect to Tenant's Equipment now or hereafter located in the Premises.

16.21 **Transfer of Landlord's Interest**. Landlord may freely transfer and/or mortgage its interest in the Premises and under this Lease from time to time and at any time, provided that any such transfer or mortgage is expressly made subject to the terms, provisions and conditions of this Lease, and the transferee or mortgagee agrees to be bound by the provisions hereof (in the case of a mortgagee, such agreement being contingent upon the mortgagee actually succeeding to Landlord's interest in the Premises and hereunder by virtue of a foreclosure or conveyance in lieu thereof). The word "**Landlord**", as used in this Lease, shall include the original Landlord named in this Lease and all persons, natural or artificial, who at any time or from time to time during the Term of this Lease succeed to the estate of Landlord in the Land and the interest of Landlord under this Lease. The word "**Tenant**", as used in this Lease, shall include the original Tenant named in this Lease and all persons, natural or artificial, who at any time or from time to time during the Term of this Lease succeed to the estate of Tenant in the Premises and the interest of Tenant under this Lease.

16.22 **Commissions**. Each party hereby warrants and represents to the other party that it has not dealt with any broker in the negotiation of this Lease except (a) Brandon Creighton JD, Creighton Realty Partners, LLC representing Landlord (collectively, the "**Broker**"). Landlord agrees to pay to Broker all commissions required to be paid in connection with the negotiation, execution and performance of this Lease pursuant to a separate written agreement between Landlord and Broker. Subject to Landlord's obligation with respect to the Broker, each party hereby agrees to indemnify and hold harmless the other party from and against any other commissions or finder's fees due by virtue of the negotiation, execution and performance of this Lease, the obligation or asserted claim for which arises from actions taken or claimed to be taken by the indemnifying party.

16.23 **Exclusive Right**. Provided Tenant is open and operating as an emergency or urgent care facility, Tenant shall have the exclusive right within the area of the Shopping Center shown of the Site Plan (the "**Exclusive Area**") for the operation of an medical surgical center, imaging center, and urgent care clinic (the "**Exclusive Use**"). Landlord covenants and agrees that, during the Term of this Lease, no portion of the Exclusive Area, except for the Premises, will be used for an urgent care clinic, and Landlord shall not (nor shall it allow any of its affiliates to) enter into any lease covering all or any portion of the Exclusive Area, except for the Premises, or sell any portion of the Exclusive Area, except for the Premises, under terms that would allow for use as an emergency care center or urgent care clinic. Notwithstanding the foregoing, if Tenant fails to open as an emergency care facility or urgent care clinic within two years after the Rent Commencement Date, or if Tenant ever uses the Premises for operation of a business that is not an emergency care facility or urgent care clinic for more than three hundred sixty five (365) consecutive days for reasons other than Force Majeure, casualty, condemnation, repair, remodeling, Landlord default or other reason beyond Tenant's reasonable control, thereafter this **Section 16.23** shall be void and of no further force or effect. The restrictions in this **Section 16.23** do not apply to existing tenants of the Medical Center listed on **Exhibit J**, whose leases pre-date this Lease and who have the right to use their premises for the Exclusive Use or have the right to change their use without Landlord's consent; however, to the extent Landlord's consent is required for any change in use by existing tenants, Landlord agrees not to consent to any such change that would violate the exclusive rights in this **Section 16.23**. Landlord agrees that the restriction in this **Section 16.23** will run with the title to the Land and the Exclusive Area for the term of this Lease and will be in the memorandum of lease prepared by Tenant as provided in **Section 16.15**. If Landlord or an affiliate of Landlord no longer owns the Exclusive Area (or a portion thereof), Tenant's rights and remedies for violation of the restrictive covenants set forth in this **Section 16.23** shall be limited to pursuit of equitable relief and enforcement against the owner and any violating tenant of the Exclusive Area, and not against Landlord.

16.24 **Authority.** Landlord and Tenant hereby respectively represent to the other that: (i) it is a duly authorized and existing entity and is qualified to do business in the State of Texas, (ii) it has full right and authority to enter into this Lease, (iii) each person signing on behalf of the respective party is authorized to do so, and (iv) the execution and delivery of this Lease by the

respective party will not result in any breach of, or constitute a default under any mortgage, deed of trust, lease, loan, credit agreement, partnership agreement or other contract or instrument to which it is a party or by which it may be bound.

16.25 **Time of Essence.** Time is of the essence of this Lease and each and all of its provisions in which performance is a factor; provided, however, if the final date of any period set forth herein falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday. The term "days" as used herein shall mean calendar days, and "business days" shall mean each day except for any Saturday, Sunday or legal holiday under the laws of the State of Texas or United States of America.

16.26 **Non-Disturbance Agreement.** Contemporaneously with its execution of this Lease, Landlord shall deliver to Tenant three (3) originals of a Subordination, Non-Disturbance and Attornment Agreement(s) in the form reasonably required by each of Landlord's lenders and capital providers, if any, having a lien upon the Premises ("**Non-Disturbance Agreement**"), and reasonably acceptable to Tenant, executed and acknowledged by Landlord and the respective capital provider or lender. If Landlord fails to deliver the Non-Disturbance Agreement(s) within thirty (30) days following the Effective Date from all required parties, if any, then Tenant may terminate this Lease at any time prior to the date Landlord delivers the Non-Disturbance Agreement(s). The immediately foregoing provisions of this Section shall not apply to the extent that no mortgage or deed of trust or similar lien currently encumbers the Premises as of the date hereof.

Upon request of Landlord, Tenant will in writing within thirty (30) days after the request subordinate its rights under this Lease to any lien or any deeds of trust to any bank, insurance company or other lending institution, hereafter in force against the Premises, and upon any improvements hereafter placed upon the Land of which the Premises are a part, and to all advances made or hereafter to be made upon the security thereof, provided that as a condition to the subordination, the subordination agreement shall include a non-disturbance agreement, shall also be executed by the party to whose interest Tenant subordinates its interest hereunder, and shall meet the following requirements: (i) it shall provide that so long as Tenant is not in default under this Lease (beyond the applicable cure or grace period provided in the Lease), Tenant's leasehold estate, and Tenant's rights under this Lease including but not limited to possession, occupancy and use of the Premises in accordance with this Lease, shall remain undisturbed and shall survive any foreclosure, transfer in lieu of foreclosure or other enforcement of the mortgage or deed of trust, and any termination of any such lease, as the case may be; (ii) there shall be no change in the terms of this Lease, no diminution of Tenant's rights provided for in this Lease, and no additional liability of Tenant; and (iii) the documentation shall be otherwise satisfactory to Tenant in the exercise of its reasonable judgment.

16.27. **Health Care Provisions; Access.** Landlord and Tenant hereby acknowledge and agree that (i) the Rent due and payable under this Lease is consistent with the fair market value of the rent for the Premises, and that no portion of the Rent payable hereunder is based on any revenue or volume of business received by Tenant from its use or operation of the Premises, and (ii) the Premises does not contain more square footage than is commercially necessary for Tenant's purposes.

Notwithstanding anything to the contrary contained herein, Landlord agrees to comply with Tenant's reasonable requirements with regard to Landlord's access (including, without limitation, in connection with a re-entry by Landlord to the Premises in the event of a default by Tenant which is not cured prior to the expiration of the applicable notice and cure period) to the Premises, including, without limitation, requirements designed to protect the privacy rights of Tenant's patients, and allow Tenant to comply with any and all applicable laws relating to patient privacy, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, as amended. In no event may Landlord be permitted to have access to any Protected Health Information.

16.28 **Limitation of Liability.** Notwithstanding anything to the contrary contained in this Lease, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed, honored or performed by Landlord, Tenant shall look solely to the interest of Landlord in the Medical Center for the collection of any judgment (or any other judicial procedures requiring the payment of money by Landlord) and no

other property or assets of Landlord, or Landlord's partners, members, shareholders, officers or directors, shall be subject to levy, execution, or other procedures for satisfaction of Tenant's remedies. No personal liability of any kind or character whatsoever now attaches or at any time hereafter under any conditions shall attach to any partners, officers, directors, or shareholders of Landlord as applicable for payment of any amounts due under this Lease or for the performance of any obligation under this Lease. For purposes hereof, in addition to any of Landlord's actual ownership interests in the real property and improvements thereon, Landlord's interest in the Medical Center (and similar phrases) shall include, without limitation, rents due to Landlord with respect to the Medical Center, insurance proceeds to which Landlord is entitled or payable under policies pursuant to which Landlord receives coverage or benefits, and proceeds from condemnation or eminent domain proceedings to which Landlord is entitled.

16.29 **Guaranty**. The effectiveness of this Lease shall be conditioned upon the execution and delivery by VIP MEDSURG VENTURES, LLC, of that certain Guaranty in the form attached hereto as **Exhibit I** and made a part hereof. Notwithstanding anything to the contrary contained herein, upon a Release Event, Guarantor shall be released from any and all liability under such Guaranty and this Lease, but only to the extent relating to the obligations and liabilities of Tenant under the Lease which accrue from and after the effective date of the Release Event. "**Release Event**" is defined as the occurrence of one of the following: (a) the interest of Tenant in and to the Lease is assigned to an assignee which (i) has a tangible net worth (exclusive of goodwill) equal to or greater than $25,000,000.00 (as evidenced by documentation reasonably acceptable to Landlord) and (ii) assumes in writing all of the obligations of Tenant under this Lease accruing from and after the effective date of such assumption; or (b) Tenant shall present Landlord with a substitute guarantor which (i) has a tangible net worth (exclusive of goodwill) equal to or greater than $25,000,000.00 (as evidenced by documentation reasonably acceptable to Landlord) and (ii) assumes in writing all of the obligations of Guarantor under the Guaranty accruing from and after the effective date of such assumption.

**[THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the last date set forth below (the "**Effective Date**").

**LANDLORD:**

Dated: June 28, 2017

By: _____

C-CUBED HOLDINGS, LLC
Name: Cooper Collins
Title: Owner

**TENANT:**

Dated: June 28, 2017

By: _____

VIP MEDSURG VENTURES, LLC
Name: Marion Fawn Creighton
Title: CEO

Settlement Agreement

May 7th, 2018

The following are the agreed upon terms and conditions of a settlement between Cooper Collins, C-Cubed Holdings, LLC (a Louisiana limited liability company owned and controlled by Cooper Collins), and VIP MedSurg Ventures LLC (the "Company") relating to the matters described herein.

Pursuant to this Settlement Agreement, Cooper Collins will be returning (net) to the Company the amount of $404,604.85 (the "Payment") calculated as set forth on Exhibit "A" attached hereto.  Cooper Collins, C-Cubed Holdings, LLC, and the Company also agree as follows:

1) Effective upon delivery of the Payment to the Company, Cooper Collins has satisfied and repaid in full his loan of July 29, 2016, and the Company settles, releases and waives its claim against Cooper Collins to recover that loan that was originally in the amount of $735,000.00.

2) Effective upon delivery of the Payment to the Company, Cooper Collins and C-Cubed Holdings, LLC settle, release and waive any claim for payment from the Company for the Company's lease or use of the real property located at 1246 N. FM 3083 W., Conroe, Texas (the "Property") prior to October 1, 2017, the effective date of the executed Ground Lease with the Company for the Property, including any claim to recover base rent, additional rent, or other charges, including for insurance of any kind, for or relating to the Property prior to October 1, 2017.

3) Cooper Collins represents: a) that he is the sole owner and manager of C-Cubed Holdings, LLC; b) that C-Cubed Holdings, LLC is the owner of the Property; and c) that he is duly and properly authorized by C-Cubed Holdings, LLC to enter into this settlement.

4) Cooper Collins and C-Cubed Holdings, LLC represent and agree that through this settlement, including the allocation of payments/credits described in Exhibit "A": a) the Company is current on the Ground Lease with C-Cubed Holdings LLC; b) the Ground Lease and all payments owed thereunder, including all payments for Base Rent and Additional Rent, if owed, have been paid in full through May 2018; c) all ad valorem property taxes for the Property under the Ground Lease have been paid through December 31, 2017; and d) any default or non-performance by the Company under the Ground Lease (including any default or non-performance relating to past due lease payments and/or late fees) are and have been waived and cured, with the Company being in good standing in all respects under the Ground Lease.

5) Effective upon delivery of the Payment to the Company, Cooper Collins and C-Cubed Holdings, LLC settle, release and waive any claim for payment from the Company for any repair or remediation costs relating to the retention pond that is on the acreage adjacent to the Property owned by C-Cubed Holdings, LLC.

6) Cooper Collins declares that he will amend or modify the current Ground Lease between the Company and "C-Cubed Holdings, LLC" (a Texas limited liability company), which contains a misnomer as to the identity of the Landlord, to reflect that the actual owner of the Property that is the subject of the Ground Lease is C-Cubed Holdings, LLC, a Louisiana limited liability company.  The Ground Lease will also be modified to reflect the correct square footage of the

Exhibit 5

leased Property, approximately 2.384 acres. No other terms and conditions of the Ground Lease are subject to change or modification without the consent of both parties.

7) The Company, through its managers, will pursue action against CSB Contractors, Inc. that will include claims and/or causes of action to remove the lien that CSB Contractors placed on the Company's interest in the building on the Property.

8) Provided that all parties sign this Settlement Agreement, the effective date of this agreement is and shall be May 8, 2018.

9) This Settlement Agreement may be signed in separate counterparts and then assembled to become one and the same document.  A copy of this executed document or any executed counterpart shall have the same force and effect as the signed original thereof.

10) This Settlement Agreement shall become null and void if the Payment is not delivered to the Company on or before May 10, 2018.


_____
Fawn Creighton

Manager, VIP MedSurg Ventures LLC


_____
Cooper Collins

Individually and for and on behalf of C-Cubed Holdings, LLC (a Louisiana Limited Liability Company) in his capacity as Owner and Manager of C-Cubed Holdings, LLC


_____
Julie McKay-Smart

Manager, VIP MedSurg Ventures, LLC


_____
Brandon Belanger

Member, VIP MedSurg Ventures, LLC

1) 2.3 acres

2) 8.00/sq ft per comps

M3560

Summary of resolution of Cooper Collins loan repayment to VIP

| Cooper owes to VIP | | Amount | Description |
|---|---|---|---|
| | $ | 735,000.00 | Loan to member - 7/29/2016 |
| | $ | 40,195.65 | From July 29th, 2016 - 21 months interest at 3.125 / year - **A** |
| | $ | 775,195.65 | Total amount of loan outstanding to Cooper Collins |

| VIP owes to C-Cubed Holdings | | Amount | Description |
|---|---|---|---|
| | $ | 104,475.00 | Ground lease between VIP MedSurg Ventures and C-Cubed Holdings, LLC a Louisiana con |
| | $ | 200,000.00 | Pre construction ground lease - 25 months @ $8K / month - August 2015 to September 2 |
| | $ | 29,418.97 | Taxes on ground lease through December 31, 2017 |
| | $ | 9,306.83 | Insurance of land - 13 months - March 2015 to March 2016 - $715.91/month |
| | $ | 27,390.00 | Detention pond repair - per invoice 18059, dated 3/2/2018 to Cooper Collins from Hasa |
| | $ | 370,590.80 | Total amount owed to C-Cubed Holdings LLC by VIP MedSurg Ventures __ |

| Amount owed to VIP/(Cooper) | $ | 404,604.85 |
|---|---|---|

**A**  Interest will be calculated by JPM and adjustment made, post the return of monies, NLT next business day

**B**  The ground lease, between VIP MedSurg Ventures and C-Cubed Holdings LLC (LA), effective October 1, 2017 needs to be amended to reflect the prop

**C**  Both parties have agreed to draft a pre construction lease, to reflect a lease term of 25 months at $8K per month

**Additional items of consideration and agreement between the parties**

1) Cooper Collins will return all monies above to VIP - $775,195.65 and VIP will pay to Collins all amounts owed under ground leases

2) VIP Managers agree that the liens placed by CSB on the VIP business will be pursued by the Managers

Signed

_____
Fawn Creighton
Manager of VIP MedSurg Ventures

_____
Cooper Collins
Owner of C-Cubed Holdings LLC (LA)

Future ground
Not in ground lease

**OWNERS' AGREEMENT REGARDING THE DISTRIBUTION OF SALES PROCEEDS**

This agreement is entered into effective the 20th day of December 2018 between Marion Fawn Creighton, Julie McKay-Smart (by revocable proxy), Brandon Belanger, and Cooper Collins, who collectively own 100% of VIP Medsurg Ventures, LLC (MSV) and 94% of VIP Surg ASC, LLC (ASC) and who are referred to in this agreement as the Parties. Belanger and Cooper each own 30% of MSV and Creighton and McKay-Smart each own 20% of MSV.

1. There is pending a potential sale of assets by VIP Medsurg Ventures, LLC to Astoria Property Company, LLC and a sale of assets by VIP Surg ASC, LLC to Muve – Conroe, LLC (the "*Sale*"). Assuming the Sales occurs, the Parties agree to distribute the sale proceeds in accordance with Exhibits 1 and 2 attached to this agreement.

2. The Parties recognize that the payments to be made in Exhibits 1 and 2 are estimates and not exact figures. The Parties agree that the aggregate funds from the Sale will be distributed to the Parties after the payments on Exhibits 1 and 2.

3. No later than 45 days following the closing of the Sale, (1) MSV will pay Fawn Creighton the $453,000 she advanced to MSV, (2) MSV will deliver $268,000 to Brandon Belanger as the full and complete return of his capital account, including interest, and (3) MSV will deliver $268,000 to Cooper Collins as the full and complete return of his capital account, including interest. These amounts will be paid before any other capital accounts are refunded and before any other Member loans are repaid. The funds described in this paragraph shall be held in the respective corporate banking accounts that receive the proceeds at closing until the 45th day after closing or such earlier date as the Parties unanimously agree. MSV and ASC may loan one

Exhibit 6

another money or may pay expenses owed to each other to allow MSV to fund its obligations as shown on Exhibit 2.

4. In addition, if Fawn Creighton, Julie McKay-Smart, Brandon Belanger or Cooper Collins are required to advance any additional money prior to closing, they will be reimbursed those amounts advanced concurrent with or immediately following the closing.

5. The available Sales Proceeds remaining after payment of all the items on Exhibits 1 and 2, will be distributed pro rata to each Party based on their member ownership interest in MSV.

6. Thereafter, each Company shall hold all its assets and proceeds indefinitely to assure that all liabilities have been paid and to provide time to collect accounts receivable, sell excluded assets, and effect the wind down of MSV and ASC.  At that time the Parties will decide on all final distributions.

7. Fawn Creighton has confirmed that all the doctor investors in VIP Surg ASC, LLC have agreed to accept a return of their investment at closing. The doctor investors represent 6% ownership in VIP Surg ASC, LLC. See Exhibit 3 for the doctor investors' ownership detail, by individual name or entity and ownership percentage.

8. After closing of the Sale, Fawn Creighton and Julie McKay-Smart will remain as Co-Managers of ASC.  However, no funds may be removed from any company account

==without the express written approval of both Co-Managers and with advance==

==notification to both Brandon Belanger and Cooper Collins==

Fawn Creighton

(AS PER J.M.S. PROXY)

Julie McKay-Smart (by revocable proxy)

Brandon Belanger

Cooper Collins

Exhibit 1 – Proceeds flow for ASC asset sale

*Analysis of net proceeds of sale of ASC*



Exhibit 2 – Proceeds flow for MSV asset sale



| | | | |
|---|---|---|---|
| Montgomery County | $ | (165,000) | Property tax - estimated for 2018 |
| C-Cubed Holdings | $ | (38,000) | Three months rent plus late fees and estimated additional CAM for 2018/2019 |

Exhibit 3 – Ownership detail of VIP Surg ASC, LLC



**C-Cubed Holdings, LLC**
403 Corporate Woods Drive
Magnolia, TX 77354

**March 8 , 2019**

**VIP MedSurge Ventures, LLC**
1246 North FM 3083 West
Conroe, Texas 77304

REF: December 5, 2018 Default Notice Letter from William Wagner

Dear VIP MedSurge Ventures, LLC Management,

**Effective immediately, the Lease between C-Cubed Holdings LLC, and VIP MedSurge Ventures, LLC has been terminated.** As you know, Mr. Wagner requested payment on December 5, 2018, representing C-Cubed Holdings, LLC for late ground lease payments from VIP MedSurge Ventures, LLC.  Since that time there have been multiple letters in reference to collection of past due payments and default notices delivered to VIP MedSurge, LLC management. Most recently, the letter hand delivered to VIP MedSurge Ventures, LLC management on February 24, 2019.

In this document Mr. Wagner stated, "Your failure to comply in any respects concerning that letter within the period of time stated may result in my client seeking relief available to them as set forth in the Lease and the Texas Statutes applicable to commercial tenancy. Specifically, I call your attention to Section 15.2 of the Lease which allows for immediate possession without process of law."

*15.2 Landlord's Remedies. If a Tenant's Default occurs, Landlord may, at any time thereafter prior to the curing thereof and without waiving any other rights hereunder or available to Landlord at law or in equity (Landlord's rights being cumulative, and all such rights at law or in equity being expressly reserved by Landlord), perform any or all of the remedies listed in section15.2 of the ground lease.*
*(a)Landlord may terminate this Lease by giving Tenant written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice with the same force and effect and to the same extent as if the effective date of such notice were the day originally fixed in Article 2 for the expiration of the Term. Landlord, its agent or representatives, shall have the right, without further demand or notice, to re-enter and take possession of the Premises and remove all persons and property therefrom with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for anears of Rent or existing breaches hereof. In the event of such termination, Tenant shall be liable to Landlord for damages in an amount equal to ( i) the discounted present value ( using a discount rate of ten percent (10%)) of the amount by which the Rent reserved hereunder for the remainder of the stated Term exceeds the then net fair market rental value of the Premises for such period of time, plus, (ii) all expenses incurred by Landlord enforcing its rights hereunder and any and all other actual damages incurred by Landlord in connection with such default.*

Please feel free to contact me if you have any questions.

Regards,

*Sarah Ramsey*
Sarah Ramsey
C-Cubed Holdings, LLC
713)791-8772
Sramsey@fortisbiopharma.com

Exhibit 7

**CAUSE NO. 18-05-06529**

| | | |
|---|---|---|
| VIP MEDSURG VENTURES, LLC | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| V. | § | OF MONTGOMERY COUNTY, TEXAS |
| | § | |
| CSB CONTRACTORS, INC. | § | |
| Defendant | § | 410th JUDICIAL DISTRICT COURT |

## MOTION TO WITHDRAW AS COUNSEL
## FOR PLAINTIFF VIP MEDSURG VENTURES, LLC

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Loyd Neal with the law firm of Dunn & Neal, L.L.P., counsel for Plaintiff VIP Medsurg Ventures, LLC, with this Motion to Withdraw and respectfully shows the Court the following:

1.     Loyd Neal, on behalf of Dunn & Neal, L.L.P. (hereinafter collectively referred as the "Law Firm"), has served as counsel of record Plaintiff VIP Medsurg Ventures, LLC ("VIP Medsurg") since filing the Original Petition in this case on behalf of the Plaintiff. The Law Firm, through this Motion, seeks permission from this Court to withdraw as counsel for Plaintiff VIP Medsurg. Good and sufficient cause exists for counsel to withdraw as required under Rule 10 of the Texas Rules of Civil Procedure. The undersigned counsel believes that the client asserted meritorious claims and causes of action, and has meritorious defenses to Defendant's counterclaims; however, counsel seeks to withdraw for reasons that include to an inability to communicate with Plaintiff's management in a manner that counsel feels is necessary to effectively represent the Plaintiff in this case.

2.     Prior to filing this Motion, counsel sent a draft of this Motion to Withdraw to representatives of VIP Medsurg, including persons believed to be its present and/or former managers, and asked such persons to sign and return a copy of this Motion for filing to indicate

**Exhibit 8**

whether the client consented to the relief requested. A copy of this Motion was sent by email to Julie McKay-Smart, Brandon Belanger, Fawn Creighton, and Phillip Wills, and was sent by regular mail and certified mail to the office of VIP Medsurg to the attention of Julie McKay-Smart, one of the managers of VIP Medsurg. The Motion served upon representatives of VIP Medsurg by regular mail, certified mail, and email included an Acknowledgment and Consent for the relief requested in this Motion to be executed by a Manager of the company. The copy of the Motion sent by regular mail was not returned and the copy of the Motion sent by certified mail was received on February 22, 2019 as reflected on the attached Exhibit "A." Despite receiving the Motion via several different modes of delivery, a representative of the client did not sign and return the Acknowledgment and Consent form as requested.

3.      Pursuant to Rule 10 of the Texas Rules of Civil Procedure, in addition to forwarding a copy of this Motion to Plaintiff VIP Medsurg Ventures, LLC, counsel notified VIP Medsurg of its right to object to this Motion to Withdraw in a letter sent to the client representatives with the Motion to Withdraw and related Acknowledgment and Consent form. With the filing of this Motion, the undersigned counsel again notified the representatives of VIP Medsurg of the right to appear at the hearing and assert an objection to the relief requested.

4.      The last known address of Plaintiff VIP Medsurg Ventures, LLC: 1246 N. FM 3083 West, Conroe, TX 77304.

5.      This Motion is not asserted for purposes of delay, but is sought for good cause.

WHEREFORE, PREMISES CONSIDERED, the Law Firm of Dunn & Neal, L.L.P., with Loyd Neal acting as lead counsel, hereby seeks permission of this Court to withdraw as counsel of record for Plaintiff VIP Medsurg Ventures, LLC in the above-captioned matter for all purposes.

Respectfully submitted,

DUNN & NEAL, L.L.P.

By: /s/  S. Loyd Neal, III
        S. Loyd Neal, III
        TBA No. 14839390
        Email:  lneal@dunn-neal.com
        3006 Brazos Street
        Houston, Texas 77006
        (713) 403-7404 *(direct)*
        (713) 960-0204 *(fax)*

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of March, 2019, a true and correct copy of the foregoing was upon the parties below as shown.

Timothy C. Ross
J. Michael Schiff
Andrews Myers, P.C.
1885 St. James Place
15th Floor
Houston, Texas 77056-4110
Via E-Service
Email: MSchiff@andrewsmyers.com

VIP Medsurg Ventures, LLC
1246 N. FM 3083 West
Conroe, TX 77304
*Via United States First Class Mail*
*Via Certified Mail, Return Receipt Requested*
***Attn:  Julie McKay Smart, Manager***

Julie McKay-Smart
29321 S. Plum Creek Dr.
Spring, TX 77386
*Via United States First Class Mail*
*Via Certified Mail, Return Receipt Requested*

With a conforming copy sent by email to the following Members and/or Managers of VIP Medsurg Ventures, LLC:

Marion Fawn Creighton

Brandon R. Belanger

Julie McKay-Smart

Phillip Wills

                              */s/  Loyd Neal*
                              Loyd Neal

USPS.com® - USPS Tracking® Results                      https://tools.usps.com/go/TrackConfirmAction?tRef=fullpage&...

# USPS Tracking®

FAQs › (https://www.usps.com/faqs/uspstracking-faqs.htm)

## Track Another Package  +

**Tracking Number:** 70172620000033431902                      Remove ✕

Your item was delivered to the front desk, reception area, or mail room at
2:05 pm on February 22, 2019 in CONROE, TX 77301.

## ✅ Delivered

February 22, 2019 at 2:05 pm
Delivered, Front Desk/Reception/Mail Room
CONROE, TX 77301

**Get Updates** ⋁

---

**Text & Email Updates**                                                      ⋁

---

**Tracking History**                                                          ⋁

---

**Product Information**                                                       ⋁

---

See Less  ⋀

EXHIBIT

A

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

3/4/2019, 10:49 AM

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

VIP FNRSRG WUHWRS S E
2 9 19 W Omical ltr

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

2051 1 EHEE 0000 0520 2 7017

RECEIVED AND FILED
FOR RECORD
At 906 O'Clock A M.

MAR 27 2019

Melisa Miller, District Clerk
Montgomery County, Texas
By _____ Deputy

CAUSE NO. 18-05-06529

| | | |
|---|---|---|
| VIP MEDSURG VENTURES, LLC | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| V. | § | OF MONTGOMERY COUNTY, TEXAS |
| | § | |
| CSB CONTRACTORS, INC. | § | 410th JUDICIAL DISTRICT COURT |
| Defendant | § | |

### ORDER GRANTING AMENDED MOTION TO WITHDRAW
### AS COUNSEL FOR PLAINTIFF

IN HOUSTON, TEXAS, came on for consideration the Amended Motion to Withdraw as Counsel for Plaintiff VIP Medsurg Ventures, LLC, filed by Dunn & Neal, LLP with Loyd Neal as the attorney in charge. There being good cause shown to grant the relief requested; it is

ORDERED that Dunn & Neal, LLP with Loyd Neal as the attorney in charge is authorized to withdraw as counsel for Plaintiff VIP Medsurg Ventures, LLC in this case, effective as of the date of the signing of this Order.

DATED: March 27, 2019                    SIGNED: _____

                                         PRESIDING JUDGE

APPROVED AND ENTRY REQUESTED:

DUNN & NEAL, L.L.P.

By: _____
S. Loyd Neal, III
TBA No. 14839390
Email: lneal@dunn-neal.com
3006 Brazos Street
Houston, Texas 77006
(713) 403-7404 *(direct)*
(713) 960-0204 *(fax)*

Exhibit 9

**FAWN CREIGHTON'S AFFIDAVIT**
**IN SUPPORT AND EX PARTE TEMPORARY RESTRAINING ORDER**
**AND TEMPORARY INJUNCTION**

State of Texas           §
                         §
Montgomery County  §

My name is Marion Fawn Creighton. I am a member/owner of  VIP Med Surg Ventures, LLC ("***MSV***"), VIP Surg ASC, LLC ("***ASC***"), and 3083 Imaging, LLC ("***3083***" and, with MSV and ASC, the "***Companies***"). I served as a Manager for each of the Companies from their inception. I ceased being a Manager of MSV in December 2018 and ceased being a Manager of ASC in March 2019. I remain a Manager of ASC. I have personal knowledge of the facts stated in this affidavit, each of which is true and correct based on my ownership and participation in the operation of each of the Companies.

1. Plaintiffs MSV, ASC, and 3083 are owned by four individual Member/Owners; (1) Cooper Collins, (2) Brandon Belanger, (3) Mrs. Smart, and (4) Ms. Creighton. Six physicians, or entities they own, own minority interests in MSV, their total ownership is less than 6% of MSV. I and Julie McKay  Smart are healthcare professionals. Mrs. Smart is a registered nurse. I have been an executive in the HCA Hospital system at Conroe Regional Medical Center, CEO of Apollo Hospital in The Woodlands, and Manager of the three Plaintiff Companies in this lawsuit.

2. Mrs. Smart and I were the driving forces behind the idea of creating a multiservice medical facility in North Conroe. We located land at the intersection of I-45 and Hiway 3083 (the "***Site***") owned by Mr. Cooper Collins or one of the companies he is associated with. Mr. Collins is a local multi-millionaire who owns various companies, including a construction company – CSB Contractors, Inc. ("***CSB***") – that has been sued several times by unhappy clients for whom CSB built projects. At least two such cases are currently pending.

3. Mrs. Smart and I eventually joined with and Collins and Brandon Belanger, a former professional baseball player who invests with Mr. Collins in various projects, and all four became owners and some became managers of each of the Companies.[1]

4. Mr. Collins compelled the other three Members to hire CSB to construct a medical center building at the Site ("***Building***"). Construction began in 2015. CSB had never built a medical facility before, it's work was substandard, it failed to comply

---

[1] Secretary of State filings showing them as Members or Managers and excerpts from each Company's Company Agreement are attached as Exhibit 1 to establish these facts.

Exhibit 10

with federal requirements for an ASC, the building was over-budget, it was a year behind schedule, and it failed four Accreditation Association for Ambulatory Health Care inspection surveys due to CSB's poor construction.

5. One occupied, the Building's electrical system repeatedly failed, causing MSV to spend tens of thousands of dollars for fuel to run the generators needed to provide electricity. Providing a reliable electrical supply was CSB's obligation under the contract to build.

6. The HVAC system CSB installed failed to deliver as promised. It could not adequately heat, cool, and dehumidify the Building, which caused significant damage to a CT scanner and an MRI imaging machine due to unacceptable humidity. The poor work resulted in at least one surgeon complaining that he was sweating on his patient while operating in one of the ASC's operating room.

7. On July 29, 2016, Mr. Collins wrongfully transferred $735,000 from MSV's LOC at JP Morgan Chase to a law firm in Tennessee, Harris Shelton Hanover Walsh, PLLC. MSV had no dealings with this law firm and Mr. Collins was not authorized to use MSV's funds for anything other than MSV's use.

8. I contacted Chase Bank, believing MSV was the victim of a cyber-attack, but the bank confirmed Mr. Collins called to authorize the transfer. When I asked Mr. Collins if he had transferred this amount, he said No. When I contacted the bank and asked if they could confirm the request came from Mr. Collins, they confirmed they had listened to the taped call and identified Mr. Collins as the caller. I asked Mr. Collins a second time if he authorized the transfer and he denied it again.

9. I then called the bank and asked it if had mistakenly transferred the funds from MSV's account when it should have come from Mr. Collins's personal account. The bank advised me that Mr. Collins did not have an account the money could have come from!

10. When I asked Mr. Collins a third time whether he had transferred the funds, Mr. Collins confessed. When I demanded to know why he denied doing so twice before, he told me, "You asked if I transferred $735,000, when I actually transferred $750,000." Mr. Collins lied when he defended his refusal to confess by saying Ms. Creighton inquired about the wrong amount of the transfer.

11. Mr. Collins initially claimed, without any agreement by the other Members, that the $735,000 was a loan to himself and that he would pay back at an unstated interest rate by December 31, 2017.

12. Mr. Collins did not return the $735,000 by December 31, 2017. MSV was significantly harmed by losing access to this significant amount of money. Its cash flow was destroyed. Its ability to buy needed materials and supplies was critically cut short. I infused over $400,000 of my own money into MSV to allow it to remain in business while we all waited on Mr. Collins to repay his "loan."

13. Mr. Collins did not repay this fraudulent loan by December 31, 2017. He simply crippled MSV and forced it to cut corners or allow others pay bills themselves, as I did, to overcome the damage caused by for his defalcation.

14. MSV signed a Ground Lease with C-Cubed Holdings, LLC, for use of the Site. C-Cubed is wholly owned by Mr. Cooper and Mr. Cooper is its sole Manager. The goal was for MSV to lease the Building from C-Cubed, and MSV would then sublease space to ASC, 3083, and an Urgent Care Center.

15. Finally, on May 7, 2018, Mr. Collins executed a Settlement Agreement with MSV and his solely owned construction company, C-Cubed, under which: (a) he would deliver $404,604.85 to MSV, (b) MSV would forgive the unpaid balance of his "loan of MSV's funds" to himself, (c) he and C-Cubed released MSV for any amount MSV's owed for its use of the Site – despite the absence of any written agreement ever obligating MSV to pay either Mr. Collins or C-Cubed for this use, (d) C-Cubed agreed MSV had "paid in full" all Rent it owed under the Ground Lease through May 2018 and all property taxes through December 31, 2017; (e) C-Cubed agreed to modify the Ground Lease between it and MSV to, among other things, confirm that MSV was only leasing a 2.384 acre section of the 12.2 acres described in the Lease, and (f) other mutual consideration.

16. Mr. Collins never caused C-Cubed to modify the Ground Lease.

17. When 3083 and ASC finally opened for business, more than a year late due to CSB's construction delays, they did not meet their financial performance goals. Much of this, of course, resulted from the substandard Building they occupied, the intermittent electric power outages they suffered, and the equipment malfunctions or equipment deterioration caused by the excess heat and humidity CSB's poor construction caused.

18. In 2018 the four owners began looking for an exit strategy. They ultimately signed a Letter of Intent with two companies – one of which would buy the building and the real estate (Astoria Property Company, LLC) and a second that would buy the assets from MSV and ASC (Muve – Conroe, LLC). This sale was initially projected to close in December 2018 and was generally described as the "Muve Deal."

19. In November, as the Muve sale date approached, Mr. Collins began a course of conduct that was irrational and harmful to the Companies – but which was probably very profitable to him. He began making demands and asserting himself into MSV's daily operations as if he was a Manager as opposed to merely an Owner, including:

> Refusing to allow MSV to continue paying Ms. Creighton for her service as Manager of MSV, despite continuing to pay Mrs. Smart in her role as Manager. This violated state and federal wage and hour laws (requiring payment for an employee's work) and MSV's Company Agreement (which denied Mr. Collins the right to make any decisions in MSV's business). When I asked

why Mrs. Smart was paid and I was not, I was told, "Mrs. Smart needs money" or words to that effect. Nonetheless, MSV and Mr. Collins continued to require and allow me to perform her Managerial duties – without pay.

Demanding, personally or through another employee, that I work off-site and not come to any Company's office at the Building. This happened after Mrs. Smart circulated an email in late November 2018 falsely claiming I "stormed into" her office, threatened her, and "lost control." Two witness who were present during this alleged event categorically denied that I acted the way Mrs. Smart alleged and both say I was by far the calmest and most controlled person during the conversation.

Sending threatening emails to MSV Members demanding payment of CSB's inflated and fraudulent charges or face eviction from the Building.

Demanding that MSV pay the full property taxes for the Site despite the Ground Lease clearly requiring C-Cubed to pay the property taxes and get reimbursed from MSV.

Threatening to foreclose on MSV's lease of the building despite personally signing an agreement under which MSV would pay its rent and property tax obligations when the Muve sale closed.

20. The Muve Deal was extended several times and, as is often the case, the delays led to stress and debate. It also placed increased financial pressure on MSV, ASC, and 3083, none of which were meeting their financial projections. To pave the way for an anticipated extended 2019 closing date, all four Owner/Members signed an "Owners' Agreement" under which each one of them agreed that MSV (a) would pay rent, late fees, and 2018 property taxes FROM the proceeds of the Muve Deal.

21. The Muve Deal was ultimately set to close on March 8, 2019. Nonetheless, despite the imminent sale, Cooper Collins, C-Cubed's sole owner and Manager, locked MSV out of the Building around February 24th. The Muve Deal required MSV to deliver "Exclusive possession" of the Building at closing,[2] which was rendered impossible by Mr. Collins' personal decision to direct C-Cubed to lock MSV out for non-payment of rent and property taxes.

22. As noted above, Mr. Collins personally signed the Owners' Agreement under which he personally agreed that MSV would pay those debts to himself – i.e., to the company he alone owned and managed – WITH proceeds from the sale closing.[3] At the moment he ordered C-Cubed to lock MSV out, the Muve Deal was

---

[2] Exhibit 2 – Section 4.2, page 2, This is the then-current draft of the Muve Deal.

[3] The Owners' Agreement between MSV's four Owners, said MSV would use the proceeds of the Sale to pay January and February rent and all 2018 property taxes. See Exhibit 2 to Owners' Agreement. The Owners' Agreement is attached to the Application as Exhibit 6.

still scheduled to close on March 8, 2019. His personal decision to direct C-Cubed to lock MSV out of the Building materially damaged MSV and ASC.

23. To add insult to injury, the day the Muve Deal was scheduled to close, Mr. Collins directed C-Cubed to terminate MSV's lease of the Building. That left ASC, 3083, and an independent Emergency Center without the right to occupy the Building because they derived their right to be in the Building solely based on their status a MSV's subtenants.

24. Even if the Muve Deal did not close on March 8th, a new LOI to purchase ASC had already been received by March 8th and it is still waiting to be signed. Because the ASC never met its financial projections, the only way its Owners, including its physician owners, are likely to ever recover their investments, capital, or make any profit on the ASC is if the ASC sells its assets. Yet, Mr. Collins refuses to even sign the new LOI so ASC can at least begin negotiation and attempt to close a sale.

25. More importantly, in recent days he has threatened to close down the ASC and 3083. He, or others on his behalf, even refused to pay the light bill – resulting in Entergy coming within hours of cutting off power.

26. Shutting their operations would leave valuable electronic equipment worth hundreds of thousands of dollars subject to high heat, humidity, and other dangers that could greatly diminish if not destroy their value and – as such – destroy the ASC and 3083's value to their Owners.

27. In December of 2017, the Building and the equipment in it (which a Landlord might be able to seize and sell to collect unpaid rent) was appraised at $12 million. There is just over $7 million in debt on it today.

28. The day before Mr. Collins caused C-Cubed to wrongfully foreclose on MSV's Ground Lease, he proposed that all the other Owner/Members give him their ownership interests in exchange for him paying all the debt and taking sole control of the Building.

29. MSV sued CSB, the construction company Mr. Collins owned part of, for its multiple breaches of its contract to construct the Building in May 2018 – mere days after Mr. Collins finally agreed to document and repay his unapproved $735,000 loan from MSV.

30. Loyd Neal was MSV's attorney in that lawsuit. However, Mr. Collins was able to get other Members, though not Ms. Creighton, to go along with his plan to direct Mr. Neal not to take depositions or serve much discovery and to do as little as possible to prosecute MSV's multi-million dollar claims against HIS company, CSB.

31. As a result, with a trial date approaching and feeling unprepared for trial, Mr. Neal filed a Motion to Withdraw on March 4, 2019. At the time, Ms. Creighton was no

longer an MSV Manager and had no authority to respond. Incredibly, no one from MSV responded to Mr. Neal's request  and the Court granted the withdrawal.

32. Now, as a result of what clearly appears to be Mr. Collins's efforts, MSV has no counsel in that lawsuit and will be unable to prosecute its claims against CSB and unable to defend CSB's claims against it.

33. MSV and ASC were recently sued on a promissory note to Northwest Anesthesiology and Pain Services, P.A. Despite notice, no attorney appeared at the Temporary Injunction Hearing before Judge Bays to contest the emergency relief.

34. In recent days I was told that Mrs. Smart apparently committed extraordinarily wrongful, and possibly fraudulent, actions in her role as Manager of ASC. As I reviewed documents supporting these allegations, I concluded her actions could possibly expose ASC to civil and criminal charges. When I and one of ASC's senior medical professionals confronted her, Mrs. Smart confessed to "egregious and horrible errors in judgment."

35. ASC's investigation of the events is ongoing, but it appears Mrs. Smart may have engaged in this bad conduct dozens of times without other Managers or Owners ever knowing it.

36. I am informed and now believe that one or more ASC employees were aware of Mrs. Smart's actions but were intimidated by her erratic behavior and irrational conduct and were afraid to report her because they feared losing their jobs.

37. I believe Mrs. Smart's credibility as an ASC Manager and an executive of any sort has been destroyed and she cannot be allowed to serve as Manager of any of the Companies until the full extent of her admitted misconduct is determined and restorative actions have been taken.

38. Between late November and the date of this filing, I – through my attorney – have suggested, demanded, and encouraged all the parties to mediate. Prior November, attorney Neal made similar recommendations. The personal acrimony between the Owner/Members leaves a face-to-face meeting a recipe for disaster. I believe mediation with a strong mediator is the only way to forge an agreement to move forward and protect each Company's value.

39. Mr. Collins has declined every request, opportunity, and encouragement to mediate.

40. If this Court does not enjoin MSV, ASC, and 3083 – along with all persons acting on their behalf or in concert with them – precluding any Defendant from interfering with the sale of any of the Companies in a commercially reasonable transaction, and returning the parties to the last actual, peaceable, non-contested status that preceded the controversy as described below; (1) each Company will suffer irreparable harm, (2) the current proposed LOI will not result in a sale, and (3) the three Companies are likely to implode. This would be the direct and proximate

result of closing the ASC, excluding any of the Companies from the Building, or confirming that C-Cubed rightfully terminated MSV's Lease.

41. The damage to each Company is imminent because if the Companies are denied the right to operate in the normal course of business, are denied access to their space in the Building, or are forced into ever more deeply compromised financial conditions, the entirety of their value will be destroyed. One or more of the other Member/Owners have argued several times that ASC should be shut down, making a decision to close it a known and imminent threat. The ability to project the future revenues and profits from Companies now on the threshold of being profitable and CURRENTLY having material sale value, will be impossible to determine with reasonable certainty , creating irreparable injury.

42. The last peaceable non-contested status was before Cooper Collins began threatening to end MSV's access to the building, close ASC, and close 3083. It is before Ms. Creighton was removed as a Manager of MSV and 3083, before MSV was locked out of the building, and before MSV's Lease for the Building was terminated.

43. There is a real and present danger that unless these Companies are required to operate in the normal course of business and attempt to complete a sale of ASC's assets (and perhaps a sale of MSV's Leasehold interest in the Building), each Company will be irreparably damaged in ways that will be impossible to determine with any reasonable certainty. MSV has already been locked out and its Lease purportedly terminated, and its Lease is the single most important asset it has – without its leasehold rights, its value is negligible.

44. Because the actions complained about in this Petition have been ongoing, and have escalated in intensity and frequency over recent months, there is a substantial likelihood that people or entities subject to the injunctive relief sought here would take irreversible action and cause irreparable harm if they are given notice of this application for a TRO before it is granted. Therefore, Plaintiffs seek an ex parte TRO followed by a preliminary injunction and a trial for damages.

45. Each Exhibit to the Application is a true and correct copy of what it purports to be.

   ‣ Exhibit 1 is a true and correct copy of MSV's Company Agreement, as amended.

   ‣ Exhibit 2 is a true and correct copy of a JP Morgan monthly statement showing $735,000 transferred from MSV's LOC account.

   ‣ Exhibit 3 is a true and correct copy of an e-mail Mr. Cooper delivered to MSV's other Owner/Members confirming he directed JP Morgan bank to transfer $735,000 from MSV's account.

   ‣ Exhibit 4 is a true and correct copy of the Ground Lease between MSV and C-Cubed.

- ‣ Exhibit 5 is a true and correct copy of the May 7, 2018 Settlement Agreement under which Mr. Cooper agreed to amend the Ground Lease.

- ‣ Exhibit 6 is a true and correct copy of the March 2018 Owners' Agreement.

- ‣ Exhibit 7 is a true and correct copy of the Notice of Lease Termination C-Cubed send to MSV on March 8, 2019.

- ‣ Exhibit 12 is a true and correct copy of the then-active Building Purchase and Sale Contract between MSV and Astoria Property Company, LLC.

Marion Fawn Creighton

Before me, the undersigned Notary, appeared a person known to me to be Marion Fawn Creighton. After being sworn in, Ms. Creighton confirmed that she signed this Affidavit based on her personal knowledge for the purposes stated in it.

Tammy Breen, Texas Notary Public

Tammy S Breen
My Commission Expires
04/18/2022
ID No 676432

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the**
**Secretary of State of Texas**
Filing #: 802225598 06/01/2015
Document #: 609266470002
**Image Generated Electronically**
**for Web Filing**

---

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**VIP MedSurg Ventures LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Creighton    Brandon**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**11133 Interstate 45**
**Suite 320  Conroe  TX  77304**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐ A. The limited liability company is to be managed by managers.

**OR**

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members.
The names and addresses of the governing persons are set forth below:

| Managing Member 1: **Julie    McKay-Smart** | Title: **Managing Member** |
|---|---|
| Address: **29321 South Plum Creek Drive    Spring  TX, USA  77396** | |
| Managing Member 2: **Marion    Fawn  Creighton** | Title: **Managing Member** |
| Address: **2116 Cresent Mill Lane    Conroe  TX, USA  77304** | |

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

---

Exhibit 1A

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**JP Spiers**          **4265 San Felipe St, Suite 1100, Houston, TX 77027**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**JP Spiers MD JD**

Signature of Organizer

**FILING OFFICE COPY**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the**
**Secretary of State of Texas**
Filing #: 802394498 02/18/2016
Document #: 656680060002
Image Generated Electronically
for Web Filing

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**VIP Surg ASC, LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Brandon   Creighton**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**11333 Interstate 45   Conroe  TX  77304**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐ A. The limited liability company is to be managed by managers.

**OR**

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

| Managing Member 1: | **Julie   McKay Smart** | Title: | **Managing Member** |
|---|---|---|---|

Address: **29321 S. Plum Creek Drive   Spring  TX, USA  77386-77386**

| Managing Member 2: | **Marion   Fawn  Creighton** | Title: | **Managing Member** |
|---|---|---|---|

Address: **2116 Cresent Mill Lane   Conroe  TX, USA  77304**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

Exhibit 1B

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Julie McKay-Smart**        **29321 S. Plum Creek Drive; Spring, TX 77386**

## Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

## OR

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **February 19, 2016**

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Julie McKay-Smart**

Signature of Organizer

**FILING OFFICE COPY**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

Filed in the Office of the
Secretary of State of Texas
Filing #: 802684596 03/28/2017
Document #: 724769840002
Image Generated Electronically
for Web Filing

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**3083 Imaging, LLC**

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**InCorp Services, Inc.**

**OR**

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**815 Brazos St., Ste. 500   Austin  TX  78701**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.
The names and addresses of the governing persons are set forth below:

| Managing Member 1: | **Julie  E  Smart** | Title: | **Managing Member** |
|---|---|---|---|
| Address: | **2257 N. Loop 336 W   Suite 140368   Conroe  TX, USA  77304** | | |
| Managing Member 2: | **Brandon     Belinger** | Title: | **Managing Member** |
| Address: | **2257 N. Loop 336 W   Suite 140368   Conroe  TX, USA  77304** | | |
| Managing Member 3: | **Cooper     Collins** | Title: | **Managing Member** |
| Address: | **2257 N. Loop 336 W   Suite 140368   Conroe  TX, USA  77304** | | |
| Managing Member 4: | **Marion   Fawn  Creighton** | Title: | **Managing Member** |
| Address: | **2257 N. Loop 336 W   Suite 140368   Conroe  TX, USA  77304** | | |

### Article 4 - Purpose

Exhibit 1C

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Jaycie Howard**      **3773 Howard Hughes Parkway, Suite 500S, Las Vegas, NV 89169**

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

## OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Jaycie Howard**

Signature of Organizer

**FILING OFFICE COPY**

### JOE MICHELS' AFFIDAVIT
### IN SUPPORT AND EX PARTE TEMPORARY RESTRAINING ORDER
### AND TEMPORARY INJUNCTION

State of Texas      §

                   §

Montgomery County  §

My name is Joe Michels. I am a Texas attorney and have been licensed to practice law for over 25 years. I represent Fawn Creighton, individually and in her derivative capacity in the lawsuit this affidavit is filed in. I have personal knowledge of every fact stated in this affidavit based on my representation of Ms. Creighton and all of the facts are true.

- Exhibit 1 to Ms. Creighton's Affidavit contains true and correct copies of materials I downloaded from the Texas Secretary of State's website.

- Exhibit 8 the Original Petition and Request for Ex Parte Temporary Restraining Order and Temporary Injunction is a true and correct copy of Loyd Neal's Motion to Withdraw as Counsel in Cause No. 18-05-06529 in the 410th Judicial District Court of Montgomery County, Texas, *VIP MedSurg Ventures, LLC v. CSB Contractors, Inc.*

- Exhibit 9 the Original Petition and Request for Ex Parte Temporary Restraining Order and Temporary Injunction is a true and correct copy of the Order Granting Loyd Neal's Motion to Withdraw as Counsel in Cause No. 18-05-06529 in the 410th Judicial District Court of Montgomery County, Texas, *VIP MedSurg Ventures, LLC v. CSB Contractors, Inc.*

Joe Michels

Before me, the undersigned Notary, appeared a person known to me to be Joe Michels. After being sworn in, Mr. Michels confirmed that he signed this Affidavit based on his personal knowledge for the purposes stated in it.

Tammy S Breen
My Commission Expires
04/18/2022
ID No 676432

Tammy Breen, Texas Notary Public

# Exhibit 11

## BUILDING PURCHASE AND SALE CONTRACT

This Building Purchase and Sale Contract ("**Contract**") is entered into by and between VIP Medsurg Ventures, a Texas limited liability company ("**Seller**") and Astoria Property Company, LLC, a Delaware limited liability company ("**Purchaser**"), effective as of the date the last party executes and delivers this Contract ("**Effective Date**").

1.     <u>Purchase and Sale.</u> At Closing (as defined below), Seller agrees to sell and Purchaser agrees to buy, subject to the terms contained herein, all of the following (collectively, "**Property**"): (a) All improvements, structures and fixtures now constructed and completed with respect to and situated on an approximately 2.38-acre land located at 1246 North FM 3083, Conroe, Texas 77354, as further described on <u>Exhibit "A"</u>, including without limitation that approximately 19,500 square foot medical building located thereon, and all equipment and amenities owned by Seller (and not by its tenants), together with all of Seller's right, title and interest in all parking areas, loading dock facilities, landscaping and other improvements, structures and fixtures (all of the foregoing being hereinafter collectively referred to as the "**Improvements**"); (b) All leases, site plans, surveys, soil and substrata studies, architectural renderings, plans and specifications, engineering plans and studies, floor plans, landscape plans and other plans, diagrams or studies of any kind, if any, in Seller's possession which relate to the Land or the Improvements ("**Existing Documents**"); and (c) All other rights, privileges and appurtenances owned by Seller and in any way related to the Property.

2.     <u>Purchase Price.</u> Purchaser will pay Seller the sum of $7,500,000 in immediately available funds for the Property (the "**Purchase Price**"). Purchaser will pay the Purchase Price to Seller at Closing. Notwithstanding the foregoing, if the Lease with 3083 Imaging, LLC is terminated at or before Closing, then the Purchase Price shall be reduced by $500,000.

3.     <u>Earnest Money Deposit.</u> On or before the 5th business day after the Effective Date, Purchaser shall deposit $50,000 in earnest money ("**Earnest Money Deposit**") with Stewart Title Insurance Company ("**Title Company**"), with an address at 1220 Washington, Suite 102, Kansas City, MO 64105, Attn: Wayne Bennett, as escrow agent. Upon the expiration of the Inspection Period (as defined below), Purchaser shall deposit an additional $50,000 with the Title Company as additional Earnest Money Deposit. All Earnest Money Deposit shall be held by the Title Company and disposed of as provided in this Contract. If the purchase and sale of the Property is consummated in accordance with this Contract, then the Earnest Money Deposit shall be applied to the payment of the Purchase Price at Closing. If (a) Seller fails to perform its obligations under this Contract, (b) the conditions precedent to Closing under Paragraph 12 are not satisfied, or (c) Purchaser terminates this Contract under Paragraph 7, the Earnest Money Deposit shall be promptly returned to Purchaser. If Purchaser fails to fulfill its obligations under this Contract, Seller may retain the Earnest Money Deposit as liquidated damages as Seller's sole and exclusive remedy. PURCHASER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF SUCH A BREACH OF THIS CONTRACT BY PURCHASER WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT, TOGETHER WITH ALL INTEREST EARNED THEREON, IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS CONTRACT FAILS TO CLOSE, AND THAT SUCH ESTIMATE IS REASONABLE UNDER

1

Exhibit 12

THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS CONTRACT.

4.    Closing. The closing ("**Closing**") of the Property shall occur at the offices of the Title Company simultaneously with the closing under the Ancillary Agreements, or such other date as the parties may otherwise agree in writing. The Closing shall occur in escrow at the Title Company. Purchaser shall have the option to extend Closing for up to [_____seven (7)___] additional days upon delivery of written notice to Seller for the purpose of conducting a private offering of Purchaser's securities to eligible investors ("**Syndication**"). Purchasers Syndication must be completed by December 7, 2018. At Closing, Seller shall deliver to Purchaser the following:

4.1    A Bill of Sale, in the form reasonably acceptable to Purchaser ("**Bill of Sale**"), transferring title to the Property to Purchaser free and clear of any liens, charges, security interests, options, claims, mortgages, pledges, proxies, voting trusts or agreements, obligations, understandings or arrangements or other restrictions on title or transfer of any nature whatsoever ("**Encumbrances**").

4.2    Exclusive possession of the Property, subject only to tenant's rights under the leases to Next Level Urgent Care, LLC, 3083 Imaging, LLC, and VIP ASC, LLC (such tenants, "**Existing Tenants**", and such leases, "**Leases**").

4.3    Termination Agreement, pursuant to which the ground lease between Seller and C-Cubed Holdings, LLC is terminated.

4.4    An affidavit reflecting that Seller is not a foreign person selling property as described in the Foreign Investment in Real Property Tax Act and provide Seller's tax identification number.

4.5    Settlement Statement as mutually agreed with Purchaser.

4.6    Seller's Certificate stating that all representations and warranties in Section 9 of this Contract remain true and correct as of the Closing, executed by Seller's authorized agent.

4.7    Estoppel certificates and subordination, non-disturbance and attornment agreement, executed by each Existing Tenant, in forms reasonably acceptable to Purchaser.

Purchaser shall deliver to Seller the following:

4.8    The consideration required pursuant to Section 2 above by wire transfer in accordance with instructions from Seller.

4.9    Settlement Statement as mutually agreed with Seller.

5.    Conveyance. Seller shall convey the Property, including all related rights and benefits, to Purchaser, by the Bill of Sale.

6.      Intentionally Omitted.

7.      Inspection Period. Purchaser shall have a 30-day period from the Effective Date (such period, "**Inspection Period**") to physically inspect and/or to cause one or more engineers or other representatives to physically inspect the Property without interfering with Seller's operations, to determine the adequacy of the Property for Purchaser's intended use. Seller specifically consents to Purchaser obtaining a Phase I Environmental Site Assessment of the Property, and conducting such other or further tests and studies as the results of that Phase I or Purchaser's other inspections may suggest being prudent. Purchaser shall make such inspections in good faith and with due diligence, and Purchaser agrees to repair any damage to the Property caused by Purchaser's inspection. All expenses of any kind incurred by Purchaser relating to the inspection of the Property will be Purchaser's expense. Seller shall cooperate with Purchaser in all reasonable respects in making such inspections, but Seller shall not be obligated to incur any out-of-pocket expense in connection therewith. If Seller does incur out of pocket expense inconnection with the Inspection Period, Seller shall be entitled to reimbursement at closing. Purchaser shall deliver to the Seller the completed inspection reports within 5 days of completion. Within 5 days after the Effective Date, Seller shall deliver to Purchaser copies of the Existing Documents including the following:

i.      Current As-Built Survey for the Property;
ii.     Covenant, Conditions, and Restrictions applicable to the Property;
iii.    Plans and Specifications;
iv.     Leases;
v.      Ground Lease;
vi.     Environmental assessments and reports;
vii.    Any and all third-party evaluations in Seller's possession regarding the condition of the building on the Property and its contents including the mechanical, electrical, and plumbing systems;
viii.   Appraisals of the Property in Seller's possession;
ix.     Maintenance Records; and
x.      Service Contracts.

Seller hereby reserves the right to have a representative present at the time of making of any such inspection. Purchaser shall indemnify and defend Seller against and hold Seller harmless from any and all loss, cost, liability, or expense (including reasonable attorneys' fees) and repair any damage arising out of Purchaser's (or Purchaser's agents, employees, and contractors) activities on the Property during the Inspection Period. Notwithstanding any other provision hereof, this indemnity obligation shall survive the termination of this Contract. In the event this Contract is terminated, copies of all surveys and environmental, engineering, and other similar reports pertaining to the physical condition of the Property shall be delivered to Seller at no expense and within five (5) days of termination. In the event Purchaser determines in its sole discretion to do so, Purchaser may elect to terminate this Contract, for any or no reason, by delivering written notice thereof to Seller on or before the expiration of the Inspection Period, and thereafter the parties shall have no further rights or obligations hereunder except that each party shall be responsible for its respective costs and expenses as provided for herein, the exception being a $10,000.00 fee owed to Seller for

Due Diligence expense, if Purchaser terminates this Agreement for no reason in the Inspection Period, and the Earnest Money Deposit shall be returned to Purchaser.

      8.      <u>Possession; Risk of Loss</u>. Seller shall give Purchaser possession of the Property at Closing. Seller shall bear all risk of loss relating to the Property prior to the Closing.

      9.      <u>Representation, Warranties, and Covenants of Seller</u>. Seller represents and warrants to Purchaser as follows, as of the date of this Contract and as of Closing:

      9.1      Seller is a duly organized, validly existing limited liability company in good standing under the laws of the State of Texas and is authorized to do business in the State of Texas. This Contract has been duly authorized, executed and delivered by Seller, and is and at the time of the Closing will be a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

      9.2      Seller has received no written notice of any (and, to Seller's knowledge, there is no) current, proposed or threatened eminent domain or similar proceeding, or private purchase in lieu of such proceeding, which would affect the Property in any way whatsoever.

      9.3      Seller has not received any written notice of a claim that the Property does not comply with any federal, state, county, city or any other laws, ordinances, rules and regulations, including, but not limited to, those relating to environmental, zoning, land use and division, building, fire, health and safety matters, of any government or any agency, body or subdivision thereof bearing on the construction of the Improvements and on the operation, ownership or use of the Property, which noncompliance Seller has not cured.

      9.4      Except as set forth on <u>Schedule 9.4</u> attached hereto, Seller has received no written notice of any pending or threatened litigation which does or would affect the Property or Seller's ability to fulfill all of its obligations under this Contract. There are no outstanding claims on Seller's insurance policies which claims relate to the Property.

      9.5      Except as disclosed to Purchaser, there are no service contracts or other written agreements for services, supplies or materials affecting the use, operation or management of the Property.  Seller has delivered to Purchaser true, complete and correct copies of all service contracts.

      9.6      Seller has not received any written notice concerning any alleged violation of any applicable environmental law, rule or regulation which remains uncured.

      9.7      Purchaser has no obligation to continue to employ any persons presently employed by Seller at the Property.

      9.8      Seller is not a "foreign person" as defined in Internal Revenue Code Section 1445 and any related regulations. At the Closing, Purchaser will have no duty to collect withholding taxes for Seller pursuant to the Foreign Investors Real Property Tax Act of

1980, as amended.

9.9     To the knowledge of Seller, there are no unrecorded liens for improvements or work to the Property, or unpaid bills or claims for such improvements or work that could give rise to such liens.

9.10     Seller has delivered to Purchaser true and complete copies of all Leases.  To Seller's knowledge, no material default or breach exists on the part of any tenant under the Leases. Seller as landlord has fully completed all construction obligations and all tenant improvements specified in the Leases to be the responsibility of the landlord thereunder and has paid all tenant improvement costs, allowances and leasing commissions applicable thereto and no such costs are payable at any time hereafter.  Seller has not received any written notice of any default or breach on the part of the landlord under any of the Leases, nor, to Seller's knowledge, does there exist any default or breach on the part of the landlord thereunder.  No Lease grants any tenant any right to purchase all or any portion of the Property. There are no agreements which would require the payment of a leasing commission by the landlord upon any renewal or expansion of an existing Lease or new Lease executed or otherwise exercised after the Effective Date.  There are no pending contracts for the sale of all or any portion of the Property.

9.11     (a) Seller owns and has good and valid title to all Property, including, but not limited to, machinery, equipment, materials, and supplies constituting the Improvements, free and clear of all Encumbrances, and (b) all Improvements are in good working condition and repair, ordinary wear and tear excepted.

9.12     There are no audits, investigations, examinations, claims or other activities against the Property for Taxes pending, or to Seller's knowledge, threatened; and no notice of any audit, examination, or claim for taxes, whether pending or threatened, has been received. There are (and as of the Closing Date, there will be) no Encumbrances on the Property relating to or attributable to Taxes, excluding any Taxes that have accrued but are not yet due consistent with past practices. There is no basis for the assertion of any claim relating or attributable to Taxes which, if adversely determined, would result in any Encumbrance on the Property. As used herein, "**Taxes**" mean (i) any tax or similar governmental charge, impost, levy or other assessment (including without limitation income taxes, franchise taxes, transfer taxes or fees, sales taxes, use taxes, gross receipts taxes, value added taxes, employment taxes, excise taxes, ad valorem taxes, property taxes, withholding taxes, payroll taxes, minimum taxes or windfall profit taxes), (ii) any related penalties, fines, additions to tax or interest imposed by any Taxing authority in connection with any of the items in clause (i), and (iii) any transferee liability in respect of any items described in clause (i) or (ii).

Seller's representations and warranties herein shall survive the Closing for a period of 12months after the Closing Date. As used herein, "knowledge" means, with respect to Seller, that each of the Seller's managers and shareholders either is actually aware of the particular fact or matter or, by virtue of such person's position, reasonably would be expected to be aware of the particular fact or matter.

10. <u>Proration</u>. All rents, payments under service contracts assumed hereunder, utility charges, and any and all personal and property taxes and special assessments on the Property will be apportioned as of the Closing.

11. <u>Closing Cost</u>. Purchaser will pay:

(i) The Title Company's fee for acting as closing agent, if any; and

(ii) The preparation of loan documents, if applicable, due diligence and inspection costs, and other charges customarily paid by Purchaser.

Seller will pay:

(iii) The cost of recording all releases of existing mortgages and other financing instruments;

(iv) None of the Title Company's fee for acting as closing agent, if any; and

(v) $75,000.00 in real estate commission to Purchaser's Broker Bruaman Realty, Inc. as set forth in Section 13 and as evidenced by the Broker Agreement between Purchaser and Bruaman Realty, Inc.

12. <u>Conditions Precedent to Closing</u>. The obligation of Purchaser to close under this Contract is subject to the following conditions, unless waived by Purchaser:

12.1 Seller shall have performed and complied with all agreements and covenants required by this Contract prior to or on the Closing;

12.2 Seller shall deliver the closing deliverables under Section 4 above, including the Lease;

12.3 There shall not have been any material adverse change in the condition of the Property, or in any laws and restrictions, contractual relations, or the approvals, which would adversely affect the Property as it is currently operated;

12.4 Purchaser shall have received reasonable assurances to the satisfaction of Purchaser that the transactions contemplated under the following agreements will close simultaneously with the Closing under this Contract: (i) Asset Purchase Agreement, dated as of the even date of this Agreement, by and between Muve – Conroe, LLC, and VIP Surg ASC, LLC; and (ii) Real Estate Purchase and Sale Agreement, dated as of the even date of this Agreement, by and between Purchaser and C-Cubed Holdings, LLC (collectively, "**Ancillary Agreements**");

12.5 Purchaser shall have obtained financing upon terms reasonably acceptable to Purchaser;

12.6     The Syndication shall have closed; and

12.7     Existing Tenants shall have entered into new leases upon terms acceptable to Purchaser.

13.     <u>Commission</u>. Seller represents and warrants to Purchaser that it has engaged no person or entity who can properly claim a right to a real estate commission, real estate finder's fee, real estate acquisition fee or other real estate brokerage-type compensation based upon the acts of that party with respect to the transaction contemplated by this Contract ("**Real Estate Compensation**"). Purchaser represents and warrants to Seller that other than Bruaman Realty, Inc. ("**Purchaser's Broker**"), who is Purchaser's broker and whom the Seller will pay $75,000.00 in real estate commission, it has engaged no person or entity who can properly claim a right to a Real Estate Compensation. Each party hereby agrees to indemnify and defend the other against and to hold the other harmless from any and all loss, cost, liability, or expense (including, but not limited to, attorneys' fees and returned commissions) resulting from any claim for Real Estate Compensation by any other person or entity based upon such party's acts.

14.     <u>Miscellaneous</u>.

14.1     <u>Governing Law</u>. This Contract shall be governed by the laws of the State of Texas.

14.2     <u>Merger Clause</u>. This Contract, including all exhibits, when executed by both Purchaser and Seller, shall contain the entire understanding and agreement between Purchaser and Seller with respect to the matters referred to herein, and shall supersede all prior or contemporaneous agreements, representations and understandings with respect to such matters and no oral representation or statement shall be considered a part hereof.

14.3     <u>Notices</u>. Any notice or communication required or permitted hereunder shall be deemed to be delivered, whether actually received or not, on the second day next succeeding deposit in the United States mail, postage fully prepaid, registered or certified mail, properly addressed to the intended recipient at the addresses shown below:

If to Seller:          VIP Medsurg Ventures, LLC
                       _____
                       _____
                       Attention:

If to Purchaser:       Astoria Property Company, LLC
                       11221 Roe Ave.
                       Leawood, Kansas 66211
                       Attention: John Foudray

14.4     <u>Assignment, etc</u>. Purchaser's interest in this Contract shall be assignable by Purchaser without the prior written consent of the Seller, but upon notice to Seller. This

Contract shall be binding upon and inure to the benefit of the representatives, heirs, estates, successors and assigns of the parties hereto.

14.5    Force Majeure . Each party's failure to perform any term or condition of this Contract as a result of conditions beyond its control such as, but not limited to war, riots, terrorist acts, strikes, fires, floods, acts of God, materials shortages, transportation delays, labor disturbances, governmental restrictions, or any other causes beyond the reasonable control of the party, shall not be deemed a breach of this Contract.

14.6    Amendments. This Contract, together with all exhibits and the documents referred to herein contains all the terms and conditions agreed upon by the parties hereto with respect to the transaction contemplated hereby, and shall not be amended or modified except by written instrument signed by all the parties.

14.7    Time. Time is of the essence of every provision contained in this Contract. Whenever the time for performance or doing of act hereunder falls on a Saturday, Sunday or legal holiday, such time shall be deemed executed to the next successive business day.

14.8    Further Action. The parties to this Contract shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Contract.

14.9    Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Contract or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition. Any extension or waiver by any party of any provision hereto shall be valid only if set forth in an instrument in writing signed on behalf of such party.

14.10    Counterparts. This Contract may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

14.11    Indemnification.

(a)    Seller agrees to indemnify and hold Purchaser and Purchaser's officers, directors shareholders, members, Affiliates, employees and agents (the "**Purchaser Indemnitees**") harmless from any and all damages, losses, liabilities (joint or several), payments, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including without limitation, fees, disbursements and expenses of attorneys, accountants and other professional advisors and of expert witnesses and costs of investigation and preparation) of any kind or nature whatsoever (collectively, "**Damages**"), directly or indirectly resulting from, relating to or arising out of any breach of or inaccuracy in any representations or warranties of Seller under this Contract. Notwithstanding the foregoing, Purchaser Indemnitees will not be entitled to indemnification pursuant to this Section unless and until the aggregate Damages

8

exceed $10,000 (the "**Basket**"), and, in such event, indemnification pursuant to this Section shall be made for the aggregate amount of such Damages from the "first dollar" (that is, without regard to the Basket), and Seller will not have any obligation to indemnify under this Section after eighteen (18) months following the Closing Date; provided, however, that in no event shall the aggregate liability of Seller for Damages related to or arising out of this Section exceed the Purchase Price (the "**Cap**"). Further notwithstanding the foregoing, any indemnification claim for Damages by Purchaser Indemnitees relating to any breach or inaccuracy of any representations or warranties set forth in Sections 9.1, 9.6, 9.8, 9.11(a), and 9.12 or common law fraud, willful misconduct or criminal activity, shall not be subject to the Basket, the Cap, or other limitations set forth in this Section.

(b) If a party has a claim for indemnification pursuant to this Article ("**Indemnitee**"), and if such Indemnitee intends to seek indemnity with respect thereto under this Article, the Indemnitee shall promptly after the assertion of any claim by a third party or the discovery of any fact upon which Indemnitee intends to base a claim for indemnification under this Contract ("**Claim**"), notify the party or parties from whom indemnification is sought ("**Indemnitor**") of such Claim. In the event of any Claim, Indemnitor, at its option, may assume (with legal counsel reasonably acceptable to the Indemnitee) the defense of any claim, demand, lawsuit or other proceeding in connection with the Indemnitee's Claim, and may assert any defense of Indemnitee or Indemnitor; provided that Indemnitee shall have the right at its own expense to participate jointly with Indemnitor in the defense of any claim, demand, lawsuit or other proceeding in connection with the Indemnitee's Claim and provided further that failure to give such notice shall not preclude Indemnitee making any Claim thereon if the failure or delay in giving such notice did not prejudice Indemnitee. In the event that Indemnitor elects to undertake the defense of any Claim hereunder, Indemnitee shall cooperate with Indemnitor to the fullest extent possible in regard to all matters relating to the Claim (including, without limitation, corrective actions required by applicable law, assertion of defenses and the determination, mitigation, negotiation and settlement of all amounts, costs, actions, penalties, damages and the like related thereto) so as to permit Indemnitor's management of same with regard to the amount of Damages payable by the Indemnitor hereunder. Neither Purchaser nor Seller shall be entitled to settle any Claim without the prior written consent of the other, which consent shall not unreasonably be withheld.

(c) In the event that the Indemnitor shall undertake, conduct or control the defense or settlement of any Claim and it is later determined that such Claim was not a Claim for which the Indemnitor is required to indemnify the Indemnitee under this Article, the Indemnitee shall reimburse the Indemnitor for all its costs and expenses with respect to such settlement or defense, including reasonable attorneys' fees and disbursements.

(d) The foregoing indemnification is given solely for the purpose of protecting the parties to this Contract and Purchaser Indemnitees and shall not be deemed extended to, or interpreted in a manner to confer any benefit, right or cause of action upon, any other person

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day first written above.

**VIP MEDSURG VENTURES, LLC**


By:_____
Name:
Title:
Signature Date: _____, 2018


**ASTORIA PROPERTY COMPANY, LLC**


By:_____
Name:
Title:
Signature Date: _____, 2018

10

**<u>Exhibit "A"</u>**

**Land Description**